16-CV-5144

JS 44   (Rev. 07/16)

# CIVIL COVER SHEET

16·CV·5144

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
SODEXOMAGIC, LLC

**DEFENDANTS**
DREXEL UNIVERSITY

16   5144

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
John McCreary, Esq. (PA 43704)
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center, 6th Floor
Pittsburgh, Pennsylvania 15222
Tel: (412)394-5400

Attorneys *(If Known)*
Stephen A. Cozen, Esq.
Cozen O'Connor
One Liberty Place
650 Market Street, Suite 2800
Tel: (215)-665-2020

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
      Plaintiff
- ☐ 3  Federal Question
      *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
      Defendant
- ☒ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Fraudulent Inducement / Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)

SEP 27 2016

| **IF ANY** | *(See instructions):* | JUDGE | | DOCKET NUMBER |
|---|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| September 26, 2016 | |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

JS 44 Reverse  (Rev. 07/16)

### INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: SodexoMAGIC, LLC, 9801 Washingtonian Blvd., Gaithersburg, MD 20878

Address of Defendant: Drexel University, 3141 Chestnut Street, Philadelphia, PA 19104

Place of Accident, Incident or Transaction: Drexel University, 3141 Chestnut Street, Philadelphia, PA 19104
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☑   No☐

Does this case involve multidistrict litigation possibilities?    Yes☐   No☑
*RELATED CASE, IF ANY:*
Case Number: _____    Judge _____    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
    Yes☐   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
    Yes☐   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
    Yes☐   No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
    Yes☐   No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*
I, John McCreary _____, counsel of record do hereby certify:
☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: 9/26/2016 _____    PA 43704
    Attorney-at-Law    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 9/26/2016 _____    43704
    Attorney-at-Law    Attorney I.D.#

CIV. 609 (5/2012)



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Sodexomagic, LLC                                           CIVIL ACTION

          v.                          **16    5144**

Drexel University                                          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                        (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                 (  )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                    (  )

(f) Standard Management – Cases that do not fall into any one of the other tracks.            (X)

| September 27, 2016 | John A. McCreary, Jr. | Sodexomagic, LLC |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (412) 394-6695 | (412) 586-1068 | jmccreary@babstcalland.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP 27 2016

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)     The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)     In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)     The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)     Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)     Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
#### (See §1.02 (e) Management Track Definitions of the
#### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.



**Babst│Calland**
Attorneys at Law

John A. McCreary, Jr.
Attorney at Law
T 412.394.6695
jmccreary@babstcalland.com

September 26, 2016                16      5144

Via Federal Express

Clerk of Court
U.S. District Court for the Eastern
District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797

Re:   Sodexomagic, LLC v. Drexel University

Dear Clerk:

Enclosed for filing please find an original Complaint, along with a Civil Coversheet, Designation Form and two Disclosure Statements, as well as a CD containing copies of all documents and a check for the filing fee in the amount of $400.

Very truly yours,

John A. McCreary, Jr.

JAM/tmp

Enclosures



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SODEXOMAGIC, LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| DREXEL UNIVERSITY, | ) |
| Defendant. | ) |

**16    5144**

CIVIL ACTION NO.

JURY TRIAL DEMANDED

## COMPLAINT

Drexel University ("Drexel") fraudulently induced its long-time food service partner, SodexoMAGIC, LLC ("SodexoMAGIC"), into providing an up-front $9.3 million investment as part of a ten-year contract based on knowingly false representations about Drexel's plans for future student enrollment, and further refused to honor the contract's requirement to engage in good faith negotiations to find a mutually agreeable solution to remedy the enrollment inaccuracy once discovered, causing SodexoMAGIC to lose millions of dollars and warranting imposition of punitive damages upon Drexel for its outrageous conduct.

## INTRODUCTION

1.      SodexoMAGIC and its affiliates have been the food service contractor at Drexel for more than twenty years. On or around June 9, 2014, Drexel issued a Request for Proposals ("RFP") for a campus dining strategic partnership and SodexoMAGIC was ultimately selected as the winner in August 2014. The parties then entered into negotiations for another long-term contract that called for SodexoMAGIC to invest more than $24 million in state-of-the-art

1

renovations to Drexel's facilities, commissions to Drexel of over $35.5 million, and over $2.2 million in additional "community" funding (i.e. donations to Drexel-chosen community organizations and funds). The contract was signed on May 21, 2015 (the "Agreement") with SodexoMAGIC providing its first substantial investment of $9.3 million shortly thereafter.

2.      One of the fundamental elements of the business deal, which is explicitly reflected in Drexel's RFP and in SodexoMAGIC's bid and proposal and in the negotiated terms of the Agreement, is student enrollment. The RFP indisputably represents that Drexel's student enrollment will grow at a robust rate, specifically requiring bidders to take this assumed growth into account in their proposals. Throughout subsequent contract negotiations following the award to SodexoMAGIC, Drexel repeatedly validated that assumption, expressed its desire to structure a deal around that assumption, and agreed to memorialize that assumption and Drexel's representations surrounding it into the Agreement. Only after the Agreement was signed and the $9.3 million initial investment was secure did Drexel disclose to its partner of over twenty years that student enrollment for the upcoming year was going to decline, not increase – in accordance with a detailed plan specifically approved by Drexel's President months before execution of the Agreement. Drexel's calculated omission of this known defect in the critical financial assumption of the entire Agreement locked SodexoMAGIC into losing millions of dollars beginning in the very first year – and millions more in the years to follow.

3.      Having become aware of the decrease in enrollment after signing the Agreement, SodexoMAGIC immediately sought an explanation and a way to remedy the situation. By the fall of 2015, SodexoMAGIC began providing various proposals to remedy the financial impact due to the enrollment shortfall, such that SodexoMAGIC would not continue to lose millions of dollars. (The Agreement requires the parties to negotiate new terms in good faith when there is a

2

change in the fundamental economics.) The talks dragged on for months, as Drexel showed no willingness to provide SodexoMAGIC with any financial relief, even to break even, let alone make a modest profit for its services. This, despite the fact that it had now become clear Drexel had purposefully hidden its plan to decrease enrollment during contract negotiations in order to induce SodexoMAGIC into funding a $9.3 million lease payment that Drexel desperately needed to secure space for a new dining facility Sodexo was to manage. Nevertheless, SodexoMAGIC continued to negotiate in good faith with Drexel, as required by the Agreement.

4.     After almost a year of fruitless discussions, when it became clear that Drexel was not negotiating in good faith, SodexoMAGIC issued a Notice of Default on July 25, 2016. Per Section 3.1(B) of the Agreement, Drexel had 10 days to "cure" the non-payment default, or SodexoMAGIC could terminate the contract and end services immediately. Continuing its attempts to negotiate in good faith, SodexoMAGIC agreed to extend the "cure" period until September 30, 2016. Unfortunately, SodexoMAGIC's hope that its long-time partner, now advised by highly reputable outside counsel, would honor its contractual commitment to negotiate in good faith and not insist on holding its partner to money-losing terms, was misplaced. Instead, Drexel abruptly ended negotiations, refused a requested in-person meeting to work through the issues, and showed SodexoMAGIC the door by giving a (ineffective) 60-day Notice of Termination for convenience on September 19, 2016 (albeit, self-servingly stating that the notice is extended until December 10, 2016, such that Drexel's students would not be left without food service before the end of the fall term). Despite Drexel's continued abuse, and SodexoMAGIC's contractual right to walk away from Drexel and stop services immediately, SodexoMAGIC is committed to continuing to provide first-class food service at Drexel until the end of the current term.

3

**PARTIES**

5.      SodexoMAGIC is a Delaware limited liability company. The members of
SodexoMAGIC are Sodexo, Inc., a Delaware corporation based in Gaithersburg, Maryland, and
Magic Johnson Enterprises, a California corporation based in Beverly Hills, California. Magic
Johnson Enterprises owns a 51% interest in SodexoMAGIC, and Sodexo, Inc. owns a 49%
interest. No member of SodexoMAGIC is a citizen of Pennsylvania.

6.      Drexel is a Pennsylvania non-profit educational institution with a registered office
and campus at 3141 Chestnut Street in Philadelphia, Pennsylvania. Drexel promotes itself as one
of America's 15 largest private universities, one of Philadelphia's top 10 private employers, and
one of the top 100 ranked universities in the country.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action under 28 USC § 1332,
because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest
and costs, and is between citizens of different states.

8.      This Court has personal jurisdiction over Drexel because Drexel consented to
jurisdiction in Section 10.5 of the Agreement.

9.      This Court has personal jurisdiction over Drexel because Drexel is a citizen of
Pennsylvania.

10.     Venue is proper in this District because Section 10.15 of the Agreement is a
mandatory forum selection clause in which the parties "submit[ted] to the exclusive jurisdiction
of the courts located in the Eastern District of Pennsylvania for litigation of any disputes arising
under this Agreement." The Agreement also states that it is governed by Pennsylvania law. (Ex.
A § 10.15). As set forth herein, this litigation arises out of and relates to the Agreement.

4

11.     Venue is also proper in this District, pursuant to 28 U.S.C. § 1391, because Drexel is subject to personal jurisdiction in this State. In addition, courts in Pennsylvania have a substantial interest in providing a forum for the enforcement of contracts entered into in Pennsylvania and governed by Pennsylvania law.

## FACTS

## I.  DREXEL HIDES THE TRUTH ABOUT ITS ENROLLMENT TO INDUCE MASSIVE UP FRONT INVESTMENT FROM SODEXOMAGIC

### a.  Drexel Told SodexoMAGIC It Needed More Space

12.     SodexoMAGIC and its affiliates have been providing food services to Drexel for more than twenty years. Before entering into the Agreement with SodexoMAGIC, Drexel more recently received food services under a Management Agreement with Sodexho Management, Inc. dated as of March 10, 2004, with an initial term of ten years, beginning July 1, 2003 and continuing until June 30, 2013. That contract was amended from time to time.

13.     In 2014, Drexel desperately and quickly needed millions of dollars in cash to revitalize its failing infrastructure for food service facilities, and made a large up-front investment a condition of its RFP and ultimately the new food service contract.

14.     Drexel knew, however, that a vendor would be unwilling to make such a sizeable investment in the future, and could not do so at a profit, unless it believed that Drexel was poised to continue the steady growth that Drexel had seen and promoted for years.

15.     Accordingly, when its food services were opened to bidding for a new contract, Drexel instructed vendors to form business plans and budgets for their proposals on the assumption that Drexel's student population not only was stable, but also would increase consistently over the next ten years.

16.     Drexel's RFP dated July 2, 2014, specifically instructed vendors to assume continued robust growth in Drexel's student population and to tailor their bids accordingly, stating "The University's Strategic Plan calls for an enrollment increase from our current number of 26,132 to 30,470 students by 2017 and to 34,000 students by 2021. Proposed programs, facilities and infrastructure of services should be aligned to this plan." The RFP also provided for discounted meal pricing commensurate with the assumed increased volume of students.

17.     At the time of the RFP, Drexel enjoyed a position of trust as a longtime client of SodexoMAGIC and its affiliates. In addition, during the previous six year period, Drexel had strived for and experienced significant growth in its student population. Accordingly, SodexoMAGIC submitted a proposal with pricing conforming to the assumptions mandated by the RFP, which appeared to be firmly based in reality given Drexel's known and promoted enrollment history, and was awarded the new contract.

18.     Following the award to SodexoMAGIC, several discussions occurred between James Tucker, Senior Vice President for Student Life and Administrative Services at Drexel, and Rita LaRue, Vice President of Drexel Business Services, among others, on the Drexel side; and Nancy Arnett, Vice President, Thomas Post, Division President (Campus Services), and Leonard J. Riccio, Division President (Universities), among others, on the SodexoMAGIC side; in which the parties negotiated changes to drafts of what ultimately became the Agreement.

19.     LaRue represented herself as the "mouthpiece" of Drexel, with authority to fully negotiate on behalf of and bind Drexel.

20.     During those negotiations, LaRue repeatedly said that existing dining facilities were cramped and in disrepair, and an additional facility was needed immediately to serve Drexel's rapidly expanding student population. Because adding another dining facility required

6

substantial additional overhead expenses, and because Drexel was demanding that a multi-million dollar investment be made up-front, SodexoMAGIC sought and received assurances from LaRue that the number of students enrolled at Drexel would in fact grow.

21.     LaRue repeatedly represented to SodexoMAGIC that Drexel would continue to achieve substantial growth in student enrollment. Among other things, LaRue said that Drexel would place a greater emphasis on sophomore retention, and that there would be growth across the board in all classes and at all campuses. LaRue never suggested the freshman class would do anything but grow, and grow consistently. The size of the freshman class was particularly important because first year students at Drexel are required to live on campus and purchase a student meal plan.

22.     Early parts of the negotiations and drafts of the Agreement focused on Drexel achieving the student enrollment figures set forth in the RFP. LaRue quickly began balking at including such specific language; not because she honestly disclosed that Drexel's student population would not grow, but rather because she misled SodexoMAGIC with a feigned concern that the precise enrollment numbers would likely fluctuate. LaRue repeatedly justified her hesitation as a desire to avoid Drexel "getting nickel and dimed over five students."

23.     Understanding LaRue's concern, Arnett specifically asked if Drexel would be willing to commit to a percentage threshold of growth, and LaRue agreed. After consulting internally as to the growth assumptions necessary for SodexoMAGIC to operate profitably, Arnett suggested using a two percent annual growth rate in the Agreement, which was conservatively less than the growth rate represented by Drexel in the RFP, and LaRue, on behalf of Drexel, again agreed.

7

24.     Throughout this process, Arnett and LaRue regularly reviewed pro forma financials together, and LaRue, who professed a background in finance, acknowledged that two percent growth would be necessary for SodexoMAGIC's business plan to work.

### b. Drexel Promises Student Growth Throughout Its Long-Term Relationship

25.     On or around May 21, 2015, SodexoMAGIC and Drexel finally executed the new Agreement on terms that, unknown to SodexoMAGIC, overwhelmingly favored Drexel. Relying on Drexel's assurances, SodexoMAGIC organized its financial planning and budgets around Drexel's growth projections, and agreed to a cost structure based on these substantial enrollment increases. Even more important, SodexoMAGIC agreed to Drexel's demand for an up-front payment of more than $9 million to invest in Drexel's dining facilities.

26.     The term of the Agreement is ten years, ten months, and five days, retroactively commencing August 25, 2014 and continuing until June 30, 2025.

27.     Section 9.1 of the Agreement provides:

9.1 Changes in Policies and Practices. **The financial terms set forth in this Agreement and other obligations assumed by SodexoMAGIC hereunder are based on conditions in existence on the date SodexoMAGIC commences operations, including by way of example, Client's student population**; labor, food, and supply costs; and federal, state and local sales, use and excise tax. **In addition, each party has relied on representations regarding** existing and **future conditions and projections made by the** other **in connection with the negotiation and execution of this Agreement. In the event of** a change in the conditions or **the inaccuracy** or breach **of**, or the failure to fulfill, **any such representation by a party, the financial terms and other obligations assumed by the other party shall be renegotiated on a mutually agreeable basis to reflect such** change, **inaccuracy** or breach. SodexoMAGIC shall submit any requested changes and the cause for such changes to Client, in writing, prior to any negotiations.

(emphasis added).

28.     Section 9.2 of the Agreement provides:

9.2 <u>Financial Assumptions</u>. In the interest of a strong and lasting partnership, Client agrees to review the following items with SodexoMAGIC at the annual meeting in July of each year and discuss any applicable revisions to the Agreement that are mutually agreeable based on any deviations, provided that the relevant data and supporting documentation is submitted to Client thirty (30) days in advance of the meeting. **Client recognizes that SodexoMAGIC made certain assumptions in preparing the financial package offered in this Agreement and understands that changes to the financial assumptions below may have an adverse economic impact on SodexoMAGIC; in such cases, Client shall work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact**. SodexoMAGIC acknowledges its responsibility to respond quickly and expertly to factors under their control that may affect these outcomes.

. . . .

**Parties agree that the University's growth is a critical factor in calculating the Investments afforded under this Agreement and it has been projected by SodexoMAGIC that this growth will realize an increase of 2% per year in the freshman class year over year**. Additionally, Client expects that SodexoMAGIC will be similarly motivated in increasing voluntary meal plans among eligible students in accordance with Exhibit M.

. . . .

Minimum Catering Net Sales of Three Million Four Hundred Thousand Dollars ($3,400,000) in full Contract Year 1 (July 1, 2015 through June 30, 2016) with projected growth of three percent (3%) annually thereafter.

(emphasis added).

29.     The Agreement does not contain an integration clause prohibiting consideration of all representations outside its four corners to interpret the Agreement.[1] Nor does the Agreement contain an anti-reliance provision stating that neither party is relying on such representations. To the contrary, the Agreement affirmatively states in Section 9.1 that "each party **has relied on representations** regarding existing and future conditions and projections made by the other in connection with the negotiation and execution of this Agreement." (emphasis added)

---

[1] Section 10.11 of the Agreement concerns how the Agreement may be amended, and simply acknowledges that the Agreement replaces the earlier management agreements under which SodexoMAGIC's affiliates had been providing food services. Section 10.11 cannot be read as a true integration clause, otherwise it would directly conflict with Section 9.1's express statement that the parties are relying on representations made outside the four corners of the Agreement.

9

30.     Section 9.1 of the Agreement states that both Drexel's student population and Drexel's projections of growth in its student population are material conditions of the contract, and that SodexoMAGIC has relied on Drexel's representations concerning those conditions in entering into the Agreement.

31.     Section 9.1 provides that in the event one of those conditions changes or is inaccurate, or Drexel fails to meet its projections, the financial terms and other obligations assumed by SodexoMAGIC "**shall**" be renegotiated on a "**mutually agreeable basis**."

32.     Section 9.2 of the Agreement goes on to state that two percent annual growth in Drexel's student population is a "critical factor" in the financial package offered by SodexoMAGIC and that if that material assumption changes, Drexel "shall work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact."

33.     Per the RFP, SodexoMAGIC staffed the Drexel campus dining locations with employees belonging to Teamsters 115 Union, pursuant to a collective bargaining agreement that required SodexoMAGIC to assume a pension liability obligation upon termination of the contract, which would not have incurred this early in the contract but for Drexel's breach.

## II.     DREXEL STALLS FOR TIME AS THE TRUTH COMES TO LIGHT

34.     Unknown to SodexoMAGIC, before execution of the Agreement, Drexel had embarked on a radical restructuring of its business strategy that dramatically changed virtually all aspects of Drexel's operations, including its marketing, admissions decisions, staffing, and student retention. The restructuring's effect on Drexel's student enrollment figures was particularly profound, and would be felt almost immediately upon implementation. Knowing the chilling effect the restructuring would have on the RFP and contract negotiation process for food

services, Drexel stalled for time, remained noncommittal about its actual student numbers, and feigned ignorance of the problems that would be created by Drexel's fraud – all to induce SodexoMAGIC to complete its multi-million dollar initial investment. As a longtime client, Drexel enjoyed a position of trust with SodexoMAGIC and received the benefit of the doubt, which it duplicitously exploited to SodexoMAGIC's detriment.

35.     Barely two weeks after execution of the Agreement, it was revealed that Drexel's actual student population was going to be dramatically different than what Drexel had represented. On or around June 8, 2015, Drexel President John A. Fry wrote a "Dear Colleague" letter in which he disclosed that Drexel's freshman class would be smaller than in previous years. He added, "Given Drexel's dependence on tuition, a smaller freshman class means that we will operate next year with less revenue than we have historically experienced."

36.     On June 9, 2015 (the next day), William Cunningham, Resident District Manager for SodexoMAGIC, asked LaRue for an update on the size of the next year's freshman class, noting that SodexoMAGIC was in the process of developing its budget based on that information. On or about June 15, 2015, LaRue responded, stating that the freshman class size would "potentially" be 2,600 to 2,700 but was "challenging to predict." She added that "in theory, this class is a better fit than previous classes, so the rate of melt should be slower than before." On or about June 16, 2015, LaRue met with Cunningham and was equally noncommittal as to the size of Drexel's incoming freshman class and its potential impact to SodexoMAGIC's finances.

37.     On or about July 9, 2015, as required by the Agreement just executed, SodexoMAGIC delivered its first substantial investment check for $9.3 million to Drexel. These funds ostensibly were to fund the capital development of the "Urban Eatery," a new dining

11

facility. On information and belief, the money may instead have been used to pre-pay rent on the facility. Regardless, Drexel cashed the check without a single word concerning the now-revealed enrollment restructuring that its supposed long-time partner had begun asking about with concern.

## III.    DREXEL ALWAYS KNEW IT WAS LYING TO SODEXOMAGIC

38.    In its RFP, Drexel unequivocally stated, "The University's Strategic Plan calls for an enrollment increase from our current number of 26,132 to 30,470 students by 2017 and to 34,000 students by 2021. Proposed programs, facilities and infrastructure of services should be aligned to this plan."

39.    Using the expected growth rate figures in the RFP as a back-drop, Drexel coyly negotiated a "conservative" annual growth rate projection of two percent with SodexoMAGIC, as reflected in the Agreement.

40.    The "conservative" figure of two percent, which the Agreement specifically required was to be re-worked if proven inaccurate, was a perfectly reasonable compromise in light of the projections provided by Drexel in its RFP, i.e., after a two percent increase in the *entire student population* every year from 2014 to 2017, beginning with a population of 26,132, the number of students would have been 27,732, not 30,470.

41.    Drexel and its representatives, including LaRue, knew when making these statements and promises to SodexoMAGIC and its representatives, including Arnett, that the statements were false and that SodexoMAGIC would rely on these statements.

### a.    Drexel's Recent Past As A "Safety School"

42.    Beginning at least as early as the 2005-2006 academic year, Drexel had pursued a high-volume admissions strategy, recruiting and enrolling as many applicants as possible. Drexel

used a direct marketing approach, in which it sent pre-populated emails to a large number of prospective students who could apply to Drexel with one click, and without any application fee. Applications increased from 12,000 to approximately 55,000 over nine years, more than a 300% increase.

43.     At the same time, an 80% acceptance rate became necessary, because the yield of admitted applicants accepting offers fell from 32% to 8%. Between 2008 and 2013, Drexel more than doubled the number of applications it received. However, for every 35 additional applications, only one new student enrolled, and a majority of new students failed to graduate during four years. As of 2013, only nine percent of applicants admitted to Drexel wound up enrolling.

44.     Drexel had effectively become what high school students refer to as a "safety school," i.e., a university to which students apply to hedge their bets in the event that other, more preferred schools reject their applications.

### b.  Drexel's Attempt To Reinvent Itself

45.     At some time during the 2013-2014 academic year, Drexel's senior management received a report from Huron Consulting Group ("Huron"), which Drexel had retained in 2012 to advise the university on its admissions strategy.  Huron's report apparently recommended that Drexel shift to a focus on attracting applications from potential students who were more likely to accept admissions offers from Drexel.

46.     Drexel began a "Student Lifecycle Management" or "SLM" initiative designed to build relationships with students years before they enrolled at Drexel. Drexel apparently anticipated the initiative would require three to five years to implement.

13

47.     On or around April 9, 2014, Drexel announced that it had hired Randall C. Deike as Senior Vice President of its new Division of Enrollment Management and Student Success, and that he would begin in this position on September 1, 2014.

48.     Drexel implemented changes to its admissions policies, which included ending one-click applications and eliminating completely Drexel's rolling admissions process. Drexel also began requiring an application fee and the submission of an essay.

### c.  Drexel's Student Population Crash

49.     Drexel's changes had the effect of reducing the number of applications dramatically, which dropped from 55,000 to about 29,000 in the first year. They also moderately improved Drexel's yield, which increased to 13.7%.

50.     Not surprisingly, with the reduced number of offers, the total number of accepted offers dropped from 3,100 as of May 2014, to 2,929 as of May 2015.

51.     With the smaller class, Drexel eliminated approximately thirty-six administrative positions as part of a cost-cutting initiative to save $18 million.

52.     On or around September 3, 2015, President Fry posted a letter on the Drexel website in which he remarked that "[a]s a result of pursuing fewer applications while increasing our standards, we expected (and budgeted for) a reduced number of new undergraduates – 2,600 freshmen and 850 transfer students." Drexel wound up receiving more freshmen than it had planned for, but still far fewer than the previous year's class of more than 3,000.

53.     Then, in 2016, Drexel's freshman class shrank dramatically. As of June 2016, 2,518 freshmen had committed to attending in the fall, down by 400 students or nearly 14 percent from the 2,918 students who had committed by the same time in 2015. At the same time, the average SAT score of admitted students fell by six to seven points.

14

### d. **Drexel's Contemporaneous Knowledge Of Its Lies**

54. Although Deike did not formally begin his position until September 1, 2014, the broad strokes of the plans he implemented must already have been known to Drexel in April 2014, when Drexel announced his hiring. At a minimum, Drexel's senior management had by that time received the Huron report that recommended a shift in Drexel's recruiting strategy.

55. Yet, in June 2014, Drexel instructed SodexoMAGIC to expect massive growth in building a response to the RFP. Further, in May 2015, as part of the contract negotiations and terms of the Agreement, Drexel continued to represent to SodexoMAGIC that its student population was not only stable, but that the freshman class would increase by at least two percent annually.

56. Drexel entered into the Agreement with SodexoMAGIC on or around May 21, 2015, when Drexel already knew that its number of accepted applications had dropped approximately 5.5% compared to the previous year. Drexel itself was budgeting internally for a freshman class size of only 2,600. Rather than disclosing the truth to its long-time partner, Drexel maintained the ruse, hid the facts, and entered into the Agreement to secure its $9 million up-front payment, knowing that SodexoMAGIC's financial models would never materialize.

57. Specifically, Sections 9.1 and 9.2 of the Agreement state, among other things:

- Drexel anticipates a yearly growth rate in its freshman class of at least two percent;

- Drexel's student population is a material fact upon which SodexoMAGIC is relying in entering into the Agreement; and

- In the event that conditions (including Drexel's student population) are found to be inaccurate, the parties to the Agreement will renegotiate its financial terms to correct the inaccuracy.

## IV.   DREXEL'S MATERIAL BREACH OF THE AGREEMENT

58.     Beginning with the 2015-2016 school year, which was the second academic year of the contract term (as the Agreement was dated retroactively to August 25, 2014), freshman enrollment at Drexel not only failed to grow at the anticipated growth rate, but shrank.

59.     In response, SodexoMAGIC attempted to hold Drexel to the Agreement, which required the parties to renegotiate the Agreement's financial terms on a mutually agreeable basis, and to reach mutually agreeable solutions to counter the impact to SodexoMAGIC resulting from the dramatic drop in the student population.

60.     Beginning in fall 2015, the parties met regularly to discuss the adverse economic impact on SodexoMAGIC caused by shortfalls in mandatory boarders and related issues.

61.     These meetings remained unsuccessful through May and June 2016, when SodexoMAGIC again presented solutions directly to LaRue for necessary and appropriate changes to the economic terms of the Agreement to allow SodexoMAGIC to achieve a reasonable return.

62.     Although the process had taken months, SodexoMAGIC believed that a resolution had been achieved, as LaRue indicated the deal was acceptable.

63.     Accordingly, on June 28, 2016, Riccio memorialized this understanding in a proposed letter agreement to LaRue. Among other things, the proposed letter agreement increased the board rates, relieved SodexoMAGIC from certain "community" fund payments, and called for Drexel to pay for the shortfalls in mandatory boarders and contractual catering that were dramatically inconsistent with projections in the July 2014 RFP – roughly $3 million.

64.     Despite LaRue's representations to Riccio, there was in fact no agreement.

16

65.     On July 19, 2016, LaRue responded, accepting some of the proposed amendments and providing counterproposals as to others. Most significantly, Drexel took the position that it had no obligation to make any payment to SodexoMAGIC for what it termed "pro forma shortfalls."

66.     Now seeing that Drexel was unwilling to negotiate in good faith by honoring its negotiated commitments, on July 25, 2016, SodexoMAGIC provided a Notice of Default pursuant to Section 3.1(B), citing the inconsistencies with the various negotiations and the Drexel's material breach of the Agreement for non-payment.

67.     Section 3.1(B) specifically allows termination for Cause after a ten-day cure period.

68.     Although Section 3.1(B) provides for a ten-day cure period, it also permits an extension of the cure period by the party providing notice in order to facilitate negotiations.

69.     On July 25, 2016, SodexoMAGIC provided a tolling of the cure period in a subsequent communication, with the cure period restarting "only if the talks reach an impasse."

70.     During July and August 2016, the parties continued to negotiate, coming closer together on certain issues, but making no headway on the critical issue of whether Drexel was required to make SodexoMAGIC whole for substantial shortfalls caused by reductions in mandatory boarders and contract catering.

71.     In the midst of negotiations, however, Drexel revealed its engagement of outside counsel, who penned a letter dated August 23, 2016, in which Drexel took the position that it was not in breach, the Agreement assigned all risk of declining student enrollment to SodexoMAGIC, and that SodexoMAGIC itself was in breach of the Agreement. These purported "breaches" were makeweight, unsupported, and not material to a multimillion dollar contract.

72.     On September 1, 2016, SodexoMAGIC's counsel sent Drexel's counsel a letter in which it expressed disappointment at Drexel's behavior. The letter explained that "while SodexoMAGIC has truly valued its relationship with Drexel, and would much rather continue that partnership on mutually beneficial terms throughout the nine years left on the current Agreement and for years thereafter, it cannot and will not tolerate such gamesmanship and, frankly, underhanded behavior." SodexoMAGIC agreed to extend the cure period to September 30, 2016, but cautioned that Drexel's continuing failure to act would force SodexoMAGIC to consider other options.

73.     Despite SodexoMAGIC's continued attempts to negotiate at least a peaceful fall semester, Drexel has refused to meet in person and instead filed a purported 60 day notice of termination for convenience – which it would hold until December 10, 2016 – although the notice is not effective in light of SodexoMAGIC's prior notice. Subsequently, on September 26, 2016, Sodexo ended the cure period and exercised its right to terminate the Agreement.

74.     Although entitled to stop services immediately, SodexoMAGIC agreed to remain until the end of the term, December 10, 2016, because SodexoMAGIC does not leave students in the middle of a term.

## FIRST CAUSE OF ACTION
### Fraudulent Inducement

75.     SodexoMAGIC incorporates by reference the allegations in the previous paragraphs.

76.     Drexel misrepresented its student enrollment, and the anticipated growth thereof, to SodexoMAGIC. At a minimum, Drexel hid material information from SodexoMAGIC that was critical to the economic terms specifically memorialized in the Agreement, upon which SodexoMAGIC relied and upon which Drexel knew SodexoMAGIC was relying.

77.    In its RFP, Drexel stated, "The University's Strategic Plan calls for an enrollment increase from our current number of 26,132 to 30,470 students by 2017 and to 34,000 students by 2021. Proposed programs, facilities and infrastructure of services should be aligned to this plan."

78.    In negotiations between Drexel and SodexoMAGIC, LaRue repeatedly stated that Drexel's student population would grow and that this growth was the reason for multimillion dollar investments demanded by Drexel to rehabilitate its dining facilities. During negotiations, LaRue never disclaimed the numbers set forth in the RFP, stating only that she did not want to "be nickel and dimed" if the precise number of students varied by a de minimis amount. LaRue readily agreed to a two percent growth rate, which was conservative in light of the growth rate represented in the RFP.

79.    In the Agreement, Drexel stated that its freshman class would grow at a rate of two percent, year over year, and that SodexoMAGIC could rely on this projection as a material fact.

80.    Drexel knew that the student population information and growth projections it provided to SodexoMAGIC were materially inaccurate. At a minimum, Drexel lacked any reasonable basis for its statements to SodexoMAGIC and/or was reckless as to their truth.

81.    Drexel concealed the truth about its student population from SodexoMAGIC because it intended to induce SodexoMAGIC to enter into a long-term financial arrangement with economic and non-economic terms that were both very favorable to Drexel. These included, but were not limited to, the multimillion dollar up-front investment, combined with the ability to terminate the Agreement upon sixty days written notice. Drexel also intended to induce SodexoMAGIC to rely on the same false statements to provide services under the Agreement.

19

82.     SodexoMAGIC reasonably and justifiably relied on Drexel's statements concerning its student population and the growth thereof. The Agreement acknowledges SodexoMAGIC's reliance. In addition, the number of students to be fed was a fundamental building block in SodexoMAGIC's own budgets and a bedrock underpinning of the financial structure of the Agreement.

83.     SodexoMAGIC has been injured by its reliance on Drexel's inaccurate statements. Relying on the continued honesty of its longtime partner and specific representations memorialized in the Agreement, SodexoMAGIC entered into the Agreement on terms extremely favorable to Drexel, also incurring obligations to other third parties, known to Drexel, that were necessary for SodexoMAGIC to provide food services.

84.     While the precise amount of injury remains to be proven, SodexoMAGIC has suffered and will suffer millions of dollars of damages, including but not limited to liabilities that have already been incurred, and lost profits.

**SECOND CAUSE OF ACTION**
**Breach of Contract**

85.     SodexoMAGIC incorporates by reference the allegations in the previous paragraphs.

86.     The Agreement is a binding contract supported by consideration.

87.     SodexoMAGIC has performed under the Agreement.

88.     In the Agreement, Drexel promised that if the information it provided to SodexoMAGIC was inaccurate, Drexel would renegotiate in good faith the financial terms and other obligations assumed by SodexoMAGIC to correct the inaccuracy.

89.     Drexel provided SodexoMAGIC with inaccurate information.

20

90.     Drexel failed to renegotiate the Agreement in good faith, instead insisting on commercially unreasonable terms that would not even allow SodexoMAGIC to earn a profit.

91.     In the Agreement, Drexel promised that if the assumptions embedded in its projection of two percent annual growth changed in a manner having an adverse economic impact on SodexoMAGIC, Drexel would work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter the impact to SodexoMAGIC.

92.     The "critical factor" of Drexel's growth was inaccurate.

93.     Drexel did not realize an increase of two percent per year in the freshman class year over year.

94.     Drexel failed to work with SodexoMAGIC in good faith to mutually agree upon solutions that would counter the adverse economic impact to SodexoMAGIC.

95.     As a direct and proximate result of Drexel's material breaches, SodexoMAGIC has suffered and will continue to suffer harm and monetary damages amounting to millions of dollars, including but not limited to liabilities already incurred, and lost profits.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**

96.     SodexoMAGIC incorporates by reference the allegations in the previous paragraphs.

97.     Relying on Drexel's statements about its student population, SodexoMAGIC agreed to assume certain pension liabilities of workers on Drexel's campus, and agreed to provide campus dining services far below the intended rate.

98.     Drexel received benefits from SodexoMAGIC's actions and appreciated and retained those benefits.

21

99.     Under the circumstances, it would be inequitable to allow Drexel to continue to retain these benefits without payment of value to SodexoMAGIC.

100.     It is currently estimated that there is a single sum withdrawal liability of over $3.6 million relating to certain pension liabilities.

## FOURTH CAUSE OF ACTION
### Punitive Damages

101.     SodexoMAGIC incorporates by reference the allegations in the previous paragraphs.

102.     SodexoMAGIC relied on Drexel's statements about its student population in taking on significant obligations not only to Drexel, but to other third parties.

103.     Drexel knew that its statements were false, or at a minimum, exhibited reckless disregard for their truthfulness.

104.     Drexel acted with reckless indifference to SodexoMAGIC's interests. From the start, Drexel baked inaccurate assumptions into its budget request to its vendors and told them to rely on those numbers, when Drexel knew full well that the numbers were wrong and that its chances of achieving projected growth were nonexistent. When confronted with the falsity of its statements, Drexel not only failed to honor the Agreement, but insisted on contract terms that would further exacerbate the injuries to SodexoMAGIC caused by Drexel's fraud. Among other things, the terms proposed by Drexel as the cost of continuing to do business would have resulted in a net loss to SodexoMAGIC. In addition, Drexel enjoyed and continues to enjoy the benefits of multi-million dollar improvements to its dining facilities that it had fraudulently induced SodexoMAGIC to pay. Drexel knew or should have known that its actions would have serious detrimental consequences for SodexoMAGIC.

105.    Drexel's outrageous conduct shocks the conscience. Drexel should be assessed punitive damages in an amount sufficient to deter similar behavior by others.

## **PRAYER FOR RELIEF**

WHEREFORE, SodexoMAGIC respectfully request that this Court:

A.    Enter Judgment in favor of SodexoMAGIC on all claims set forth above.

B.    Award SodexoMAGIC damages (including, but not limited to, expectation damages, consequential damages, and punitive damages) in an amount to be determined against Drexel.

C.    Award SodexoMAGIC costs in this action, including attorneys' fees, costs, and expenses per Section 10.12 of the Agreement as well as operation of law.

D.    Award SodexoMAGIC such further damages and equitable relief as are just and proper.

Respectfully submitted,

SodexoMAGIC, LLC,

By its attorneys,

John A. McCreary, Jr. (PA 43704)
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center, Sixth Floor
Pittsburgh, Pennsylvania 15222
(412) 394-5400 (Phone)
(412) 394-6576 (Fax)
jmccreary@babstcalland.com


Timothy J. Fazio (BBO #654157)
[admission pending]

23

Katharine A. Dennis (BBO #688288)
[admission pending]
MANION GAYNOR & MANNING LLP
125 High Street
Boston, MA 02110
Tel: (617)670-8800
tfazio@mgmlaw.com
kdennis@mgmlaw.com

Dated: September 26, 2016
#1644586

24