# Exhibit A

# In The Matter Of:

*Sodexomagic, LLC v.*
*Drexel University*

---

*Melissa Brown*
*June 21, 2017*

---

NEXTGEN|REPORTING
Making Litigation Easier. www.nextgenreporting.com
WORLDWIDE COVERAGE | (888) 267-1200

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

SODEXOMAGIC, LLC. : CIVIL ACTION
:
Plaintiff (s) :
:
vs. :
:
DREXEL UNIVERSITY :
:
Defendant (s) : NO. 2:16-cv-05144-MMB

- - -

Oral Deposition of MELISSA BROWN, taken pursuant to notice, held at Dechert, Cira Center 2929 Arch Street, Philadelphia, Pennsylvania on June 21, 2017, beginning at approximately 10:10 a.m., before Michelle Palys, Court Reporter-Notary Public, there being present.

- - -

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

- - -

APPEARANCES:

MANION, GAYNOR & MANNING, LLP
BY: KATHARINE A. DENNIS, ESQUIRE
125 High Street
Boston, Massachusetts 02110
Phone: (617) 670-8513
Representing the Plaintiff
kdennis@mgmlaw.com

COZEN O'CONNOR
BY: ROBERT W. HAYES, ESQUIRE
One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103
Phone: (215) 665-2094
Representing the Defendant
rhayes@cozen.com

- - -

I N D E X

- - -


WITNESS

MELISSA BROWN

| EXAMINATION BY: | PAGE |
|---|---|
| MS. DENNIS | 4 |
| MR. HAYES | 122 |


- - -

E X H I B I T S

- - -


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Brown-1 | RFP | 21 |
| Brown-2 | 2/2/15 Email | 46 |
| Brown-3 | Management Agreement | 57 |
| Brown-4 | 6/15/15 Letter | 81 |
| Brown-5 | Notice of Default | 96 |
| Brown-6 | 9/1/16 Email | 109 |
| Brown-7 | 9/19/16 Letter | 112 |

- - -

MELISSA BROWN, after having been first duly sworn, was examined and testified as follows:

- - -

THE COURT REPORTER: Any stipulations?

MR. HAYES: We would like to read and sign.

- - -

(It is hereby stipulated and agreed by and between counsel for respective parties that sealing, certification and filing are waived and that all objections as to the form of questions be reserved until the time of trial.)

- - -

EXAMINATION

- - -

BY MS. DENNIS:

Q. Okay, good morning, Ms. Brown. I introduced myself off the record, but I am Kate Dennis. I represent Sodexomagic in this action. Throughout the course of the day I'll probably refer to it as Sodexomagic or Sodexo. Hopefully, you'll understand what I'm referring to. As you are aware this dispute relates to the management agreement between Sodexomagic

and Drexel University that was signed on May 21st, 2015.

Are you familiar with that agreement?

A. I am.

Q. Okay.

Throughout the course of the day if I say the agreement or the contract that's what I'm referring to. It if's confusing at any time just stop me and ask me what I'm talking about.

So a few ground rules for depositions, generally. I'm sure your attorney went over them with you, but if we could stick to verbal responses so that our court reporter can get everything down on the record clearly. No shaking your head or nodding, anything like that. I will do my best to let you finish an answer before I jump in with the next question. If you could do the same try to let me finish my question before you start answering. It's natural to anticipate the question. I'm sure you'll know where a lot of my questions are going. But I'll try my best not to step on you so we can keep a clear record.

If you don't understand a question, let me know, ask me to clarify it, ask me to rephrase. If

you answer it, I will assume that you understood it; is that fair?
A. Yes.
Q. Okay.
And if you need to take a break at any point just let us know, we can take a break whenever, it's your deposition, so long as there's not a question pending. If there is I just ask that you answer the question and then we'll take a break, sound good?
A. Okay.
Q. All right.
If you could state your full name for the record, please.
A. Melissa Brown.
Q. Okay.
And what is your current job title?
A. Associate General Counsel.
Q. At Drexel University?
A. Yes.
Q. Okay.
What's your current work address?
A. 3180 Chestnut Street, Suite 101, Philadelphia, PA 19104.
Q. Are you currently taking any medications that

might affect your ability to testify accurately and truthfully today?

A. No.

Q. Have you used any drugs or alcohol that would prevent you from being able to testify truthfully or accurately today?

A. No.

Q. Okay.

Is there any other reason why you might not be able to provide truthful or accurate testimony?

A. No.

Q. Okay.

Are you represented by Counsel?

A. I am.

Q. And is that attorney with you today?

A. Yes.

Q. Okay.

Have you ever been deposed before?

A. No.

Q. Okay.

Have you ever been a party to a lawsuit before?

A. No.

Q. How about to an Arbitration?

A. Is that personally or...
Q. Personally.
A. No.
Q. Okay.
You said you've never been deposed before, personally or otherwise, correct?
A. Correct.
Q. Okay.
What did you do to prepare for your deposition today, and to be clear, I'm not asking about the substance of conversations with your attorney?
A. I met with my attorney.
Q. Okay.
On how many times?
A. Once.
Q. For how long approximately?
A. 3 hours.
Q. Okay.
Did you look at any documents during that preparation?
A. I did.
Q. What kinds of documents did you look at?
MR. HAYES: Yeah, you can just generally say what kind but don't specifically identify

any documents.

THE WITNESS: Emails, drafts, notes, correspondences.

BY MS. DENNIS:

Q. Okay.

Did you bring any documents with you today?

A. No.

Q. Other than your attorney did you speak with anybody else about your deposition?

A. Can you explain?

Q. Have you talked to any other people about the fact that you're being deposed today?

A. Yes.

Q. Okay.

Did you talk to them about what you might be asked about?

A. No.

Q. Okay.

Did you receive a legal hold notice related to this litigation?

A. Yes.

Q. Okay.

And did you preserve your own documents

pursuant to that notice?
A. Yes.
Q. What did you do to preserve your documents?
A. My hard copies of documents I kept in my office or in my file room. And I didn't delete any emails.
Q. Okay.
A. I believe my IT Department doesn't allow emails to be deleted.
Q. Okay.
So in terms of collecting your own documents did you personally do any of the document collection for your own things?
A. Only for my physical files.
Q. Okay.
And IT collected the electronic stuff?
A. Correct.
Q. Okay.
How did you decide or did you decide what documents to produce and what documents to withhold?
A. I gave all of my documents to outside Counsel.
Q. Okay.
So you didn't make a determination of

whether something should be withheld?
A. No.
Q. Okay.
I'm just going to ask a little about your background. Could you walk me through your education starting with college?
A. Sure, I received a Bachelor's degree from Cornell University in 2000. I received a J.D. from Fordham University in 2003.
Q. Where did you work after law school immediately?
A. Morgan, Lewis & Bockius.
Q. And what kind of law were you practicing there?
A. Real Estate.
Q. How long did you work at Morgan Lewis?
A. 7 and a half years.
Q. Were you doing real estate the whole time?
A. Yes.
Q. And where did you go after you left Morgan Lewis?
A. Drexel.
Q. What was your title when you started at Drexel?

A. Associate General Counsel.
Q. Okay.
So you had the same position since 2010?
A. Correct, 2011.
Q. Okay.
Did you ever do any work in litigation?
A. No.
Q. Okay.
What types of matters do you work on for Drexel?
A. Anything related to real estate or construction. And then various other transactional matters.
Q. Do you review a lot of agreements in your capacity as Associate General Counsel?
A. Yes.
Q. Do you draft agreements usually?
A. It depends.
Q. What does it depends on?
A. What it's for.
Q. Okay.
Who do you report to?
A. Mike Exler, General Counsel.

Q. Do you know who Mr. Exler reports to?
A. John Fry, President.
Q. Uh-huh.
Do you have people who report directly to you?
A. I do.
Q. And who are those people?
A. Kim Lewis, Legal Administrator.
Q. Anyone else who reports to you?
A. No.
Q. Okay.
How does the legal department interact with the other heads of departments?
A. We provide legal support for the University.
Q. Does the Legal Department need to approve agreements that are signed by other departments in the University?
A. Yes.
Q. Are there any designated people that are like the liaison to the Legal Department from the other departments?
MR. HAYES: Object to the question. It's vague and ambiguous.
BY MS. DENNIS:

Q. With regard to Sodexomagic was there somebody else at Drexel that would have been the liaison between Sodexomagic and the Legal Department at Drexel?

MR. HAYES: Object, vague and ambiguous.

MS. DENNIS: You can answer.

MR. HAYES: If you understand the question.

THE WITNESS: I don't understand that question.

BY MS. DENNIS:

Q. Okay, okay.

Is there somebody at Drexel who worked on -- who worked with Sodexomagic that you would speak to about that account?

A. Yes.

Q. Okay.

Who was that person?

A. Rita LaRue.

Q. I'm just trying to get an idea of sort of the chain of command and how your office would interact with obviously the key players with regard to the contract between Sodexomagic and Drexel just to give you an idea of what I'm asking. I apologize if the

questions are ambiguous.
A. Okay.
Q. So with regard to that specific contract Rita would be the person who would speak to you about the contract?
A. I spoke to Rita about the contract.
Q. Were there other people that you spoke with about the contract?
A. Yes.
Q. Who were those people?
A. Jim Tucker. That was it primarily.
Q. Okay.
And Mr. Tucker no longer works at Drexel; is that correct?
A. Correct.
Q. What was his title when he left?
A. Senior Vice President, Administrative and Business Services.
Q. Does your department interact with the Board of Trustees at all?
A. Yes.
Q. Okay.
How does that relationship work, is there a direct -- is there anyone between the legal

department and the Board of Trustees?
A. Mike Exler is the board Secretary.
Q. Okay.
So would you say -- you said you report to Mike Exler, correct?
A. Yes.
Q. So do you report to the board -- do you have any accountability to the Board of Trustees?
MR. HAYES: Object to the form. If you're asking her a legal conclusion of what her legal obligation to the trustees are, I instruct her not to answer the question.
MS. DENNIS: I'm not asking her that. I'm asking the structure of how the chain of command is at the University.
BY MS. DENNIS:
Q. I don't mean legally liable. I mean, are they your boss, I guess.
MR. HAYES: If you don't know you can just say I don't know.
THE WITNESS: I don't know.
MS. DENNIS: Okay, that's fine.
BY MS. DENNIS:
Q. Does the Board of Trustee have to approve

contracts that are signed on behalf of the University?
A. Some.
Q. Okay.
Which contracts do they need to approve?
MR. HAYES: If you know.
THE WITNESS: It depends what type of contract whether it's a capital contract or an operating expense to the University. And how much the contract is for.
BY MS. DENNIS:
Q. Did the Board of Trustee have to approve the contract with Sodexomagic?
THE WITNESS: Is that privileged?
MR. HAYES: I think whether they -- yeah, I'll instruct the witness on the grounds of privilege.
MS. DENNIS: Okay.
BY MS. DENNIS:
Q. Are you refusing to answer on the basis of your Attorney's advice?
A. Yes.
Q. Okay.
What is the general process of taking

something to the board that has to be approved by the board?

MR. HAYES: Object to the form of the question. It assumes facts not in evidence.

MS. DENNIS: You can answer.

THE WITNESS: The business owner of the contract would present a resolution to the Board of Trustees and any applicable subcommittees.

BY MS. DENNIS:

Q. Do you know whether such a resolution was made regarding the Sodexomagic contract?

A. I do.

Q. Okay.

Was a resolution made?

A. No.

Q. Okay.

Did you interact with anybody at Sodexomagic directly in the course of Sodexomagic providing dining services at Drexel?

A. Do you mean providing dining services or negotiating the contract?

Q. Over the entire process, let's say from the beginning of the RFP process until the time when Sodexomagic left, did you personally interact with

anybody on behalf of Sodexomagic?
A. Yes.
MR. HAYES: Wait, not on behalf of Sodexomagic.
BY MS. DENNIS:
Q. No, no, no. I mean did you interact with anybody who themselves was representing Sodexomagic?
A. Like an attorney?
Q. An attorney or an agent, anybody that worked for them and not for Drexel?
A. Yes.
Q. Okay.
Who did you interact with?
A. Nancy Arnett, Tom Stanton, Bill Yaglou.
Q. Did you ever interact with anyone from Sodexomagic prior to the request for proposals in 2014?
A. No.
Q. So in June of 2014 Drexel put out a request for proposals for a dining services contract; is that correct?
A. Yes.
Q. Were you involved at all in the decision to put out an RFP?
A. No.

Q. Who would have been involved in that decision?

MR. HAYES: Objection, you're asking the witness to speculate, lack of foundation, personal knowledge.

THE WITNESS: I don't know.

BY MS. DENNIS:

Q. Were you involved at all in the drafting of the RFP documents?

A. Yes.

Q. In what capacity?

A. I provided certain terms and conditions for inclusion in the RFP that were to be included in the final contract.

Q. Okay.

Who else, if you know, participated in drafting the RFP?

MR. HAYES: She just said she doesn't know.

MS. DENNIS: No, I didn't ask her that question yet.

THE WITNESS: Rita LaRue.

BY MS. DENNIS:

Q. Okay.

Did anyone else besides you and Rita do

any drafting to your knowledge?
A. I don't know.
Q. Okay.
Now, I can put the RFP in front of you if it's more helpful, but do you recall which sections of the RFP you personally drafted?
A. Can I see it?
Q. Of course.

- - -

(Whereupon, Brown-1 was marked for identification.)

- - -

MR. HAYES: I'm not going to let the witness answer that question. I think it's privileged. What services she rendered to her clients is privileged.
MS. DENNIS: I don't know that the text that actually made it in would be privileged.
MR. HAYES: I think it's a service provided -- it's a substance of the service provided by the lawyer. I think that's privileged.
BY MS. DENNIS:
Q. Okay.
You're not going to answer the question

on that recommendation of your attorney?
A. Correct.
Q. Okay.
Do you know which sections Rita drafted?
A. I don't.
Q. All right.
If you could take a look at -- it's the third page of the document that's in front of you. It's the third page of the actual attachment with the RFP. In the second paragraph down you can see the RFP included specific numbers stated as Drexel's enrollment goals, correct?
A. Is that an interpretation?
MR. HAYES: Objection, where?
BY MS. DENNIS:
Q. No, it's literally the language.
MR. HAYES: Where are you directing -- what page?
MS. DENNIS: The first page of the RFP. So there's the email and then it's the attachment. The Bates number is Drexel 0051446.
MR. HAYES: Object to the form of the question.

BY MS. DENNIS:
Q. The RFP included specific numbers as Drexel's plan, correct?
MR. HAYES: Object to the form of the question, misstates the terms of the document, asking the witness to interpret documents she did not author.
MS. DENNIS: You can answer the question.
MR. HAYES: If you have an understanding of it.
THE WITNESS: What's the question?
BY MS. DENNIS:
Q. The question is does that second paragraph include enrollment numbers and say that those enrollment numbers are Drexel's plan?
MR. HAYES: Object to the form, misstates the terms of the document, ask the witness to interpret documents she did not author.
MS. DENNIS: You're allowed to read it.
THE WITNESS: The document says the University strategic plan calls for an enrollment increase from our current number of 26,132 to 30,470 by 2017 and to 34,000 by 2021.
BY MS. DENNIS:

Q. So it states that the University has a strategic plan to increase to those enrollment goals, correct?

MR. HAYES: Objection, asked and answered, ask the witness to interpret a document she did not author, misstates the terms of the document.

BY MS. DENNIS:

Q. Is this the first time you're seeing this document?

MR. HAYES: Should not answer that question with respect to anything you've learned in terms of representing or being involved as Counsel to Drexel.

MS. DENNIS: You can answer the question.

MR. HAYES: You will follow instructions, please.

BY MS. DENNIS:

Q. Aside from looking at it possibly with your attorney in a privileged scenario while you were preparing for this deposition, have you seen this?

MR. HAYES: First, Ms. Brown represented Drexel with respect to these negotiations. She's also representing Drexel as lead in-house Counsel

Q. Do you know whether there was a committee that decided to implement it?
A. I don't.
Q. Okay.
Did the implementation of the SLM Initiative affect your role at Drexel at all?
A. Yes.
Q. Okay.
To the extent that you can, how did it affect your position?
A. I work for a University so anything that affects the students would affect everything related to University operations.
Q. Okay.
But you're not familiar with what it is?
A. I am familiar with what it is.
Q. Okay.
MR. HAYES: Again, don't reveal information that was provided to you in the course of providing legal advice or services to the University.
BY MS. DENNIS:
Q. What is the SLM Initiative?
MR. HAYES: Same instruction.

THE WITNESS: Yeah, that would be privileged information.

BY MS. DENNIS:

Q. It's not a confidential initiative so...

A. The only thing I know about it is in connection with my role of representing the University.

Q. Okay.

Do you know whether the University ever made any public announcements or releases regarding the Student Life Cycle Management Initiative?

A. I do know.

Q. Okay.

Are you familiar with the contents of those announcements?

A. Somewhat familiar.

Q. Okay.

Can you tell me how it is the University explained to the public what the Student Life Cycle Management Initiative is?

A. I don't recall the specifics of press releases relating to the SLM.

Q. Okay.

So you're not able or not willing to describe for me at all what the SLM Initiative is?

MR. HAYES: Again, don't reveal privileged information.

THE WITNESS: What I know about it would have been learned in the course of my role as Attorney to the University other than what is -- was presented in press releases which I don't remember specifically what they said.

BY MS. DENNIS:

Q. Okay.

So just so we're clear on the record, you are unwilling to speak generally about what it is because the basis of that is privileged?

A. I'm unwilling to because what I know is privileged, other than what is public, and I don't recall specifics about the public announcement relating to the SLM Initiative.

Q. Do you have any knowledge about the affect of the SLM Initiative on Drexel's enrollment?

A. Yes.

MR. HAYES: Object to the form of the question.

BY MS. DENNIS:

Q. What is that knowledge?

MR. HAYES: You should not reveal any

information you learned -- I can say it over and over. Any privileged information.

THE WITNESS: Repeat the question.

BY MS. DENNIS:

Q. Do you have any knowledge about the SLM Initiative's affect on enrollment?

A. And I said yes and then did you have a follow-up question?

Q. No, you did say yes.

Do you have any knowledge as to whether the SLM Initiative's affect on enrollment was considered in the decision to implement it?

MR. HAYES: Same instruction that I've been giving you with respect to privilege.

THE WITNESS: Can you rephrase that.

MS. DENNIS: I'm going to ditch the question -- strike that.

BY MS. DENNIS:

Q. When did you become aware that the SLM Initiative would have an affect on enrollment?

MR. HAYES: Object to the form of the question, assumes facts not in evidence. Also same instruction with respect to privilege.

THE WITNESS: Can you repeat it.

BY MS. DENNIS:
Q. When did you become aware that the SLM Initiative might have an affect on enrollment?
MR. HAYES: Same objection.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. Did you become aware of that fact at some point?
MR. HAYES: Again, instruct the witness unless you learned that outside one way or the other outside the concept of what you were told as providing legal services do not answer the question.
THE WITNESS: There was some public announcements in newspapers.
BY MS. DENNIS:
Q. And what were those announcements?
A. I don't remember.
Q. But they mentioned enrollment specifically to your memory?
A. Yes.
Q. Okay.
And did they mention that enrollment would decrease?
A. I don't remember.

Q. Do you remember when those announcements were?
A. No.
Q. Okay.
Do you know when Sodexo was made aware that enrollment would go down?
MR. HAYES: Object to the form, it assumes facts not in evidence and same privilege instruction.
THE WITNESS: I think that would be privileged information.
BY MS. DENNIS:
Q. When Sodexo was told that the enrollment would go down?
MR. HAYES: It assumes facts not in evidence.
MS. DENNIS: I don't think that communication with Sodexo is privileged.
MR. HAYES: You're assuming --
MS. DENNIS: I didn't ask when they decided to tell them.
MR. HAYES: You're assuming that enrollment would go down because the SLM Initiative.
MS. DENNIS: No, I just said when was Sodexo made aware that enrollment would go down. That

was the question that I asked.

MR. HAYES: That's not the question you asked.

MS. DENNIS: That is literally the question that I asked. We can go back and read it.

THE WITNESS: I don't have any personal knowledge about it. I only know what I've learned in connection with my representation of Drexel.

BY MS. DENNIS:

Q. Okay.

Do you know whether Sodexo was told at some point that enrollment would go down?

A. The same answer, I have no personal knowledge.

Q. Okay.

Are you familiar with a letter that President Fry sent out to the Drexel community. I'll put it in front of you but it was dated June 15th, 2015, and it's a Dear Colleague letter regarding the SLM Initiative?

A. I don't remember.

\- - -

(Whereupon, Brown-4 was marked for identification.)

\- - -

BY MS. DENNIS:
Q. So it's a few emails down. This is sort of the resulting chain. But it's a President Fry email. The header is at the bottom of the first page but the substance is on the back page there. Have you ever seen this bottom email from President Fry before?
A. Yes.
Q. Okay.
When did you first see this document -- this letter, I guess?
A. I would have received it on June 8th.
Q. Okay.
Were you involved in drafting this letter?
A. No.
Q. Were you aware that it was being sent before it was sent?
A. That would be privileged.
Q. So you would be on this list that it went to?
A. Correct.
Q. Okay.
Do you know whether Sodexo was made aware of the potential drop in enrollment before this email went out?

MR. HAYES: Object to the form.
THE WITNESS: What's the question?
BY MS. DENNIS:
Q. Were you aware of whether Sodexo -- let me rephrase it.
Do you know whether Sodexo was made aware prior to this email going out that enrollment might go down?
MR. HAYES: Object to the form.
THE WITNESS: I have no personal knowledge as to whether Sodexo was made aware.
BY MS. DENNIS:
Q. Okay.
Does this email refresh your recollection of what the SLM Initiative was?
MR. HAYES: The email or the letter from President Fry?
MS. DENNIS: The letter from President Fry.
THE WITNESS: Does it refresh my --
BY MS. DENNIS:
Q. Yes, unless I'm wrong, your testimony was that aside from what you knew about it in your capacity as attorney there were public releases but you didn't

really remember what they said; is that correct -- is that a correct characterization of your prior testimony?
A. Yes.
Q. Okay.
Does this refresh your recollection at all?
A. As to public announcements?
Q. As to public announcements?
A. Yes.
Q. Okay.
Do you have any personal knowledge as to Sodexo's reaction to receiving this email?
A. No.
Q. Okay.
Are you aware that Sodexo initiated renegotiation of the management agreement at some point?
A. Yes.
Q. What is your understanding as to why that happened?
MR. HAYES: Object to the form of the question.
THE WITNESS: Can you rephrase that.

BY MS. DENNIS:
Q. Sure, what is your understanding as to why Sodexo went on to renegotiate the contract?
MR. HAYES: Object to the form.
THE WITNESS: Sodexo wanted to renegotiate certain business parts of the contract due to a change in enrollment.
BY MS. DENNIS:
Q. Okay.
What is the basis for your understanding of that as the reason why?
A. Based on information provided by Sodexo.
Q. Okay.
Can you be more specific?
A. There were some letters and conversations -- letters Sodexo sent, conversations that I was a part of with Sodexo where that information was provided.
Q. In this letter from President Fry, President Fry says in the third paragraph down and the last line. As a result our enrolled class will be smaller than in previous years.
Did I read that correctly?
A. Yes.
Q. Do you know whether there was a public

statement previous to this that described the affect of the SLM as having a decline in enrollment?

MR. HAYES: Objection, misstates the term of the document. The document clearly said as a result of not going to the wait list that they will have a smaller --

MS. DENNIS: I read the final sentence. Our enrolled class will be smaller than in previous years.

MR. HAYES: The letter in no way intimates it's because of the SLM Initiative.

MS. DENNIS: Literally, the headline of the email is Budgetary Impact of Student Life Cycle Management.

MR. HAYES: I don't care. It says as a result of not going to the wait list our enrolled class will be smaller than in previous years.

MS. DENNIS: Knowing that we might encounter changes in implementing this new strategy then we send people to the wait list then the enrollment goes down. It's very clearly tied to that but I will rephrase the question if that's your new position.

BY MS. DENNIS:

Q. This email says the sentence as a result our enrolled class will be smaller than in previous years, correct?
A. Correct.
Q. Is there a previous statement regarding the SLM Initiative that says that enrollment might go down?
MR. HAYES: Object to the form of the question.
THE WITNESS: I think there was an article in the Philadelphia Inquirer.
BY MS. DENNIS:
Q. That says enrollment will go down?
A. That discusses Student Life Cycle Management Initiative.
Q. And specifically says that enrollment will go down?
A. I don't know what else it says.
Q. Okay.
You don't have knowledge of any other public release prior to this suggesting that Drexel's enrollment may decline?
A. Again, I don't remember what the Philadelphia Inquirer article says.
Q. Did you participate in the renegotiation

meetings with Sodexo?
A. Some of them.
Q. Okay.
Who else participated in those meetings on behalf of Drexel?
A. Helen Bowman, Rita LaRue.
Q. Okay.
Do you recall who participated in those meetings on behalf of Sodexo?
A. Nancy Arnett, Bill Yaglou and maybe Tom Stanton.
Q. Do you recall when those renegotiation meetings started?
A. There was -- I believe there was one the beginning of June that I was not a part of.
Q. And that's 2015?
A. Yes, June, 2015.
Q. Sorry to interrupt you.
A. That I was not a part of.
Q. Okay.
MR. HAYES: Just right after the contract was signed.
THE WITNESS: Oh, wait, 2016.
MS. DENNIS: You can't coach her on her

answers, first of all.

MR. HAYES: I'm not coaching her on her answers.

THE WITNESS: It was --

MS. DENNIS: First of all, you were right. But second of all --

THE WITNESS: No, wait, it was 2016. It was last summer.

BY MS. DENNIS:

Q. That they began to renegotiate?

A. The renegotiation was last summer, 2016.

Q. Okay.

A. The contract was signed in 2015.

Q. Correct, the contract was signed in 2015.

A. My knowledge of the first attempt by Sodexo to renegotiate was the beginning of June, 2016, last summer.

Q. Okay.

And that's when you got involved in those negotiations?

A. When I got involved in the negotiations would be privileged.

Q. Okay.

Well, you said the first meeting that

happened that you didn't go to was June, 2016?
A. Correct.
Q. When was the first meeting that you did go to?
A. I want to say sometime July, 2016.
Q. Okay.
Do you know how many times the parties met to renegotiate?
A. No.
Q. What is your understanding of Sodexo's position on why the contract needed to be renegotiated?
MR. HAYES: Objection, asked and answered.
BY MS. DENNIS:
Q. You said it specifically had to do with enrollment changes; is that correct?
A. Yes.
Q. Okay.
What specifically with regard to those enrollment changes?
A. I don't think there was anything specific.
Q. Okay.
You were in meetings with Sodexo regarding the renegotiation, correct?
A. Yes.

Q. Are you familiar with Sodexo's position on whether or not they knew enrollment was going to go down?
A. I know Sodexo's position.
Q. I asked for your understanding of Sodexo's position and you said that you didn't know?
MR. HAYES: That's not what she said.
BY MS. DENNIS:
Q. Okay.
What is your understanding of Sodexo's position on whether or not they knew enrollment was going to go down?
A. Sodexo's position is that they did not know enrollment was going to go down.
Q. Okay.
What is Sodexo's position regarding whether or not -- what is your understanding of Sodexo's position regarding whether or not Drexel told them that enrollment was going to go down?
A. You mean my opinion on Sodexo's position? I'm confused about that.
Q. Well, you were present -- not your opinion, your understanding.
A. Okay.

Q. You were present at these negotiation meetings. I'm asking what you were talking about, why was there a negotiation session to begin with?
A. Sodexo wanted to renegotiate the contract.
Q. To do what, what was the point of renegotiating?
A. To renegotiate business terms.
Q. For what purpose?
A. Sodexo claimed that they needed to make more money than they were making from the contract.
Q. Is it your understanding that they were making money from the contract?
A. They're a service provider.
Q. Is it your understanding that they were making money on this contract?
A. Yes.
Q. At that point in time?
A. I'm sorry, what point in time?
Q. At the point in time when they initiated renegotiations of the contract?
A. Okay.
Q. Is it your understanding that they were making money from this contract at that time?
A. I only know that Sodexo said they were not.

Q. Okay.
So your understanding that they were trying to make more money is based on what?
A. The fact that they're a service provider.
Q. Okay.
You stated that you reviewed multiple drafts of the agreement, correct?
A. Yes.
Q. Do you have an understanding of how that contract works for them to make revenue?
A. Yes.
Q. Okay.
So are you -- do you have an understanding of their explanation of why the enrollment affects their ability to make money on a contract?
MR. HAYES: Object to the form of the question.
THE WITNESS: I understood -- I understood what Sodexo's position was.
BY MS. DENNIS:
Q. What was your understanding of Sodexo's position?
A. That due to a decrease in freshman enrollment

there were less meal plan -- involuntary meal plan sales.
Q. Okay.
And what was the affect of less involuntary meal plan sales?
A. Less revenue for Sodexo.
Q. Okay.
Are you familiar with Sodexo's capital investment to Drexel, we talked a little bit about it earlier?
A. Yes.
Q. Do you know the amount of that capital investment?
A. Roughly.
Q. And what was that?
A. New investment or old investment?
Q. Investment related to this agreement that we've been talking about today?
A. I think it was a total of about 11 million dollars.
Q. Okay.
Did anyone at Sodexo ever represent to you that the ability to make that investment was tied to the enrollment?

A. No.
Q. Okay.
Was it your understanding that the ability to make that investment was tied to enrollment?
A. No.
Q. Okay.
How long did the renegotiation process go on for?
A. 4 months.
Q. Okay.
A. That I know of.
Q. Sure.
Do you have any idea, I may have asked this and I apologize if I did, how many sessions you were able to attend in the renegotiation?
A. With Sodexo I was probably on 3 to 5 calls.
Q. Okay.
Were they conferences with multiple people?
A. Yes.
Q. Okay.
Outside of those conferences did you have contact with anybody at Sodexo regarding the renegotiation?

A. I talked to Tom Stanton.
Q. On how many occasions would you say?
A. 2 or 3 times.
Q. Okay.
Do you remember when those calls were?
A. I can't remember specifically. It was right around when Tom sent me a notice of default.
Q. Okay.

\- - -

(Whereupon, Brown-5 was marked for identification.)

\- - -

BY MS. DENNIS:
Q. Take a second and look it over, but is this the notice of default that you mentioned now?
A. Yes.
Q. Okay.
So you testified that one of the calls with Tom was right around when this came out?
A. Correct.
Q. Was it before?
A. I think it was right before.
Q. Okay.
A. So either that day or the day before.

Q. Okay.
Can you tell me about the substance of that call?
A. Tom called and said that he was going to be sending a notice of default.
Q. Okay.
So safe to say by that point the renegotiations had broken down?
A. I wouldn't say they had broken down at that point.
Q. Okay.
What would you say the status of the renegotiation was at that point?
A. At that point Drexel had sent a counterproposal to Sodexo with respect to the business terms.
Q. Okay.
Are you -- I was just going to go there. Are you familiar with proposals that Drexel made during the renegotiation process?
A. Yes.
Q. Can you tell me about some of the proposals or any of them?
A. I can't remember specifics without seeing

them. If you want me to look at something.
Q. We can talk about them generally.
A. Okay.
Q. You said they were proposals related to the business terms, correct?
A. Yes.
Q. Okay.
Do you remember anything more specific than that about which particular business terms were being discussed?
A. There were probably 7 or 8 terms that were being discussed.
Q. Okay.
Did Sodexo also make proposals regarding those same terms?
A. Yes.
Q. Okay.
Do you remember anything about Sodexo's proposals?
A. I don't remember the specific proposals.
Q. Do you remember the parties discussing a proposed extension of the term of the contract?
A. Yes.
Q. What was the purpose behind that possibility?

MR. HAYES: Object to the form.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. Okay.
What was the goal of the renegotiation?
MR. HAYES: Object to the form.
THE WITNESS: To find a mutually beneficial solution for both parties to continue the contract.
BY MS. DENNIS:
Q. Okay.
So Sodexo's position at that point was that it was losing money on the contract because of the enrollment decline, correct?
A. That was Sodexo's position.
Q. And what was Drexel's position?
A. That's privileged.
Q. What was Drexel's position as expressed to Sodexo?
A. I'm sorry, Drexel's position for what? Can you be more specific.
Q. Well, so we talked about Sodexo's position which is that they plan for a different enrollment, the enrollment decline, and they wanted to renegotiate the