with respect to this litigation. And she's not going to disclose anything she learned or saw in the course of her providing those legal service. That would be our position throughout the deposition.

BY MS. DENNIS:

Q. So to be clear, you're refusing to answer whether or not you've seen the RFP before?

MR. HAYES: She's refusing to answer if she saw it in the course of providing legal services to Drexel.

BY MS. HAYES:

Q. Did you see it other than in the course of providing legal services to Drexel?

A. No.

Q. Okay.

Were you aware of the University's strategic plan at the time the RFP went out to vendors?

MR. HAYES: Again, you should not disclose any information that was provided to you as Counsel to Drexel.

THE WITNESS: That would be privileged.

MS. DENNIS: Whether you're aware. I don't believe that's privileged.

MR. HAYES: If it would reflect

information that was communicated to her by Drexel in the course of her legal representation under Pennsylvania Law that's privileged.

MS. DENNIS: Sure, if it was never spoken about with anybody besides an employee of Drexel.

That's fine, okay.

BY MS. DENNIS:

Q. You refuse to answer that question on the basis of privilege?

A. Yes.

Q. Okay.

MR. HAYES: Well, your answer is you have not seen it outside the scope of providing legal services to Drexel, right?

THE WITNESS: Correct.

But it was I'm not answering it based on privilege.

BY MS. DENNIS:

Q. Do you have any idea where the numbers that were included in this paragraph came from?

MR. HAYES: Again, you shouldn't disclose any information that was provided to you as Counsel for Drexel.

THE WITNESS: It's privileged.
BY MS. DENNIS:
Q. Okay.
Do you have any knowledge as to whether these numbers are accurate at the time that they were included in the RFP?
MR. HAYES: Object to the form of the question on the grounds as previously instructed. Do not reveal anything that you've learned as Counsel to Drexel. Beyond that I'll also object to the form of the question because there's no way they could or could not be accurate since it sets forth goals.
BY MS. DENNIS:
Q. To clarify, is it accurate that those were the goals at that time to your knowledge?
MR. HAYES: Again, do not reveal any information you've learned in the course of providing services to Drexel -- legal services, pardon me.
THE WITNESS: It's privileged.
BY MS. DENNIS:
Q. Okay.
Do you have any knowledge as to whether bidding vendors used these numbers in the preparation of their responses?

MR. HAYES: Repeat the same instruction. Also, object to the question it's vague and -- lack of foundation and personal knowledge.
THE WITNESS: Can you repeat the question.
BY MS. DENNIS:
Q. Sure, do you know whether the bidding vendors who responded to the RFP used those numbers in preparing their submissions?
A. I don't know.
Q. Okay.
Did you ever see any of the RFP responses from the bidding vendors?
MR. HAYES: You can answer that question yes or no.
THE WITNESS: No.
BY MS. DENNIS:
Q. You're aware that the RFP required an upfront investment from bidding vendors?
MR. HAYES: Same instruction.
THE WITNESS: Repeat the question.
BY MS. DENNIS:
Q. Were you aware that the RFP -- part of the RFP required an upfront investment from the bidding

vendors?

MR. HAYES: Same instruction, object to the question, misstates the terms of the document.

THE WITNESS: Am I supposed to answer it?

MR. HAYES: If you have any information other than providing legal services you can provide that information, otherwise, no.

THE WITNESS: It's privileged material.

BY MS. DENNIS:

Q. To be clear, if a conversation or context was business advice and not legal advice, that is not covered by attorney/client privilege so something to keep in mind.

Do you have any knowledge of whether any of the bidding vendors included an upfront investment as part of their RFP response package?

MR. HAYES: Same instruction, also lack of foundation, personal knowledge.

THE WITNESS: Can you repeat the question.

BY MS. DENNIS:

Q. Do you know whether any of the bidding vendors included an upfront investment as part of their RFP

&response?
A. Yes.
Q. Do you know which vendors included an upfront investment as part of their response?
A. Sodexo.
Q. Do you know what the investment was used for?
MR. HAYES: Again, the same instruction. I mean, if you learned in the course of providing legal services, it's privileged. Don't answer the question.
THE WITNESS: Okay, it's privileged.
BY MS. DENNIS:
Q. Do you have any knowledge of whether Drexel represented to vendors including Sodexo that the investment would be used for a new dining facility?
MR. HAYES: Object to the question, instruct the witness not to answer to the extent any information she learned was obtained in the course of providing legal services to Drexel.
THE WITNESS: Privileged information.
BY MS. DENNIS:
Q. Okay.
MR. HAYES: Kate, I'm going to cut this off at some point. The witness has already told you

that she didn't draft the RFP. She provided certain terms and conditions and that's it. She had no personal knowledge about this. You're just asking for information that Ms. Brown learned as a lawyer.

MS. DENNIS: Well, I think that there are a number of --

MR. HAYES: Even if she wasn't a lawyer Ms. Brown has no basis to give you any information about this RFP. She didn't participate in it.

MS. DENNIS: She said that she participated in drafting terms and conditions.

MR. HAYES: She drafted certain terms and conditions.

MS. DENNIS: Which she won't tell me which ones so how do I know which ones to ask about.

MR. HAYES: Because it's privileged.

MS. DENNIS: That's what I'm saying. If she can't tell me which ones then I can't know which ones I'm asking about where the answer is going to be that it's privileged.

MR. HAYES: She said terms and conditions. That's clearly not the business terms.

MS. DENNIS: I mean, I don't think it's clearly anything except she wouldn't give me any

answer.

MR. HAYES: At some point I'm going to cut it off. I mean, it's just wasting time. If I have to file a motion for protective order.

MS. DENNIS: That's fine. If I have to file a motion to get answers on things that are not privileged I will do that as well. But I don't think that there's any kind of blanket privilege attached to anything she ever touched. That's not how the privilege rules work. That's not what happened here. She was obviously involved in different capacities as evidenced by the emails that we have. So I mean, legal advice, certainly. I'm certainly not trying to get at legal advice. I have not asked a singe question saying what was your legal advice so...

MR. HAYES: In Pennsylvania, information provided to a lawyer in the course of providing legal services is privileged.

MS. DENNIS: That's fine. I have not taken issue with Ms. Brown invoking privilege where she has invoked privilege.

MR. HAYES: I know, but you're just wasting time.

MS. DENNIS: So every question I have

you're going to invoke privilege?

MR. HAYES: No, about the RFP, yes.

MS. DENNIS: All right, well, you know, I don't know which sections she's going to say she had nothing to do with.

MR. HAYES: You have the terms and conditions. What she drafted and what she didn't --

MS. DENNIS: I asked about two terms, Bob, two. Frankly, I wasn't going to ask about another term so this is pointless.

MR. HAYES: All right, good.

MS. DENNIS: I have not put up a fight. I have not given you a hard time about invoking privilege. You know, I'm reserving my issues with that, but, you know, you got to let me ask the questions.

BY MS. DENNIS:

Q. Did you have any role in the evaluation of the responses that Drexel got from bidding vendors to the RFP?

A. That's privileged information.

Q. How so?

MR. HAYES: Did you make any evaluation of the business terms comparing contracts at all?

THE WITNESS: No.
BY MS. DENNIS:
Q. Were you present at any presentations by the bidders with regard to their RFP responses?
A. No.
Q. Okay.
Do you know whether bidders made presentations with regard to their RFP responses?
A. I don't know.
Q. Okay.
Were you involved in the process of evaluating the best and final offers that came from bidding vendors?
MR. HAYES: You can answer that to the extent if you were or were not involved in evaluating the business terms.
THE WITNESS: No.
MS. DENNIS: I don't believe that yes or no as to whether she was involved is privileged information. It's not the substance of the conversation. I think I'm entitled to know whether there was a conversation, who was there, how long it was, where it was, when it was.
MR. HAYES: I disagree.

MS. DENNIS: Okay.
BY MS. DENNIS:
Q. Do you know who was involved in the evaluation of the RFP responses?
A. I don't.
Q. Do you know whether Rita LaRue was involved?
A. I do.
Q. Okay.
Do you know anyone else that was involved in the evaluation of the RFP responses?
A. No.
Q. Okay.
Do you know which vendors provided RFP responses?
A. I know some.
Q. Could you tell me who those parties are?
A. Sodexo, Aramark, and I don't know any others.
Q. Okay.
Were you involved in the selection of the winning RFP bidder?
A. No.
Q. Did the Legal Department need to approve the selection of the winning bidder?
A. No.

Q. Do you know whether the Board of Trustees had to approve the selection of the winning bidder?

MR. HAYES: Again, do not reveal any information gleaned or in your capacity of representing Drexel or any conclusions formed as a result of representing or being a lawyer for Drexel.

THE WITNESS: Can you repeat that question.

BY MS. DENNIS:

Q. Do you know whether the Board of Trustees had to approve the selection of the winning vendor?

MR. HAYES: Do you have my instructions in mind?

THE WITNESS: Can you repeat yours.

MR. HAYES: Do not repeat any information you learned while providing legal services to Drexel or if your answer would be a legal conclusion, you know, interpreting legal documents.

THE WITNESS: Can you repeat your question, I'm sorry.

MS. DENNIS: That's fine.

BY MS. DENNIS:

Q. Do you know whether the Board of Trustees was required to approve the selection of the winning

vendor?
A. They were not.
Q. Okay.
Do you know whether President Fry was required to approve the selection of the winning vendor?
A. I don't know.
Q. Okay.
Do you have any personal knowledge of the basis for Drexel's selection of Sodexo as the winning vendor?
A. Can you repeat it.
Q. Do you have any personal knowledge as to the basis for Drexel selecting Sodexo as the winning vendor?
MR. HAYES: Not revealing information you learned in both providing legal services to Drexel.
THE WITNESS: I do.
BY MS. DENNIS:
Q. Could you tell me what that basis was?
A. That would be privileged.
Q. Okay.
Is any of those basis business reasons?
A. Yes.

Q. Can you elaborate on the business reasons for choosing Sodexo?

MR. HAYES: I'll instruct the witness not to answer the question to the extent it was disclosed to her in the course of providing legal services and/or advice to Drexel.

THE WITNESS: It would be privileged information.

BY MS. DENNIS:

Q. Okay.

Did you participate in the negotiation of the agreement between Sodexo and Drexel?

A. Yes.

Q. Okay.

Who else participated in the negotiation?

A. From Drexel?

Q. Both sides.

A. Rita LaRue, Don Liberati, Jackie Gemenden, Paula King, Nancy Arnett, Tom Stanton. I can't remember if there were any others.

Q. Okay.

What was Rita's role with regard to negotiating the management agreement?

A. She was the main point of contact from Drexel.
Q. How about Don Liberati what was his role?
A. He was assisting Rita.
Q. And Jackie?
A. Assisting Rita.
Q. And what was Paula King's role?
A. The same, assisting Rita.
Q. Is that everyone you can think of on the Drexel side who participated in the negotiation?
A. Jim Tucker. I think that was it.
Q. Okay.
And who had ultimate authority to agree to terms throughout the course of the negotiation of the agreement?
MR. HAYES: Again, you shouldn't reveal anything that was disclosed to you in the course of providing services, but also if it involves a legal interpretation.
THE WITNESS: Yeah, that's privileged.
BY MS. DENNIS:
Q. You were present at negotiation sessions for the management agreement?
A. Some.
Q. Okay.

At a particular session was there anybody present with you who would have been able to sign off on a particular term?

MR. HAYES: Same instruction.

THE WITNESS: Yeah, that's privileged.

BY MS. DENNIS:

Q. Did you ever meet -- participate in meetings where there were Sodexo people at that meeting as well?

A. Yes.

Q. Okay.

Were decisions ever made in those meetings?

A. By who?

Q. That's what I'm asking. Did the parties ever sign off on a particular term at one of those meetings?

MR. HAYES: Just object to the form of the question.

I mean, the witness is struggling because -- the contract is not signed off on until it's signed.

MS. DENNIS: You don't need to answer the questions, Bob.

MR. HAYES: I'm not answering the questions.

MS. DENNIS: You're really, really bordering on coaching this entire time and I've been very patient about it.

MR. HAYES: Asserting privilege objections is not coaching the witness.

MS. DENNIS: No, but reinterpreting my question and saying to her what the answer is absolutely coaching.

MR. HAYES: No, I explained to you why the witness was having difficulty with your question.

MS. DENNIS: And then you answered the question.

MR. HAYES: No, I didn't.

MS. DENNIS: Okay.

THE WITNESS: Can you restate the question.

MS. DENNIS: Sure.

BY MS. DENNIS:

Q. Who had the ultimate authority in a room where it was you, Rita, Don, Jackie, Paula King and the people from Sodexo that you mentioned?

MR. HAYES: Object to the form of the question. And again, the same instruction.

THE WITNESS: Who had authority from

Drexel?
MS. DENNIS: Yes.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. Okay.
Do Don and Jackie and Paula report to Rita?
A. Yes.
Q. Do you report to Rita?
A. No.
Q. Does Rita report to you?
A. No.
Q. Okay.
How long was the negotiation process for the management agreement?
A. About 9 months.
Q. Okay.
I know you said that you attended some of the meetings but not all of the meetings, correct?
A. Correct.
Q. Do you recall how many you attending roughly?
A. I don't.
Q. Okay.
Do you know how many there were in

total roughly?
A. I don't.
Q. Do you know whether there's any person from Drexel who attended all of the meetings?
A. I don't know.
Q. Okay.
Have you participated in negotiating contracts prior to the Sodexomagic contract?
A. Yes.
Q. Do you have an opinion as to whether the negotiation process was unusually long or short in relation to those that you had participated in previously?
MR. HAYES: Object to the form of the question, asks for opinion testimony from a fact witness.
MS. DENNIS: You can answer.
THE WITNESS: I don't have an opinion.
BY MS. DENNIS:
Q. Okay.
Do you have an opinion as to whether it was an unusually difficult or unusually easy negotiation process?
MR. HAYES: Object to the form.

THE WITNESS: I don't have an opinion.
BY MS. DENNIS:
Q. Okay.
Were there particular terms in the negotiation process that were more challenging than others to decide on?
A. Yes.
Q. Okay.
Could you tell me what those terms were?
MR. HAYES: I want to make sure I interpreted your question correct. Are you asking her in terms of negotiating them with Sodexo?
MS. DENNIS: Uh-huh.
THE WITNESS: Can you repeat it.
MS. DENNIS: Yeah, sure.
BY MS. DENNIS:
Q. In terms of negotiating between Drexel and Sodexo, again, not asking you about conversations internal at Drexel where you would have been rendering legal advice. Were there particular terms that were more difficult to reach a resolution on?
A. Yes.
Q. What terms were those?

A. I wasn't at all of the meetings so I don't know which terms -- business terms were more difficult than others.
Q. Okay.
Were there specific terms that were areas of difficulty at the meetings where you were present?
A. Yes.
Q. And what terms were those?
A. The indemnification.
Q. Can you talk to me about what the difficulty was with that particular term?
A. It was just two parties negotiating an indemnification provision.
Q. Okay.
A. Coming from different sides.
Q. Was the indemnity piece a particularly important term to Drexel?
A. Yes.
Q. Okay.
And why is that?
MR. HAYES: Again, just communicate -- reveal legal strategy opinions.
THE WITNESS: Yeah.

MS. DENNIS: I will show you some emails I think you say to Tom Stanton that it is important and why so...

- - -

(Whereupon, Brown-2 was marked for identification.)

- - -

BY MS. DENNIS:

Q. Ms. Brown, if you can take a second and just read through this email. It's between you and Tom Stanton over the course of let's say the end of January, beginning of February, 2015.

A. Is there a question?

Q. So my question was and I'll strike the question why it was important to Drexel. But this email is relating to the negotiation of the indemnity provision, correct?

A. Correct.

Q. Okay.

Did you reach out to Tom Stanton specifically directly to discuss other terms in the management agreement?

A. Yes.

Q. Okay.

Which other terms did you discuss directly with Tom?
A. The provision regarding proprietary and confidential information, possibly the insurance. I can't remember if there were others.
Q. Okay.
But the indemnity piece is a piece that you said was a particular challenge in negotiating this agreement, correct?
A. Correct.
Q. Okay.
Could you describe for me the disagreement, if there was one, between the parties on the indemnity piece?
A. It was really a standard indemnification negotiation.
Q. Do you have an opinion as to why it posed a challenge in this particular negotiation?
MR. HAYES: Objection, ask opinion testimony from a fact witness.
THE WITNESS: Two parties have different positions.
BY MS. DENNIS:
Q. Okay.

Did Sodexo take issue with Drexel's original proposal on the indemnity provision?
A. Yes.
Q. Okay.
Was that issue expressed to you by somebody at Sodexo?
A. Yes.
Q. What was Sodexo's issue with Drexel's proposal?
A. It seems covered by Tom's email to me.
Q. I can read the email. I'm asking about your recollection.
A. It related mainly to claims involving Sodexo employees.
Q. Would you say that the negotiation of the indemnity provision was a large focus of the negotiation overall?
A. No.
Q. Okay.
What would you say was the biggest focus in terms of the meetings you attended?
A. The business terms.
Q. Okay.
And which terms were those

specifically?
A. All of the business terms.
Q. Okay.
Any specific business term more than others?
A. Not that I can recall.
Q. Okay.
Did Jim Tucker participate in any of the contract negotiations?
A. In terms of the meetings that I was present at?
Q. Yes.
A. I don't remember.
Q. Okay.
When did Jim Tucker leave Drexel?
A. I believe the end of calendar year, 2015.
Q. Did you participate in any negotiation meetings with Sodexo where the financial assumption sections were worked on?
A. No.
Q. Okay.
Did you ever have any conversations with anybody at Sodexo about the financial assumptions section of the management agreement?