A. No.
Q. Were you present at any negotiation meetings with Sodexo where enrollment was discussed at all?
A. I don't recall.
Q. Do you have any knowledge aside from privileged knowledge relating to Drexel's refusal to put enrollment numbers in the management agreement?
MR. HAYES: Object to the form of the question.
THE WITNESS: Can you restate that.
BY MS. DENNIS:
Q. Drexel did not want to put enrollment numbers into the management agreement, correct?
MR. HAYES: Object to the form.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. Okay.
So you didn't participate in the negotiation of the financial assumptions section of the management agreement, correct?
A. Correct.
Q. Okay.
Do you have any knowledge about the negotiation discussions between Sodexo and Drexel with

regard to the financial assumptions sections of the management agreement?

MR. HAYES: Don't reveal privileged information.

THE WITNESS: Can you restate the question.

BY MS. DENNIS:

Q. Do you have knowledge of conversations or discussions between Sodexomagic and Drexel with regard to the financial assumptions sections of the management agreement?

A. I don't.

Q. Okay.

At any of the meetings that you were at, the negotiation meetings with Sodexo and Drexel, was it communicated to Sodexo at any point that Drexel anticipated a decline in student enrollment?

MR. HAYES: Object to the form of the question, lack of foundation and personal knowledge, assumes facts not in evidence.

THE WITNESS: Can you repeat the question.

MS. DENNIS: Sure.

BY MS. DENNIS:

Q. At any of the meetings where you were physically present, not the meeting between Sodexo and Drexel, did anyone at Drexel ever represent to anybody at Sodexo that enrollment would decline?

MR. HAYES: Object to the form of the question.

THE WITNESS: I don't know.

BY MS. DENNIS:

Q. Okay.

Do you know of any time outside of negotiation meetings when someone at Drexel communicated to Sodexo that enrollment was predicted to decline?

MR. HAYES: Object to the form of the question, assumes facts not in evidence.

THE WITNESS: I don't know.

BY MS. DENNIS:

Q. Okay.

Did you ever communicate to anyone at Sodexo that enrollment was projected to decline?

MR. HAYES: Object to the form, assumes facts not in evidence.

THE WITNESS: Repeat it.

BY MS. DENNIS:

Q. Did you ever communicate to anybody at Sodexo that enrollment might decline?
A. No.
Q. Okay.
MR. HAYES: Same objection to form.
BY MS. DENNIS:
Q. At any of the meetings that you were present between Sodexo and Drexel relating to the negotiation of the management agreement did you hear anybody at Drexel communicate to Sodexo that enrollment would not grow?
MR. HAYES: Object to the form of the question.
THE WITNESS: I don't recall.
BY MS. DENNIS:
Q. Did you ever communicate to Sodexo that enrollment would not grow?
A. No.
MR. HAYES: Object to the form of the question.
BY MS. DENNIS:
Q. So you don't have any knowledge regarding the negotiation specifically of the financial assumptions section 9.1 and 9.2 in the management agreement,

correct?
A. Correct.
Q. Okay.
You have no knowledge of any versions of those terms proposed by Drexel, correct?
MR. HAYES: You can answer yes or no. But again, you can't reveal the substance of any privileged communication.
THE WITNESS: Can you repeat it.
BY MS. DENNIS:
Q. You don't have any knowledge of proposed versions of those terms that were provided by Drexel in the course of negotiations, correct?
A. When you say I don't have any knowledge how do I answer yes or no to that?
Q. Because I say correct at the end and you say yes, correct or no, not correct.
A. Okay, repeat it.
Q. You don't have any knowledge of proposed versions of those terms, 9.1 and 9.2 which are the financial assumptions, proposed by Drexel in the course of negotiations, correct?
MR. HAYES: Same instructions.
THE WITNESS: Not correct.

BY MS. DENNIS:

Q. So you do have knowledge of proposed versions of those terms provided by Drexel?

MR. HAYES: You can answer that yes or no.

THE WITNESS: Yes.

BY MS. DENNIS:

Q. Do you have knowledge of versions of those proposed terms provided by Sodexo?

A. Repeat that.

Q. Do you have knowledge of proposed versions of those terms provided by Sodexo?

A. Do I have knowledge? How is that question different than the one that I've already answered? I'm just trying -- I don't completely understand.

Q. Sure, I was asking if you saw versions that Drexel put out and the second question is any versions that Sodexo may have put together?

A. I saw different versions. I don't know whose versions they were.

Q. That's fair.

So you saw different versions of that section, but you didn't participate in negotiating that section yourself?

A. Correct.
Q. Okay.
Outside of a privileged context have you seen the management agreement before in its final form?
A. Have I seen the agreement?
Q. Yes.
A. Yes.
Q. Okay.
Are you familiar with the financial assumptions sections 9.1 and 9.2?
A. Yes.
Q. Okay.
So you're aware that that section acknowledges that the parties are relying on certain assumptions outside the contract, correct?
MR. HAYES: Object to the form of the question.
THE WITNESS: Are you asking me to interpret the contract?
BY MS. DENNIS:
Q. No, I'm asking you what it says on its face?
A. I don't have it in front of me.
Q. Okay, I can put it in front of you.

\- - -

(Whereupon, Brown-3 was marked for identification.)

\- - -

BY MS. DENNIS:

Q. So what you got in front of you is the management agreement between Sodexomagic and Drexel. It is the final version. I believe it's the signed version, yeah. So the terms that I have asked you about are on Page 30, Sections 9.1 and 9.2. So in Section 9.1 about four lines down the agreement states in addition, each party has relied on representations regarding existing and future conditions and projections made by the other in connection with the negotiation and execution of this agreement.

Did I read that correctly?

A. You did.

Q. Okay.

So Drexel was aware that in signing this agreement Sodexo and Sodexo was aware of Drexel as it's a mutual term -- strike that, let me start over.

In this agreement Drexel acknowledges that Sodexo is relying on representations regarding existing and future conditions --

A. There's no knowledge of this in the contract.
Q. The contract states that the parties are each relying on outside representations, correct?
MR. HAYES: Object to the form of the question. Also, the document speaks for itself. To the extent your asking the witness to interpret you're asking a legal conclusion, instruct the witness not to answer the question.
THE WITNESS: I'm not going to answer.
BY MS. DENNIS:
Q. Okay.
And what's the reason that you're not answering that?
A. It's a legal interpretation.
MR. HAYES: The contract is a question of law so you can only be asking the witness for a legal conclusion. She also did not negotiate these provisions. She testified that she saw these provisions when she was providing legal services to the client.
MS. DENNIS: No, she didn't.
MR. HAYES: She did.
MS. DENNIS: I don't believe that that's true. I asked if she saw it outside of that and

she said yes.

MR. HAYES: You said if she ever saw the contract outside of it.

MS. DENNIS: Yes.

MR. HAYES: Well, she saw it.

THE WITNESS: I've only seen this contract in connection with my role as Associate General Counsel.

MS. DENNIS: Okay, well, you were free to say that when I asked that question.

THE WITNESS: You asked if I ever seen the contract before.

MS. DENNIS: Outside of a privileged context is what I said. We can go back and look for it if you want.

BY MS. DENNIS:

Q. Okay.

So were you aware in signing the contract the parties were relying on outside representations?

MR. HAYES: Object to the form of the question. It misstates the terms of the document. Again, do not reveal any information that you received during the course of your legal services.

THE WITNESS: What was the question.
BY MS. DENNIS:
Q. Are you aware -- were you aware that in signing this contract Sodexomagic was relying on assumptions that are outside the contract?
MR. HAYES: Same objection, same instructions.
THE WITNESS: I wasn't aware.
MS. DENNIS: I wasn't asking you to interpret the contract. I'm asking your own personal knowledge and awareness.
BY MS. DENNIS:
Q. If you look in Section 9.2 there's a list on Page 31 and I don't want you to be reading those out of context so you can read the whole term if you want. I'm not going to read it into the record. But I would like to ask you about a couple of the things in this list on Page 31.
A. What's the question?
Q. That list on Page 31 is a list of financial assumptions; is that correct?
MR. HAYES: Objection, the document speaks -- there's a writing that speaks for itself. To the extent you're asking her to interpret it that's a

legal conclusion.

BY MS. DENNIS:

Q. Okay.

Section 9.2 describes these as financial assumptions. We can dispute that later. I'm not asking you that.

MR. HAYES: Same objection.

BY MS. DENNIS:

Q. I would like to direct your attention to the fourth bullet point where it says parties agree that the University's growth is a critical factor in calculating the investments afforded under this agreement and it has been projected by Sodexomagic that this growth will realize an increase of two percent per year in the freshman class year over year.

Did I read that correctly?

A. Yes.

Q. Okay.

Do you have any knowledge as to how the parties ultimately agreed to include that section?

A. I have no knowledge.

Q. Okay.

Do you have any knowledge as to how the parties came to agree to use a two percent figure in

this term?
A. I have no knowledge.
Q. Okay.
Did you review drafts of the management agreement?
A. Yes.
Q. Okay.
How many drafts would you say you reviewed?
A. I don't really remember.
Q. Okay.
Did you provide Rita with feedback on those drafts?
A. That's privileged.
Q. I'm not asking the substance of the feedback. I'm asking whether the feedback happened.
MR. HAYES: Just answer that question yes or no.
THE WITNESS: Yes.
BY MS. DENNIS:
Q. Was it required for you to sign off on each draft?
MR. HAYES: Again, she's not answering these questions if doing so requires you to interpret

the internal requirements of Drexel as a lawyer.

THE WITNESS: What is the question again?

BY MS. DENNIS:

Q. Did you have to sign off on drafts?

A. No.

Q. Okay.

- - -

Whereupon, a brief discussion was held off the record.)

- - -

(Whereupon, a brief break was taken at this time.)

- - -

BY MS. DENNIS:

Q. Okay.

So we left off talking about the negotiation of the management agreement. I just want to circle back around and make sure we're clear on a couple of things. So it's your testimony that you have no knowledge regarding the negotiation of the financial assumptions section of the management agreement, correct?

A. I wouldn't say no knowledge.

Q. Okay.
No knowledge with regard to discussions between Sodexomagic and Drexel?
A. Correct.
Q. Okay.
So you have no knowledge of what may have been said by either party in discussions of those terms, correct?
A. Correct.
Q. Okay.
Were you aware of whether Sodexomagic used the enrollment numbers in the RFP in crafting their RFP response?
MR. HAYES: Object to the form.
THE WITNESS: Can you restate it or rephrase it.
BY MS. DENNIS:
Q. Were you aware of whether Sodexomagic used the enrollment numbers in the RFP in crafting its RFP response?
MR. HAYES: Object to the form.
THE WITNESS: Was I aware at what point?
BY MS. DENNIS:

Q. Were you aware at the point when you were negotiating the management agreement?

MR. HAYES: Object to the form. And again, don't reveal -- object to the form.

MS. DENNIS: You can answer the question.

THE WITNESS: Can you rephrase it using more of a timeframe.

BY MS. DENNIS:

Q. Sure, at the time when you participated in the negotiations of the management agreement were you aware of whether Sodexomagic had used the enrollment numbers in the RFP in preparing its response?

MR. HAYES: Object to the form, lack of foundation and personal knowledge.

THE WITNESS: Does that mean I'm supposed to --

MR. HAYES: Yeah, so if I instruct you not to answer you shouldn't, but otherwise, you can answer the question.

THE WITNESS: Okay, I was not aware.

BY MS. DENNIS:

Q. Okay.

Do you have any knowledge of any

representations made to Sodexo by Drexel with regard to whether enrollment would increase?
A. Can you say that again.
Q. Do you have any knowledge of any reputations made by Drexel to Sodexo regarding whether enrollment would increase?
A. I'm not aware of any.
Q. Okay.
You never participated in any conversations with Sodexo regarding enrollment, correct?
MR. HAYES: Object to the form. The witness testified she either did not or did not recall any.
THE WITNESS: Can you repeat.
BY MS. DENNIS:
Q. Sure, you didn't personally have any conversations with Sodexo regarding enrollment, correct?
A. Correct.
Q. Okay.
Who is Huron Consulting Group?
A. A consulting group.
Q. Do you know anything else about them?

A. No.
Q. Do you know where they're located?
A. No.
Q. Do you know what kind of consulting services they provide?
A. No.
Q. Okay.
When did Drexel engage Huron Consulting Group?
MR. HAYES: Objection, lack of foundation and personal knowledge.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. What did Drexel engage Huron Consulting Group to do?
A. I don't know.
Q. Have you ever heard of the Huron Consulting Group?
A. Yes.
Q. Are you aware that Drexel engaged the Huron Consulting Group at some point?
MR. HAYES: Again, do not reveal any information you learned in the course of providing legal services or advice to Drexel.

THE WITNESS: Can you repeat the question.
BY MS. DENNIS:
Q. Are you aware that Drexel engaged the Huron Consulting Group?
A. I would only know that in connection with providing legal support to the University.
Q. Okay.
When did Huron's report come out?
MR. HAYES: Objection, lack of foundation, personal knowledge, same instruction.
THE WITNESS: I don't know.
BY MS. DENNIS:
Q. Okay.
Have you ever seen their report that Huron put out?
MR. HAYES: You can answer that question yes or no.
THE WITNESS: I have.
BY MS. DENNIS:
Q. Okay.
What did Huron recommend in its report regarding Drexel's admission strategy?
MR. HAYES: You should not reveal any

information you learned when providing legal advice or services to Drexel.

THE WITNESS: I only -- can you repeat the question.

BY MS. DENNIS:

Q. Sure, what did Huron recommend regarding Drexel's admission strategy?

A. That's privileged information.

Q. Okay.

The information in the report is privileged?

A. The information in the report would be privileged, but...

Q. It's not, but...

A. I'm sorry, would not be privileged.

Q. So what is your answer to what Huron recommended -- what did Huron recommend regarding admission strategy?

MR. HAYES: The witness only learned of the Huron reporting in connection with providing legal services to Drexel so she is not going to answer the question.

MS. DENNIS: I don't think that what she read is privileged. Her legal advice is

privileged.

MR. HAYES: It's information -- first off, it's privilege. It's attorney/client and work product.

MS. DENNIS: She didn't prepare this.

MR. HAYES: It doesn't matter. Her reading it, what she did she's beyond being in-house Counsel she is the in-house Counsel responsible at Drexel for managing this litigation. Just as you could not take the deposition of any of our trial lawyers and ask us what we think the Huron report said. You cannot ask her, Ms. Brown, what the Huron report said.

MS. DENNIS: I'm not asking her to --

MR. HAYES: There's plenty of witnesses who can testify about the Huron report and you'll get your opportunity if the case doesn't settle. But this witness is not going to do it, she's a lawyer.

MS. DENNIS: To be clear, I'm not asking what you learned as you prepared for this litigation.

MR. HAYES: Just to be clear, had you done anything --

MS. DENNIS: This report came out in 2013.

MR. HAYES: And she just testified she has not seen it other than in the course of representing Drexel. She had no responsibility for it.

MS. DENNIS: She can say that.

MR. HAYES: She did say that.

THE WITNESS: What was the question.

BY MS. DENNIS:

Q. I asked what Huron recommended regarding the admission strategy?

MS. DENNIS: Which you guys claimed 20 times over it became public information so I'm not sure how we're saying this is privileged now.

MR. HAYES: We're not claim that the Huron report is privileged. What we are claiming is that Ms. Brown learned about the report and was involved with the report in connection with serving as the attorney responsible for managing this litigation. And therefore, her views of that report or what it said is attorney/client and work product privilege. And if you disagree, so be it. But sitting here today, I'm not allowing her to answer that question. As I said, there will be plenty of witnesses if we go forward with this litigation who can address the facts of the case. You're not going to get it from the lawyer who

represents the University.

MS. DENNIS: Just because other people could talk about it it doesn't make it privileged --

MR. HAYES: I didn't say that it does.

BY MS. DENNIS:

Q. So to be clear, you are refusing to testify about anything in the Huron report because you read it in your capacity as representation for Drexel; is that correct?

A. Yes.

MS. DENNIS: I don't want to waste time either, Bob, but I don't think that -- I think you're stretching privilege a little ridiculously here. And if there are other witnesses who are going to testify about it then I don't see the point in hiding things like this. That's not necessary.

MR. HAYES: You know, I love the way you and Fazio love to say hide things, you know, and that's just improper. It's not the way we do things here in Philadelphia.

MS. DENNIS: I don't need you to lecture me on the record about our use of the word hiding.

MR. HAYES: Well, somebody aught to

lecture you about it. That's improper.

MS. DENNIS: I think you're being very disrespectful right now.

MR. HAYES: You are being disrespectful.

MS. DENNIS: Okay.

BY MS. DENNIS:

Q. What is the Student Life Cycle Management Initiative?

A. I don't really know.

Q. Have you ever heard of it before me saying it to you just now?

A. Yes.

Q. Okay.

When was it implemented at Drexel?

A. I have no idea.

Q. Okay.

How is it related to the Huron report?

A. I don't know.

Q. Okay.

Do you know who made the decision to implement the SLM Initiative -- or sorry, strike that.

Is it okay with you if I refer to it as the SLM Initiative?

A. Sure.
Q. Who made the decision to implement the SLM Initiative at Drexel?
A. I don't know.
Q. Okay.
Do you know whether the decision to implement it would have had to be approved by the Board of Trustees?
MR. HAYES: Objection, lack of foundation, personal knowledge. Also do not -- if it requires an interpretation of the bylaws or articles of the University but any of the corporate documentations don't answer the question.
THE WITNESS: What was the question?
BY MS. DENNIS:
Q. Do you know whether the Board of Trustees would have had to approve the implementation of the SLM Initiative?
A. I don't know.
Q. Okay.
Do you have any knowledge surrounding the decision to implement the Student Life Cycle Management Initiative?
A. No.