terms of the contract.
Did Drexel have a position at the renegotiations?
MR. HAYES: Object to the form of the question, vague and ambiguous.
THE WITNESS: I really don't completely understand.
BY MS. DENNIS:
Q. Did Drexel have an opinion regarding whether the enrollment decline affected the contract at all?
MR. HAYES: Again, if anything internal to Drexel was conveyed to you as part of providing legal services you should not disclose.
BY MS. DENNIS:
Q. I'll clarify. Their position as provided to Sodexo as communicated to Sodexo at these negotiation sessions are in the various communications.
Did Drexel have a position on whether the enrollment decline had an affect on the contract?
A. Drexel had a position.
Q. And what was that position as communicated to Sodexo?
A. That Sodexo may have seen a decrease in revenues for different reasons.

Q. Okay.
A. Not just relating to enrollment.
Q. What are those reasons?
A. Wait, can you rephrase the original question you just asked before or can you restate the question you just asked before?
Q. Sure, my question before was what was Drexel's position as communicated to Sodexo with regard to whether the enrollment decline affected the contract?
A. Okay, so the first part of the answer still stands that there may have been other reasons.
Q. Okay.
A. And also that Sodexo -- that we needed to be provided with information about Sodexo's financial numbers so that Drexel could be informed about Sodexo's position.
Q. Okay.
Was it Drexel's position as conveyed to Sodexo that Drexel had told Sodexo prior to the contract that enrollment would go down?
MR. HAYES: Object to the form of the question.
THE WITNESS: Can you rephrase that.
BY MS. DENNIS:

Q. Sure, was it Sodexo's position with regard to Sodexo that Drexel had told Sodexo that enrollment may go down?
A. Sodexo or Drexel's position? You said Sodexo's position.
Q. Was it Drexel's position -- and I'm sorry to be so wordy about it but I'm trying to clarify that I'm not asking for internal communication.
A. Yeah, it's really confusing.
Q. Was it Drexel's stated position at negotiations that Drexel had told Sodexo before the management agreement was signed that enrollment might go down?
MR. HAYES: Object to the form of the question.
THE WITNESS: I don't remember.
MS. DENNIS: Okay.
\- - -
(Whereupon, a brief discussion was held off the record.)
\- - -
(Whereupon, a brief break was taken at this time.)
\- - -

BY MS. DENNIS:

Q. So we left off talking about the renegotiation of the management agreement. In terms of the sessions that you participated in with Sodexo, were there parts of the renegotiation proposals that the parties agreed on?

A. Yes.

Q. Do you recall specifically what those parts were?

A. Well, not offhand.

Q. Okay.

Do you remember any particular stumbling blocks to the renegotiation?

A. The shortfall -- the alleged shortfall.

Q. Okay.

Can you tell me a bit of that issue?

A. Sodexo was requesting that Drexel reimburse Sodexo for an alleged pro forma shortfall.

Q. Okay.

And what was their calculation of that shortfall based on, if you know?

A. We weren't provided with a lot of information from Sodexo on the shortfall. Sodexo provided a -- their calculation of what they had budgeted as to the

number of freshman, I believe, freshman. It could have been as to the number of meal plans they thought they were going to sell. I don't remember exactly what their budge was versus the actual number of either freshman or meal plans sold multiplied by the daily rate and that's how they -- that's the shortfall that they -- pro forma shortfall that they were alleging.

Q. As part of the renegotiations did you ever see a pro forma prepared by Sodexo?

A. There was -- I don't know if you would -- I don't think it was a pro forma. They prepared a rough calculation. I don't know what -- there were financial -- there was financial information exchanged.

Q. Okay.

To go back for one second. As part of the initial negotiation at the management agreement in terms of sessions that you participated in with Sodexo, did you see a pro forma from Sodexo at that point?

A. No.

Q. Okay.

So you testified that it was Sodexo's position during renegotiations that Drexel should reimburse Sodexo for these pro forma shortfalls, correct?

A. That was Sodexo's position.
Q. What was Drexel's position as communicated to Sodexo on that issue?
A. That the contract does not require Drexel to provide any subsidy or reimburse Sodexo for any alleged operating shortfalls.
Q. Okay.
When you spoke with Tom Stanton directly around the time that the notice of default was sent by Sodexo did he explain to you in that call what his position and why he believed Drexel was in default?
A. Repeat it again, I'm sorry.
Q. On the call with Tom Stanton around July 25th, did Tom explain to you Sodexo's position and why they believed that Drexel was in default?
A. Yes.
Q. Okay.
What was his explanation?
A. He alleged a breach of contract and a fraud claim.
Q. On this call in July of 2016?
A. I don't know if it -- we had 2 or 3 calls close together. I don't remember exactly which call, but yes, around that time.

Q. Okay.

In this letter and I'll give you a minute to read it if you didn't glance at it before. Why don't you do that now.

A. Okay.

Q. So in this letter Tom describes a meeting between Len Riccio and Rita LaRue or a conversation on July 18th. Do you know whether -- well, he says the day before the July 19th letter. So I'm deducing it was the 18th. Do you recall whether you were present for that particular discussion of proposals?

A. I was rereading that paragraph. Can you repeat your question?

Q. Yeah, that's fine. So he seems to be referring to a meeting between Mr. Riccio and Rita LaRue the day before in the July 19th letter from Ms. LaRue. Do you know whether you were present for the meeting that he's talking about or conversation that he's talking about?

A. I was not present.

Q. Okay.

On your call with Mr. Stanton did you discuss this particular allegation that Rita had gone back on some kind of understanding that she and

Mr. Riccio had?
A. That didn't come up specifically that I recall.
Q. Okay.
Would Rita have had the authority to agree to something in a conversation with Mr. Riccio?
MR. HAYES: To the extent that it requires legal interpretation of the bylaws or other governing documents with Drexel you should not answer the question.
THE WITNESS: Yeah, I don't think I can answer that.
BY MS. DENNIS:
Q. Okay.
Have you seen the letters attached to this letter before receiving them with Tom's letter?
A. Yes.
Q. Okay.
Do you know whether the parties continued to negotiate the management agreement after this notice of default was sent?
A. They did.
Q. Okay.
Did you participate in negotiations

after the time that this notice of default was sent?
A. I did.
Q. Okay.
Did you respond to this letter?
A. I think I sent an email response.
Q. Okay.
Do you recall what your response was to this letter?
A. I believe based on a conversation that I had with Tom after this was sent or around the time it was sent I wrote back with information about possible meeting times with Drexel and also a denial that we were in breach of the agreement.
Q. Okay.
Tom's letter there in the last paragraph references the agreement and gives a 10 day notice to cure; is that correct?
A. Yes.
Q. Okay.
Sodexo extended that cure period, right?
A. I believe the email from Tom said something about tolling it.
Q. Okay, I think I have the email here.

- - -

(Whereupon, Brown-6 was marked for identification.)

- - -

BY MS. DENNIS:

Q. Is this the document you're referring to --

A. No.

Q. -- where Sodexo agreed to toll the period?

A. No.

Q. Okay.

So there's a different document where Sodexo agreed to toll the cure period?

A. Yes.

Q. Okay.

Nonetheless, Sodexo agreed to toll it until September 30th, 2016; is that correct?

A. I don't believe the original email had a hard date.

Q. Okay, all right.

Did Drexel cure the alleged breaches in that time period?

MR. HAYES: Object to the form of the question.

THE WITNESS: How am I supposed to

answer that question?
MS. DENNIS: You can say you don't know.
THE WITNESS: Can you restate it?
BY MS. DENNIS:
Q. So the contract provides for a cure period and the way that mechanism works is you notice default based on alleged breaches and then the cure period.
A. Drexel was never in default.
Q. Okay, so Drexel didn't take any steps to cure alleged breaches?
MR. HAYES: Object to the form of the question.
THE WITNESS: Drexel continued to negotiate in good faith.
MS. DENNIS: It's not responsive to the question that I asked.
MR. HAYES: Yes, it is.
BY MS. DENNIS:
Q. Okay.
Drexel actually just a couple weeks after this sent its own termination letter; is that correct?
A. Yes.

Q. Okay.

MR. HAYES: Just so the question is clear, after this do you mean Mr. Fazio's September 1, 2016.

MS. DENNIS: After the exhibit we just looked at Mr. Fazio's September 1st letter.

BY MS. DENNIS:

Q. Did Drexel attempt to terminate the agreement at any point before Sodexo's July 25th notice of default?

A. Not to my knowledge.

Q. Okay.

Drexel didn't allege any breach by Sodexo prior to Mr. Stanton's July 25th notice of default, correct?

A. Well, Drexel had requested that Sodexo provide the required documentation as required by the contract to enter into discussions about the renegotiation.

Q. Okay.

But had Drexel notified Sodexo that it was in breach of the agreement prior to July 25th, 2016?

A. Drexel did not send any notice.

Q. So Drexel alleged breach for the first time

after the notice of default from Mr. Stanton went to you?

MR. HAYES: Object to the form.

THE WITNESS: Can you repeat the question?

BY MS. DENNIS:

Q. Sure, Drexel alleged for the first time that Sodexo was in breach of the agreement after Mr. Stanton's July 25th, 2016 letter to you?

MR. HAYES: Same objection.

THE WITNESS: Is there a specific document that you're referring to.

MS. DENNIS: Sure, I can show you Drexel's termination letter if that is helpful to you. But I don't know that there's a specific document relating to Drexel not doing something.

Do you want to see the termination letter?

THE WITNESS: Yeah.

MS. DENNIS: Sure.

\- - -

(Whereupon, Brown-7 was marked for identification.)

\- - -

THE WITNESS: What part of this letter are you talking about?

MS. DENNIS: I wasn't asking about this letter. You asked to see the letter.

THE WITNESS: Okay, what was your question?

BY MS. DENNIS:

Q. My question was that whether Drexel alleged breach of contract against Sodexo at any point prior to Tom Stanton's July 25th, 2016 notice of default to your knowledge?

A. No.

Q. Okay.

You never sent a letter alleging breach by Sodexo prior to Tom's July 25th, 2016 letter?

A. No.

Q. So after this letter went out, the exhibit you're looking at right now, Sodexo eventually terminated the agreement; is that correct?

A. There was another letter from your firm I believe terminating the agreement but agreeing to continue to perform.

Q. Okay.

So as you were saying Sodexo didn't

leave campus at the time that it terminated the agreement, correct?
A. Sodexo was there until December 10th.
Q. Okay.
Is that the end of the semester -- trimester, however, it operates, the term?
A. The term, the Fall term.
Q. Okay.
Was Sodexo required to stay on after terminating the agreement until the end of the term?
MR. HAYES: Objection, it asks the witness for a legal conclusion. I instruct her not to answer.
MS. DENNIS: Are you not going to answer?
THE WITNESS: Required by the terms of the contract?
MS. DENNIS: Yes.
THE WITNESS: I think that would be a legal conclusion.
MS. DENNIS: Okay, so you're choosing not to answer?
THE WITNESS: Uh-huh.
MS. DENNIS: Okay.

BY MS. DENNIS:

Q. Switching gears a little bit, you testified earlier that your boss, Mr. Exler, reports to President Fry; is that correct?

A. Correct.

Q. Okay.

To be clear, nothing I'm asking you is asking for the substance of communications. I'm sure Mr. Hayes will make his objections noted for the record, as he's entitled to do, but I'm not asking for substantive communication.

Do you know whether President Fry was involved in the decision to retain the Huron Consulting Group?

MR. HAYES: You can answer that yes or no.

THE WITNESS: I don't know.

BY MS. DENNIS:

Q. Okay.

Do you know whether he ever received a copy of the resulting report?

MR. HAYES: Same instruction.

THE WITNESS: I don't have personal knowledge.

BY MS. DENNIS:
Q. Okay.
Do you know whether President Fry was aware of the recommendation in the report?
A. The same answer, I don't have personal knowledge.
Q. Okay.
Did you and President Fry ever meet to discuss the report?
A. No.
Q. Okay.
Did you ever meet with him to discuss the SLM Initiative?
A. No.
Q. Did you ever meet with him to discuss the Sodexomagic contract?
A. No.
Q. Okay.
Did you ever meet with him to discuss the SLM's potential affect on enrollment?
MR. HAYES: Object to the form.
THE WITNESS: Didn't I already say I didn't meet with him.
BY MS. DENNIS:

Q. To discuss the SLM generally; is that what you're referring to?
A. Yeah, you just asked me if I met with him to discuss any of those things and I said no.
Q. Okay, so your answer is no.
Do you know whether President Fry was involved in the decision to implement the SLM Initiative?
A. What's the question again?
Q. Do you know whether President Fry was involved in the decision to implement the SLM Initiative?
A. I don't have personal knowledge.
Q. Okay.
Do you know whether he had a role in the implementation of it -- of the SLM Initiative?
A. He's the President of the University. I don't know personally.
Q. Okay.
Do you know whether President Fry was involved in the decision to issue an RFP for dining services?
A. I don't have personal knowledge of that.
Q. Okay.
Do you know whether President Fry was

involved in the evaluation of RFP responses?
A. I don't believe he was.
Q. Okay.
I may have asked this earlier and I apologize. Do you know whether he had to sign off on the selection of the RFP winning vendor?
A. You did ask that before and I don't know.
Q. Okay.
Are you aware that President Fry signed the award letter that went to Sodexo telling them they had won the RFP process?
A. I don't know what document or letter you're talking about.
Q. Okay.
Are you aware of whether President Fry ever communicated with Sodexo about the RFP process?
A. No.
Q. Okay.
Was President Fry involved in the initial negotiation of the management agreement?
A. No.
Q. Did you ever have conversations with him about the negotiation of the management agreement?
A. No.

Q. Okay.
Did you ever discuss any of the terms of the management agreement with President Fry?
A. No.
Q. Did President Fry review any drafts of the management agreement?
MR. HAYES: Object to form.
THE WITNESS: I don't believe so.
BY MS. DENNIS:
Q. Okay.
Do you know whether President Fry reviewed the final version of the management agreement?
A. I don't know.
Q. Are you aware that he signed the management agreement?
A. Yes.
Q. Okay.
President Fry's Dear Colleague letter that we discussed before that went to the faculty and staff. So at the -- in this email President Fry says that he discussed the impact of the SLM with campus leaders. Were you one of those leaders that he discussed it with?
A. No.

Q. Okay.
Did you ever have any conversations with President Fry about enrollment?
A. No.
Q. Okay.
Was President Fry involved in the renegotiation of the management agreement?
A. No.
Q. Do you know whether he was kept informed about the status of the renegotiations?
A. I don't know.
Q. Do you know whether he knew that the renegotiation was going on?
A. I believe so.
Q. Okay.
Without revealing anything -- well, if there's anything other than privileged answer to this, what's the basis of that belief that he knew that the negotiations were going on?
A. I don't have anything other than privileged information on that.
Q. Was President Fry involved in the decision to send a notice of termination to Sodexo?
MR. HAYES: Again, if the only basis

for answering that is privileged information I don't think you can answer that yes or no.

THE WITNESS: What was the question?

BY MS. DENNIS:

Q. Do you know whether President Fry was involved in the decision to send a notice of termination to Sodexo?

A. I don't know.

Q. Okay.

Did you ever discuss Sodexo's notice of default with President Fry?

A. I did not personally.

Q. Okay.

Did you ever discuss Sodexo's notice of termination with President Fry?

A. I did not.

Q. Okay, all right.

MS. DENNIS: I think that that's everything I have. I'd like to keep this deposition open based on the amount of questions that were refused to answer subject to any ruling of the Judge on any of those issues. But I thank you very much for your time today. I know that being deposed is not a delight.

MR. HAYES: I do just have a few

follow-up questions.

THE WITNESS: Uh-huh.

\- - -

EXAMINATION

\- - -

BY MR. HAYES:

Q. Directing your attention to your testimony concerning whether Drexel sent a notice of default prior to having seen Exhibit-5 from Mr. Stanton, okay.

A. Uh-huh.

Q. At least in your presence did Drexel ever communicate dissatisfaction with Sodexo's performance under the contract?

A. Yes.

Q. Okay.

And what issues did it express dissatisfaction to the best you can recall as you sit here today?

A. The information that was required to be provided by Sodexo under the management agreement in order to trigger negotiations between the parties, discussions between the parties, as well as some performance related issues.

Q. Do you recall him addressing the issue with

Magic Johnson's failure to appear at Drexel?

MS. DENNIS: Objection.

THE WITNESS: That was one of the performance related issues.

MR. HAYES: Okay, no other questions.

MS. DENNIS: Thank you.

\- - -

(Whereupon, the deposition was concluded at 12:45 p.m.)

\- - -

C E R T I F I C A T E

\- - -

STATE OF PENNSYLVANIA:

: SS

COUNTY OF PHILADELPHIA:

I, Michelle Palys, Court Reporter-Notary Public within and for Philadelphia County, State of Pennsylvania, do hereby certify that the foregoing testimony of MELISSA BROWN, was taken before me at Dechert, 2929 Arch Street, Philadelphia, Pennsylvania on June 21, 2017; that the foregoing testimony was taken by me in shorthand by myself and reduced to typing under my direction and control, that the foregoing pages contain a true and correct transcription of all of the testimony of said witness.

Michelle Palys

MICHELLE PALYS
Notary Public
My Commission expires
December 23, 2021