**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SODEXOMAGIC, LLC**<br><br>**v.**<br><br>**DREXEL UNIVERSITY** | **CIVIL ACTION**<br><br>**NO. 16-5144** |

**MEMORANDUM RE: MOTIONS FOR SUMMARY JUDGMENT
AND MOTIONS TO STRIKE**

**Baylson, J.**                                              **August 2, 2018**

I.    Introduction ........................................................................................................ 4

II.   Factual Background ............................................................................................ 5

   (A)    The Parties ................................................................................................. 5

   (B)    The Bid Process .......................................................................................... 5

   (C)    Reaching the Terms of the Management Agreement ................................. 8

   (D)    Freshman Enrollment Declines ................................................................ 12

   (E)    Sodexo Misses Profit Projections ............................................................ 13

   (F)    Contract Termination .............................................................................. 14

III.  Motions to Strike .............................................................................................. 15

   (A)    Drexel's Motion to Strike ........................................................................ 15

      (1)    Legal Standard ................................................................................... 15

      (2)    Discussion .......................................................................................... 17

   (B)    Sodexo's Motion to Strike ....................................................................... 19

IV.   Motions for Summary Judgment ...................................................................... 20

   (A)    Legal Standard ......................................................................................... 20

   (B)    Drexel's Motion for Summary Judgment as to Sodexo Count I (Fraudulent Inducement) ............................................................................................................ 21

      (1)    The Parol Evidence Rule ..................................................................... 22

         a)    Procedural Background ..................................................................... 22

         b)    The Parties' Contentions ................................................................. 23

c) Pennsylvania Caselaw..................................................................................24

d) Integration ........................................................................................................30

e) Ambiguity .........................................................................................................34

f) Sodexo's Submission Regarding the Parol Evidence Rule................................35

(2) Gist of the Action Doctrine..................................................................................38

(3) Clear and Convincing Evidence of Misrepresentations or Omissions.....................42

(B) Drexel's Motion for Summary Judgment as to Sodexo Count II (Breach of Contract)43

(1) Drexel's Motion and Reply ..................................................................................43

(2) Sodexo's Response ..............................................................................................44

(3) Analysis..............................................................................................................44

(C) Motions for Summary Judgment as to Sodexo Count V (Breach of Contract) ...........47

(1) Briefing with Respect to Drexel's Motion..............................................................48

a) Drexel Motion for Summary Judgment on Sodexo Count V (Breach of Contract) . 48

b) Sodexo's Response to Drexel's Motion..................................................................49

(2) Briefing With Respect to Sodexo's Motion............................................................49

a) Sodexo's Motion for Summary Judgment as to Sodexo Count V (Breach of
Contract) ............................................................................................................49

b) Drexel's Response ...............................................................................................49

(3) Analysis of Cross-Motions for Summary Judgment as to Sodexo Count V (Breach of
Contract) ..........................................................................................................51

a) The Alleged 2016 Agreement ...............................................................................51

i. Meeting of the Minds...........................................................................................53

ii. Consideration .....................................................................................................54

b) Sodexo Count V Continued: Claims Based on the Management Agreement .........56

(D) Drexel's Claims against Sodexo ...............................................................................58

(1) Fraudulent Inducement (Drexel Count I)..............................................................58

a) Sodexo's Motion.................................................................................................58

b) Drexel's Response ...............................................................................................59

c) Analysis..............................................................................................................61

(E) Breach of Contract (Drexel Count II) ........................................................................62

(1) Breach of Key Management Positions Clause.........................................................62

(2) Breach of Monetary Support Provisions................................................................64

(3) Breach of Provision for Visits from "Magic" Johnson.............................................67

2

    (4)      Breach for Failure to Discuss Key Performance Indicators......................................... 68

  (F)      Drexel's Motion for Summary Judgment on Sodexo Count III (Unjust Enrichment) . 70

    (1)      Parties' Contentions ............................................................................................... 71

    (2)      Analysis.................................................................................................................. 71

  (G)      Drexel's Motion for Summary Judgment on Sodexo Count IV (Punitive Damages) .. 75

V.  Conclusion ........................................................................................................................... 76

# I. Introduction

At its core, this case concerns a breakdown in business relations between a large, private university and its dining services vendor, with which it had a multimillion-dollar, long-term contract.

The case began with Plaintiff SodexoMAGIC, LLC ("Sodexo") filing a four-count complaint alleging: (1) fraudulent inducement; (2) breach of contract; (3) unjust enrichment; and (4) punitive damages. Since then, Defendant Drexel University ("Drexel") asserted two counterclaims against Sodexo for, (1) fraud, and (2) breach of contract, and Sodexo added one supplemental claim to its original allegations ("Count V") for breach of contract. Accordingly, there are now five claims alleged against Drexel and two counterclaims alleged against Sodexo. The case has featured various motions to dismiss, motions to compel, attorney-client privilege disputes, and motions for sanctions—among many other motions—which have been extensively litigated and decided by this Court in prior opinions (or held in abeyance pending further developments), and will not be restated here.

Presently before the Court are four motions:

(1) Drexel's Motion to Strike seeks to strike four declarations submitted by Sodexo in support of its Response to Drexel's Statement of Undisputed Material Facts. (ECF 208).

(2) Sodexo's Motion to Strike seeks to strike Drexel's Appendix to its Motion for Summary Judgment. (ECF 221).

(3) Sodexo's Motion for Summary Judgment seeks a ruling that, as a matter of law, dismisses Counts I and II of Drexel's Counterclaim for fraud and breach of contract, and enters judgment in favor of Sodexo as to Sodexo's Count V. (ECF 200).

(4) Drexel's Motion for Summary Judgment seeks to dismiss all five Counts brought by Sodexo. (ECF 220).

## II.  Factual Background

### (A) The Parties

Plaintiff SodexoMAGIC is a Delaware limited liability company with its principal place of business in Maryland.  (ECF 211 ¶ 1).  SodexoMAGIC is a joint venture between Sodexo Operations, LLC, a wholly-owned subsidiary of Sodexo, Inc., and Magic Food Provisions, LLC, a wholly-owned subsidiary of Magic Johnson Enterprises.  (ECF 213, at 1 n. 1).  Defendant Drexel University is a Pennsylvania non-profit institution based in Philadelphia.  (ECF 211 ¶ 2).  Marriott Management Services Corp., which was subsequently acquired by Sodexo Management, Inc., began providing dining services at Drexel in 1995.  (ECF 11 ¶ 5; ECF 213 ¶ 18).  Dining services generally consisted of managing and operating student and faculty dining halls and retail locations and catering University meetings, events, and functions.  (Id. ¶ 19).

### (B) The Bid Process

On April 18, 2014, Aramark Corp. ("Aramark"), a dining services competitor of Sodexo Management, Inc. (see ECF 211 ¶ 4), approached Drexel with an unsolicited proposal to provide dining services at Drexel.  (Id. ¶ 6).  The operative contract then in place between Drexel and Sodexo Management, Inc., was not due to expire until 2018.  (Id. ¶ 7).  Nevertheless, following Aramark's proposal, which included an offer to invest $14.5 million in Drexel's campus, Drexel terminated its contract with Sodexo Management, Inc., and began a process of putting their dining services contract out to bid in June, 2014.  (Id.).

Drexel's dining services bidding process occurred in two phases.  (Id. ¶ 8).  On June 9, 2014, as part of the first phase, Drexel distributed a Request for Proposal Qualification Overview (also knowledge as a Request for Information, or "RFI") to five companies to qualify the firms

with the best chance to compete for the contract. (Id. ¶ 9). The RFI sent to potential bidders asked responding firms, among other things, to "commit a minimum of $20M over the 10 year agreement with $12M paid up-front." (Sodexo SOF, Ex. 9). The RFI estimated the contract value "to be between $275M and $300M over the term," but made clear "this is strictly an estimate based on past performance and is in no way to be misconstrued as a firm commitment." (Id.).

As part of the second phase, following a determination of which companies responded favorably to the RFI, Drexel distributed a Request for Proposal ("RFP") on July 2, 2014 to four companies that remained in contention for the dining services contract. (Id. ¶ 9). Among the four companies remaining in contention were Aramark and SodexoMAGIC. (Drexel SOF, Ex. 3-8). The RFP stated that "The University's Strategic Plan calls for an enrollment increase from our current number of 26,132 to 30,470 students by 2017 and to 34,000 students by 2021." (Sodexo SOF, Ex. 14). The RFP continued, "[p]roposed programs, facilities and infrastructure of services should be aligned to this plan." (Id.). The RFP made clear that "traditional meal plans (aka residential, 'all-inclusive,' board plans, etc.) are required for residential freshmen and may be purchased on a voluntary basis by all other students and customers." (Id.).

In an appendix to the RFP, Drexel projected the number of dining services participants who would purchase a variety of meal plans, with projections "based on information available at time of budget submission." (Id., Ex. 14, at App'x. II). Drexel calculated the estimated number of meal plans based on an assumption of 3,100 students in the freshman class. (Resp. to Sodexo SOF ¶ 18; Sodexo SOF, Ex. 16 (Email from Drexel representative stating, "we gave the bidders participant numbers based on a freshman class of 3,100 and the FY budget that was loaded by

Finance is based on 2,800.").

In a pre-proposal meeting Drexel held separately with Sodexo and other bidders in July, 2014, Drexel informed the prospective bidders via PowerPoint presentation that the University's "Strategic Growth Plan" was to:

> [g]row enrollment commensurate with student demand and academic capacity, initially by adding graduate and transfer students, and then, after a three-year period, gradually growing subsequent undergraduate freshman classes. By 2017, Drexel will increase enrollment from our current number of 23,500 to 30,470 students; by 2021, Drexel will increase to 34,000 students.

(Sodexo SOF, Ex. 11).

The PowerPoint presented to the prospective bidders also stated that the "Strategic Growth Plan" was to:

> Grow enrollment commensurate with student demand and academic capacity, initially by adding graduate and transfer students, and then, after a three-year period, gradually growing subsequent undergraduate freshman classes.

(Id.).

Sodexo submitted its Initial Proposal for the dining services contract to Drexel on July 25, 2014. (Id., Ex. 19). Sodexo's Initial Proposal stated:

> The financial terms set forth in this proposal and other obligations assumed by SodexoMAGIC herein are based on conditions in existence on the date SodexoMAGIC commences operations, including, by way of example, Client's attendance history; labor; food and supply expenses; and federal, state and local sales, use and excise taxes. In addition SodexoMAGIC has relied on representations regarding existing and future conditions made by [Drexel] in connection with the negotiation and execution of the proposal. In the event of a change in the conditions or the inaccuracy or breach of, or the failure to fulfill, any representation by [Drexel], the financial terms and other obligations assumed by

7

> SodexoMAGIC shall be renegotiated on a mutually agreeable basis
> to reflect such change, inaccuracy or breach.

(Id.).

On August 6, 2014, Drexel asked Sodexo and Aramark to each submit a Best and Final

Offer ("BAFO"). (Resp. to Sodexo SOF ¶ 24). On August 8, 2014, Sodexo submitted its

BAFO. (Id. ¶ 25). On August 12, 2014, Drexel's Campus Dining Selection Committee

unanimously selected (9-0) and recommended awarding Sodexo the campus dining contract.

(Sodexo SOF Ex. 21). On August 15, 2014, Drexel sent a letter to Sodexo, which stated, among

other things:

> I am pleased to tell you that SodexoMAGIC has been awarded the
> campus dining contract. The award includes all financial
> components of the original SodexoMAGIC proposal submitted as
> well as all enhancements included in the Best and Final Offer
> ("The Proposal"). Beginning August 25, 2014, Drexel University
> proposes to reinstate the contract currently in effect and
> incorporate The Proposal as an amendment while a new agreement
> is negotiated during a period not to exceed 60 days.

(Id., Ex. 22).

### (C) Reaching the Terms of the Management Agreement

From this stage onwards, the principal negotiators of the Management Agreement were,

on behalf of Drexel, Rita LaRue, Don Liberati, Stacey Kara, Melissa Brown, and Paula King (id.

¶ 31); and on behalf of Sodexo, Nancy Arnett and Rush Sherman. (Id. ¶ 32).

On September 12, 2014, Sodexo sent to Drexel a first proposal for the terms of the

Management Agreement, and then, on September 19, 2014, Sodexo sent to Drexel a first draft of

the comprehensive Management Agreement. (Resp. to Sodexo SOF ¶¶ 30, 33). On September

30, 2014, LaRue (of Drexel) wrote to Sherman (of Sodexo): "We received the draft master

agreement . . . .  I do have to say that there are several inconsistencies and/or omissions from the SodexoMagic proposal and best and final offer that my team is having to check, revise and add . . . ."  (Sodexo SOF, Ex. 25).

As negotiations proceeded, Arnett (of Sodexo) wrote an internal email to Sodexo listing three "potential stumbling blocks":

> 1. Indemnity . . .
> . . .
> 2. Meal Plan Rates . . .
> . . .
> 3. Financial Assumptions:  In the RFP and presentations, Drexel provided specific student enrollment goals and suggested that bidders should take these into consideration when preparing a financial proposal.  We included these assumptions to act as a trigger for discussion and mutually agreeable modification to the contract in the financial assumptions section – however [LaRue] violently objected to any kind of mention of specific numbers.  She expressed that these were goals only and were never intended to be anything that we could count on. . . . I stressed that the numbers are not included as a guarantee on Drexel's part, but rather a baseline to trigger a conversation.  Went over like a lead balloon.  We left it that I would ask legal to take another pass at the language and they would see, but she told me that she would not take any type of specific numbers to her leadership.
> . . .
> I think that finance should prepare a cast of numbers at their proposed meal and potentially lower student population rate to better judge the overall [year-over-year] impact of any reductions to Sodexo.

(Id., Ex. 27).

Ultimately, the parties agreed to the Management Agreement, the most relevant sections of which are excerpted below:

3.1   Term and Termination.

A.     The term of the Agreement is ten (10) years, ten

(10) months, and five (5) days [] commencing [retrospectively] on August 25, 2014 and continuing until June 30, 2025.

. . .

B.    If either party breaches a material provision hereof ("Cause"), the non-breaching party shall give the other party notice of such Cause. If the Cause is remedied within ten (10) days in the case of failure to make payment when due or thirty (30) days in the case of any other Cause, the notice shall be null and void. If such Cause is not remedied within the specific period, the party giving notice shall have the right to terminate this Agreement . . . .

C.    Either party may terminate this Agreement at any time upon sixty (60) days' prior written notice to the other party.

. . .

8.15    Campus Visits by Earvin "Magic" Johnson. Mr. Johnson shall appear on [Drexel's] campus (or mutually agreed upon location) as mutually agreed by the parties for up to two (2) 90-minute speaking engagements annually during the term of this Agreement provided that the appearance dates can be mutually agreed upon by the parties. At the time of the request, [Drexel] shall propose a minimum of three (3) dates for consideration and approval subject to Mr. Johnson's availability and provide a proposed agenda for Mr. Johnson's review and consideration. Any such request shall be made a minimum of twelve (12) weeks in advance.

. . .

8.17    Measurable Outcomes. SodexoMAGIC shall be evaluated using mutually agreed upon Key Performance Indicators (KPIs) set forth in Exhibit J which shall be used to monitor SodexoMAGIC performance and [Drexel] patron satisfaction. The KPIs shall be reviewed annually by the parties during the Annual Business Review . . . .

. . .

9.1    Changes in Policies and Practices. The financial terms set forth in this Agreement and other obligations assumed by SodexoMAGIC hereunder are based on conditions in existence on the date SodexoMAGIC commences operations, including by way of example, [Drexel's] student population; labor, food, and supply costs; and federal, state and local sales, use and excise tax. In addition, each party has relied on representations regarding existing and future conditions and projections made by the other in connection with the negotiation and execution of this Agreement. In the event of a change in the conditions or the inaccuracy or breach of, or the failure to fulfill, any such representation by a

party, the financial terms and other obligations assumed by the other party shall be renegotiated on a mutually agreeable basis to reflect such change, inaccuracy or breach. SodexoMAGIC shall submit any requested changes and the cause for such changes to [Drexel], in writing, prior to any negotiations.

9.2     Financial Assumptions.        In the interest of a strong and lasting partnership, [Drexel] agrees to review the following items with SodexoMAGIC at the annual meeting in July of each year and discuss any applicable revisions to the Agreement that are mutually agreeable based on any deviations, provided that the relevant data and supporting documentation is submitted to [Drexel] thirty (30) days in advance of the meeting.  [Drexel] recognizes that SodexoMAGIC made certain assumptions in preparing the financial package offered in this Agreement and understands that changes to the financial assumptions below may have an adverse economic impact on SodexoMAGIC; in such cases, [Drexel] shall work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact. SodexoMAGIC acknowledges its responsibility to respond quickly and expertly to factors under their control that may affect these outcomes.

- . . .
- Parties agree that the University's growth is a critical factor in calculating the Investments afforded under this Agreement and it has been projected by SodexoMAGIC that this growth will realize an increase of 2% per year in the freshman class year over year. . . .
- . . .
- Minimum Catering Net Sales of Three Million Four Hundred Thousand Dollars ($3,400,000) in full Contract Year 1 (July 1, 2015 through June 30, 2016) with projected growth of three percent (3%) annually thereafter.

. . .

10.11  Amendments to Agreement. All     provisions    of    this Agreement hereto shall remain in effect throughout the term thereof unless the parties agree, in a written document signed by both parties, to amend, add or delete any provision.   This Agreement contains all agreements of the parties with respect to matters covered herein, superseding any prior agreements, and may not be changed other than by an agreement in writing signed by the parties hereto.  This Agreement shall inure to and bind all parties, their successors and assigns.

> 10.12 Collection Costs and Costs to Enforce Indemnity Obligations. The parties shall pay each other the reasonable collection expenses, attorneys' fees and court costs incurred in collecting from each other any amount not paid when due, and/or in connection with the enforcement of an indemnity obligation of a party under this Agreement.

(Id., Ex. 1).

The parties executed the Management Agreement, which is dated May 21, 2015, in late-May, 2015. (Drexel Resp. to Sodexo SOF ¶ 40).

### (D) Freshman Enrollment Declines

Incoming freshmen for the 2015-2016 academic year had an "unofficial" deadline of May 1, 2015 for accepting offers to attend Drexel. (Id. ¶ 46). A set of "talking points" for a Drexel Board of Trustees meeting sent on May 11, 2015 stated that "[m]uch of what we expected, given changes we've made in our approach to recruiting and enrolling new students, has come to fruition," including "fewer applications," and "fewer offers of admission." (Sodexo SOF, Ex. 34). At that point in time, Drexel had "2,902 deposits for the freshman class," which, after "melt" (expected declines based on students' changes in circumstances and choice of college) would be expected to yield somewhat fewer freshman enrollees. (Id.). In fact, that email stated, "[t]he adjusted budget is predicated on a class of 2,600, but we believe we are likely to do better than that due to lower melt." (Id.).

On June 8, 2015, President Fry of Drexel issued a "Dear Colleague" letter disclosing that Drexel would not enroll additional students from the waitlist and that the freshman class would be smaller than in prior years. (Sodexo SOF Ex. 33). The next day, Sodexo employee William Cunningham emailed, among others, LaRue (of Drexel), forwarding President Fry's "Dear

Colleague" letter and stating, "[t]he message below looks like there will be budget tightening and less mandatory dining plan customers for next year. Have you gotten any update as to what next year's actual first year student enrollment with [sic] be?" (Id. Ex. 36). LaRue forwarded the email to Liberati (of Drexel), who responded: "I guess they were going to find out sooner or later…" (Id.). LaRue later responded to Sodexo's original email, stating, "Currently, there are 2,918 freshmen admitted. It will be less with melt, potentially 2,600-2,700 but the rate of melt is challenging to predict." (Drexel SOF Ex. 3-20). Drexel's freshman enrollment for the 2015-2016 academic year was 2,720. (Sodexo Resp. to Drexel SOF ¶ 103).

### (E) Sodexo Misses Profit Projections

On November 4, 2015, Sodexo's Jeff Hunt stated that the gross project margin for the Management Agreement, initially "projected at 13.9% year 1 and 9.4% year 2," constituted "miss[ed] profit projections," because "[y]ear 1 actual (FY 2015) was 3.2% and year 2 projected (FY 2016 budget) is 6.2%." (Id., Ex. 40). Two days later, by email dated November 6, 2015, Hunt instructed Sodexo's Chris Elliott to "set a timetable for contract restructuring" because the gross profit margin that Sodexo's Drexel account was generating did not meeting projections. (Sodexo Resp. to Drexel SOF ¶ 105).

In a meeting held on November 18, 2015, Sherman (of Sodexo) told LaRue (of Drexel) that Sodexo was experiencing a year-to-date "shortfall of $664,436 in mandatory meal plans" against Sodexo's budget and a "FY16 shortfall, against SodexoMAGIC budget, [of] $2,120,523." (Drexel SOF, Ex. 3-24).

After several more discussions between the parties over the ensuing months (see Sodexo Resp. to Drexel SOF ¶¶ 108-112; Sodexo SOF ¶¶ 54-56), Sodexo sent Drexel a letter proposal

on June 28, 2016, seeking to change the Management Agreement, which included terms increasing meal rates, hours of operation, and compensating Sodexo for "shortfalls in mandatory boarders and contractual catering." (Drexel SOF, Ex. 3-26). By letter dated July 19, 2016, Drexel stated its willingness to accept many of the terms in Sodexo's letter, while submitting counterproposals on other terms. (Sodexo Resp. to Drexel SOF ¶ 114).

### (F) Contract Termination

On September 19, 2016, Drexel notified Sodexo by letter that it was terminating the Management Agreement for convenience, pursuant to section 3.10(C), effective December 10, 2016. (Drexel Resp. to Sodexo SOF ¶ 67; ECF 130-1). The letter also offered to pay Sodexo a daily rate of $22.44 and accept a reduced commission of 7.75% for the fall term if Sodexo agreed to remain on campus through December 10, 2016. (Sodexo Resp. to Drexel SOF ¶ 124). Sodexo responded by letter dated September 26, 2016, stating that it was exercising its "right to terminate the Agreement for Cause effective at the end of today," and that it "intended to end the cure period at the close of business . . . effective at the end of today." (ECF 130-9).[1] Sodexo also stated that it would "[agree] to remain on campus through December 10, 2016" and that it "does not leave students in mid-term." (Id.).

The next day, September 27, 2016, Sodexo filed the present lawsuit. (See ECF 1). Sodexo provided dining services to Drexel's students through December 10, 2016. (Drexel Resp. to Sodexo SOF ¶ 90). Drexel did not pay an increased daily rate or charge Sodexo a reduced commission for Sodexo's dining services rendered through December 10, 2016. (Id.).

---

[1] Between the time of the two letters, on September 23, 2016, Drexel awarded the dining services contract to Aramark. (Drexel Resp. to Sodexo SOF ¶ 68). Drexel's freshman enrollment increased to approximately 3,260 students (a 40% increase) in the 2017-2018 academic year. (Sodexo Resp. to Drexel SOF ¶ 130).

## III. Motions to Strike

### (A) Drexel's Motion to Strike

Drexel seeks to strike three declarations submitted by Sodexo in support of its response to Drexel's statement of undisputed facts. Drexel bases its motion on the "sham affidavit" doctrine, asserting that portions of the declarations directly contradict prior deposition testimony which was explicitly adopted as Sodexo's corporate representations. In response, Sodexo contends that the declarations elucidate, rather than contradict, prior testimony: Whereas prior testimony pertained to statements about Drexel being unable to predict future student enrollment, the declarations in question explain that Drexel did not make any statement that it knew enrollment would decline. In its reply, Drexel contends that it had no duty to disclose its knowledge of future enrollment figures, and therefore, because the declarations largely pertain to the extent of Drexel's forthrightness regarding future student enrollment, the entirety of the declarations— rather than any portions thereof—should be stricken.

### (1) Legal Standard

In the Third Circuit, it is well-settled that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004). When a party does not explain the contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue in dispute can be perceived as a "sham," thereby not creating an impediment to a grant of summary judgment based on the deposition. <u>Id.</u> "The court may . . . disregard an affidavit when the 'affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no

satisfactory explanation for the later contradiction.'" <u>Daubert v. NRA Grp., LLC</u>, 861 F.3d 382, 392 (3d Cir. 2017) (quoting <u>Martin v. Merrell Dow Pharm., Inc.</u>, 851 F.2d 703, 706 (3d Cir. 1988)).

The Court "may similarly disregard an affidavit 'entirely unsupported by the record and directly contrary to [other relevant] testimony,' or if it's 'clear' the affidavit was offered 'solely' to defeat summary judgment[.]" <u>Daubert</u>, 861 F.3d at 392 (quoting <u>Jiminez</u>, 503 F.3d at 254, 253); <u>cf.</u> <u>In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.</u>, 639 F. App'x 874, 877-78 (3d Cir. 2016) ("The timing of the testimony recanting the prior sworn testimony clearly increased the likelihood that it was intended solely to defeat the motion for summary judgment.") (quoting <u>In re Fosamax Prods. Liab. Litig.</u>, 707 F.3d 189, 195 (2d Cir. 2013)).

However, the inverse is also true. The Third Circuit has underscored that even when "there is a discrepancy between deposition testimony and the deponent's later affidavit, a district court is not required in all cases to disregard the affidavit." <u>Baer v. Chase</u>, 392 F.3d 609, 624 (3d Cir. 2004); <u>Armstrong v. Wes Health Sys.</u>, 188 F. Supp. 3d 478, 482 (E.D. Pa. 2016). A court may disregard any alleged inconsistency if the affiant offers a "satisfactory explanation" for the conflict between the affidavit and deposition testimony, such as that the subsequent affidavit explains or clarifies a witness's deposition testimony. <u>Jiminez</u>, 503 F.3d at 254; <u>see, e.g.</u>, <u>Videon Chevrolet, Inc. v. Gen. Motors Corp.</u>, 992 F.2d 482, 487–88 n. 16 (1993) (holding that a party's admission in his deposition which conflicted with an expert's affidavit did not amount to such "clear and extreme facts" necessary to warrant ignoring the later affidavit and concluding that the witness conceded a material issue in the case); <u>Davis v. Mothers Work, Inc.</u>, 04-cv-3943, 2005 WL 1863211, at *7 (E.D. Pa. Aug. 4, 2005) (holding that, despite an inconsistency in the

declaration and the deposition testimony, a subsequently filed declaration should be considered because it clarified the witness's earlier deposition testimony).  A court may also disregard inconsistencies where there is independent evidence in the record to bolster an otherwise questionable affidavit.  Armstrong, 188 F. Supp. at 482.

### (2) Discussion

The Court begins its analysis with two of the declarations, which are quoted by Drexel in its motion.  In the declarations, Sodexo employees state that "Drexel employees or representatives never told me or, to my knowledge, anyone at Sodexo or SodexoMAGIC that there was a risk of enrollment decline."  (ECF 208-1, at 5).  Drexel claims that this statement is incompatible with deposition testimony—later adopted by Sodexo's corporate representative—in which a Sodexo employee recalled a Drexel employee saying, in sum and substance, "nobody could predict what the freshman enrollment would be going forward," and "they didn't know exactly where it [freshman class enrollment] would be."  (Id. at 4).

The Court finds that, in this instance, the deposition testimony and the declaration are compatible.  While the deposition testimony stands for the proposition that Drexel made statements that it could not predict freshman enrollment, the declarations assert that Drexel never said there was a risk that freshman enrollment would decline.  One can imagine two statements, in which the first occurred and the second did not: (1) "Drexel cannot predict what student enrollment will be next year," and (2) "There is a risk that freshman student enrollment at Drexel will go down next year."  The first statement speaks to the predictability of freshman enrollment numbers.  The second statement speaks to the risk of enrollment decline.  It is entirely possible for Drexel to discuss the predictability of freshman enrollment without stating that there is a risk

17

of enrollment decline. To the extent that the two technically overlap, the Court declines to strike the declarations on this basis.

In making this ruling, the Court is especially mindful that this motion does not present "clear and extreme facts," which would justify striking the declarations. Video Chevrolet, Inc. v. Gen. Motors Corp., 992 F.2d 482, 487-88 n. 16 (1993). Moreover, to the extent any discrepancy might exist between deposition testimony and declarations, the Court notes that it is not required to disregard the affidavit, but instead may consider its weight in light of any apparent contradiction. See Baer, 392 F.3d at 624 (where "there is a discrepancy between deposition testimony and the deponent's later affidavit, a district court is not required in all cases to disregard the affidavit"); Heasley v. EchoStar Satellite L.L.C., No. 08-cv-261, 2009 WL 1457733, at *1 (W.D. Pa. May 22, 2009) ("gaps or minor discrepancies in Plaintiff's testimony [] bear on her credibility and are matters properly reserved for cross-examination.").

Drexel also seeks to strike a third declaration, that of Thomas Farabaugh. Drexel bases this portion of its motion on a perceived contradiction between, on one hand, a representation made by Sodexo in its responses and objections to Drexel's Rule 30(b)(6) deposition notice and, on the other hand, a representation made by Farabaugh in his declaration. In Sodexo's responses and objections, Sodexo stated that it "hereby identifies the financial model . . . as located at SDXMAGIC0003035." (ECF 208-1, at 5). In his declaration, Farabaugh referenced the same spreadsheet, stating, among other things, that "[i]t is not a 'model.'"

The Court agrees with Drexel that these representations present an irreconcilable contradiction. Sodexo may not label something a "financial model," only to later submit a declaration stating that it "is not a model." However, the Court will not strike the entirety of the

Farabaugh declaration, as urged by Drexel, but instead strike only the words, "is not a 'model' and" from the sentence in paragraph 9 of the declaration, leaving the sentence which originally began "It is not a 'model' and does not distinguish . . ." to begin, "It does not distinguish . . . ." In so doing, the Court removes only the problematic portion of the declaration, consistent with rulings in other Courts in this Circuit. See, e.g., Koken v. Lexington Ins. Co., No. 04-cv-2539, 2006 WL 5377234, at *3 (E.D. Pa. Feb. 1, 2006), Mathis v. Phila. Newspapers, Inc., 455 F. Supp. 406, 419 (E.D. Pa. 1978); Bumbarger v. New Enter. Stone & Lime Co., 170 F. Supp. 3d 801, 819-22 (W.D. Pa. 2016); Carey v. Beans, 500 F.Supp. 580, 583 (E.D. Pa. 1980), aff'd 659 F.2d 1065 (3d Cir. 1981).

### (B) Sodexo's Motion to Strike

In its motion, Sodexo seeks to strike Drexel's appendix to its motion for summary judgment on the basis that the appendix circumvented the Court's Order requiring the parties' briefs to be limited to twenty pages. (See ECF 195, at 4). Drexel contends that its appendix is a distillation of the uncontested statements of facts intended to provide an optional piece of reading for the Court should the Court want to avoid reviewing the statements and responses contained in the parties' statements of undisputed facts and responses thereto.

The Court's Order and Rules are clear that the parties are permitted to file briefs, statements of facts, and exhibits. An "appendix of distilled facts" is not contemplated by the Court, and not permitted by its Rules.

The Court will not consider the appendix when ruling on the present motions. Therefore, the motion to strike is denied insofar as it seeks to strike the appendix for failure to adhere to the

Court's Order and Rules.[2] <u>See, e.g.</u>, <u>Grey v. Johansson</u>, No. CV 15-2479, 2016 WL 1613804, at *8 (E.D. Pa. Apr. 22, 2016) (denying motion to strike while declining to consider pages exceeding page limitations imposed by Court's policies and procedures).

## IV.     Motions for Summary Judgment

### (A) Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." <u>Id.</u>

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

---

[2] Sodexo also sought from Drexel the attorneys' fees incurred as a result of filing the motion to strike. The Court declines to award any fees.

After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

**(B) Drexel's Motion for Summary Judgment as to Sodexo Count I (Fraudulent Inducement)**

Drexel's Motion contends that Count I of Sodexo's Complaint should be dismissed. Count I of Sodexo's complaint alleges that Drexel knowingly misrepresented during contract negotiations that it anticipated student population growth and, thus, fraudulently induced Sodexo into the economically-unfavorable Management Agreement.

Drexel argues that the gist of the action doctrine bars Sodexo's fraudulent inducement claim because the allegedly fraudulent statements relate to enrollment projections, which the Management Agreement explicitly addresses.

Drexel also asserts that Sodexo cannot prove that Drexel made any misstatements or omissions or that Sodexo justifiably relied on them because: (a) the proposed enrollment plan was a mere projection that was never portrayed as a guarantee, (b) Sodexo knew of Drexel's decreased freshman enrollment prior to ratifying the Management Agreement, and (c) Drexel repeatedly refused to include any fixed enrollment figures in the Management Agreement.

In response to Drexel's Motion for Summary Judgment, Sodexo contends that the gist of the action doctrine does not apply because the duty that Drexel breached was not a contractual duty derived from any student enrollment representation in the Management Agreement but rather a social duty of honesty separately maintainable in tort under Pennsylvania law.

Sodexo also asserts that Drexel made misstatements and failed to disclose its knowledge that future student enrollment would decline (contrary to all projections), such that the only question that remains at this stage is Drexel's state of mind, which is a question of fact inappropriate for resolution on summary judgment. The projections contained in the Management Agreement, Sodexo asserts, demonstrate that Sodexo relied on Drexel's misrepresentations when entering into the contract.

In its reply brief, Drexel contends that Sodexo falls short of offering clear and convincing evidence of any misrepresentations.

### (1) The Parol Evidence Rule

#### a) Procedural Background

After reviewing the parties' voluminous submissions, but prior to oral argument on July 9, 2018, the Court provided notice to the parties of the Court's intention to ask them about the impact of the parol evidence rule. The parties both addressed this point extensively at oral argument. (See ECF 243, at, e.g., 9:15-20:6).

After oral argument, the Court *sua sponte* ordered briefing from the parties regarding the effect of the parol evidence rule on both parties' fraud claims (ECF 241), which had not been discussed by the parties in their submissions. The Federal Rules of Civil Procedure specifically provide for a court's ability to grant summary judgment on grounds not raised by any party.

> After giving notice and a reasonable time to respond, the court may:
> (1) Grant summary judgment for a nonmovant;
> (2) <u>Grant the motion on grounds not raised by a party</u>; or
> (3) Consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

Fed. R. Civ. P. 56(f)(2) (emphasis added).

Specifically, the Federal Rules of Civil Procedure require that parties be given at least ten days' notice that a court is considering a *sua sponte* grant of summary judgment. <u>Gibson</u>, 355 F.3d at 223; <u>see also</u> <u>Otis Elevator Co. v. George Washington Hotel Corp.</u>, 27 F.3d 903, 910 (3d Cir. 1994). This Court provided the parties with notice on July 13, 2018 (ECF 241), and granted both parties an opportunity to supplement their submissions by July 24, 2018. The parties availed themselves of the opportunity, submitting supplemental briefing on July 24, 2018. (See ECF 245 and 246).

### b) The Parties' Contentions

Sodexo's submission, discussed in greater depth *infra*, asserts that the parol evidence rule does not apply to Sodexo's fraud claim because: (1) the Management Agreement is not fully integrated; (2) Sodexo does not seek to explain or vary the terms of the Management Agreement; (3) Sodexo's evidence explains an ambiguous contract provision; and (4) public policy precludes application of the parol evidence rule.

Drexel's submission maintains that the Management Agreement is fully integrated and unambiguous, and that Sodexo's fraudulent inducement claim is barred because it pertains to representations about student enrollment growth, a subject addressed in the Management Agreement itself. However, Drexel simultaneously contends that its own fraudulent inducement

23

claim is not barred by the Management Agreement, because its own claim is not based on Drexel being fraudulently induced to execute the Management Agreement but rather on Drexel being fraudulently induced into awarding it the dining services contract at the bidding stage.

### c) Pennsylvania Caselaw

The Pennsylvania Supreme Court has consistently held that, where a contract is fully integrated and unambiguous, parol evidence may not be admitted to support a claim for fraudulent inducement regarding that contract.

In one notable Pennsylvania Supreme Court case, HCB Contractors v. Liberty Place Hotel Associates, 539 Pa. 395, 652 A.2d 1278 (1995), plaintiff HCB entered into four identical contracts with four owners for a construction project. 539 Pa. at 397. Each of the four contracts contained express waiver provisions in which HCB agreed not to file any mechanics' liens. Id. Nonetheless, HCB eventually filed claims for liens, alleging that during the contract negotiations, the defendants gave specific assurances that they owned and would continue to own the various project elements on which HCB was to render its services as general contractor. Id. at 398. HCB also contended it was unaware that the owners had already transferred ownership to third parties when it limited its right to recovery. Id. The Court held that where a party alleges prior fraudulent oral representations regarding a subject that was specifically dealt with in the written contract, the party alleging such representations must, under the parol evidence rule, also aver that the representations were fraudulently or by accident or mistake omitted from the integrated written contract. Id. at 398. HCB Contractors, 539 Pa. 395, 652 A.2d 1278.

The HCB Contractors Court also reconciled a contradictory line of precedent set out in Berger v. Pittsburgh Auto Equipment Co., 127 A.2d 334 (1956). In Berger, a Defendant-lessee

agreed to rent the second floor of a certain property.  Berger, 127 A.2d at 335.  Plaintiff-lessor

knew that the lessee needed this property to store automobile parts of a certain weight.  Id. at

335.  The lessor assured the lessee that the flooring had been recently strengthened and would

support the lessee's goods. In reliance on this representation, the lessee executed the lease.  Id.  A

contemporaneous written collateral agreement stated that: "(t)he tenant has inspected the

premises and accepts the property in its present condition."  Id. at 335-36.  Subsequently, the

floor proved incapable of withstanding the required weight.  Id. at 337.  The lessee vacated,

leading to plaintiff's suit.  Id. at 335.  The Court held that the collateral agreement concerning the

inspection of premises only bound the lessee as to any reasonably ascertainable conditions.  Id. at

336.  Because expert tests rather than visual inspection were necessary to determine the strength

of the flooring, the Court found the contractual integration clause inapplicable and, therefore, the

parol evidence rule inoperative.  Id.  The rule laid out in Berger was expounded upon in National

Building Leasing, Inc. v. Byler, 252 Pa. Super. 370 (1977), a similar case concerning

misrepresentations about the quality of real estate.  The court in Byler had held that, as a general

rule, an allegation that fraud or misrepresentation induced the contract would enable a party to

escape the confines of the parol evidence rule.  Byler, 252 Pa. Super. at 374-75.

     The HCB Contractors court reconciled this inconsistency, holding that

> decisions cited by HCB, including Berger, Nadolny, Highmont
> Music Corp., and certain decisions of the Superior Court, may be
> distinguished as dealing with an exception to the strict application
> of the parol evidence rule in sales and leases of real property where
> oral representations regarding a lack of physical defects in the
> property were made and the purchaser or lessee was not able to
> discover, through visual inspection, that the representations were
> false.

25

539 Pa. at 400.

The Pennsylvania Supreme Court further emphasized the expansive scope of its holding in HCB Contractors in its 2004 decision in Yocca. See 578 Pa. 479, 854 A.2d 425. In Yocca, the defendants had prevailed in the Court of Common Pleas and the Commonwealth Court on fraud and negligent misrepresentation claims, based on the application of the parol evidence rule. The Commonwealth Court reversed, and the Pennsylvania Supreme Court reversed the Commonwealth Court to hold, consistent with the Court of Common Pleas, that the parol evidence rule barred … The plaintiffs alleged that a brochure given to them by the Pittsburgh Steelers negligently and fraudulently induced them into buying season tickets for football games based on a misleading picture of the area in which the seats would be located. 578 Pa. at 490. The plaintiffs further alleged that the Steelers violated the Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

The trial court dismissed the complaint, finding that the season ticket agreement entered into by the Steelers and the plaintiffs was a fully integrated agreement that represented all of the terms of the parties' agreement, thereby "supersed[ing] all of parties' previous negotiations and agreements." Id. at 492. As a result, because the plaintiffs' claims for fraud and negligent misrepresentation "were directly based on the parties' contractual agreement, they could only be brought as part of [the plaintiffs'] breach of contract claims rather than as separate tort claims." Id. The Commonwealth Court affirmed the trial court's dismissal of the plaintiffs' fraud and negligent misrepresentation claims because they were based primarily on the parties' contract. See Yocca v. Pittsburgh Steelers Sports, Inc., 806 A.2d 936, 946 (Pa. Commw. 2002). However, the Commonwealth Court reversed the trial court's dismissal of the plaintiffs' claim

26

for breach of contract, finding that the brochure in question constituted part of the parties' final agreement. Id. at 942.

The Pennsylvania Supreme Court held that the Commonwealth Court had improperly reversed the trial court's order dismissing plaintiffs' "breach of contract claims because the parol evidence rule bars any consideration of [the plaintiffs'] claims, which are wholly based on the terms in the [] Brochure." 578 Pa. at 496-97. The Pennsylvania Supreme Court explained that, as a threshold matter, the parol evidence rule applies when there is a "writing that represents the entire contract between the parties," i.e., an integrated agreement. Id. at 497 (citing Gianni, 281 Pa. at 323). The court explained that,

> [t]o determine whether or not a writing is the parties' entire contract, the writing must be looked at and "if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties...." An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

Id. at 497-98 (citations omitted).

Thus, if a court finds that the agreement in question is the parties' entire contract, "the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract" is inadmissible to explain or vary the terms of the contract, unless: (1) a term is ambiguous and parol evidence is offered to explain or clarify the ambiguity; or (2) a term was omitted from the contract because of fraud, accident, or mistake. Id. at 498.

As to the second category, the <u>Yocca</u> court emphasized a distinction in the application of the parol evidence rule between claims for "fraud in the inducement" (i.e., fraudulent inducement) and claims for "fraud in the execution":

> Notably, while parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, *i.e.,* that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.,* that an opposing party made false representations that induced the complaining party to agree to the contract.

<u>Id.</u> at 502 n. 26.

Applying the above analytical framework, <u>Yocca</u> ultimately found that the parties' final agreement was fully integrated, thereby rendering inadmissible the brochure. <u>Id.</u> at 499. In addition to containing an integration clause, the final agreement appeared to be the entire agreement between the parties because it contained the detailed terms of the contract:

> [T]he [] Agreement detailed all of the terms and conditions of that sale, <u>i.e.,</u> the precise number of seats to be sold to the named Licensee, the exact section in which those seats were located (including a visual depiction of that location), the total amounts due for each SBL, the dates those amounts were due, and all of the rights and duties associated with owning an SBL, including the Licensee's right to transfer the SBL.

<u>Id.</u> at 499.

After finding that there was no ambiguity in the parties' final agreement, the Pennsylvania Supreme Court "agree[d] with the trial court's conclusion that Appellees' breach of contract claims must be dismissed [because they are] are entirely based on allegations that the Steelers violated . . . terms and conditions that are not, in fact, part of the parties' contract." <u>Id.</u> at 500-01.

Three years later, in 2007, the Pennsylvania Supreme Court made clear in <u>Toy</u> that the "fraud in the execution" exception to the parol evidence rule, discussed in <u>Yocca</u>, and previously discussed in other case law, was to be narrowly construed. <u>See</u> 593 Pa. 20. In <u>Toy</u>, the plaintiff alleged that an insurance salesman orally misrepresented to her which provisions would ultimately be included in an insurance policy. <u>Id.</u> at 31. The trial court concluded that any misrepresentations made by the salesman were barred by the parol evidence rule. <u>Id.</u> The Superior Court reversed, concluding that the plaintiff's allegations fell within the "fraud in the execution" exception to the parol evidence rule. <u>Id.</u> The Pennsylvania Supreme Court, emphasizing <u>Yocca</u>'s distinction between fraud in the execution and fraud in the inducement, affirmed the Superior Court and held that the salesman's alleged misrepresentations were not barred by the parol evidence rule:

> while the fraud exception to the parol evidence rule potentially applies in two scenarios—fraud in the inducement, where a party alleges that he was induced into entering the agreement through the other's fraud, and fraud in the execution, where a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud—this Court has determined that in Pennsylvania, only fraud in the execution, which is alleged in this case, but was not alleged in <u>Yocca</u>, is excepted from the parol evidence rule's operation.

<u>Id.</u> at 52.

The Third Circuit has affirmed that Pennsylvania state law recognizes a distinction between parol evidence admissibility for fraud in the execution and fraud in the inducement. <u>Dayhoff Inc. v. H.J. Heinz Co.</u>, 86 F.3d 1287, 1300 (3rd Cir. 1996). Specifically, the Third Circuit articulated that:

> Fraud in the execution applies to situations where parties agree to

include certain terms in an agreement, but such terms are not included. Thus, the defrauded party is mistaken as to the contents of the physical document that it is signing. Parol evidence is admissible in such a case only to show that certain provisions were supposed to be in the agreement but were omitted because of fraud, accident, or mistake. Fraud in the inducement, on the other hand, does not involve terms omitted from an agreement, but rather allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement.

Id.; see also 1726 Cherry Street Partnership by 1726 Cherry Street Corp. v. Bell Atlantic Properties, Inc., 439 Pa. Super. 141, 154 (1995) (noting that Pennsylvania state law regarding parol evidence admissibility differs from the widely accepted Restatement (Second) of Contracts, which may allow parol evidence to demonstrate fraud in the inducement).

Given the substantial Pennsylvania case law, as detailed above, this Court is well-guided in its application of the parol evidence rule. The law in Pennsylvania is clear: where a written contract is fully integrated and unambiguous, a party may not offer parol evidence in support of a claim that they were fraudulently induced to enter into that contract.

### d) Integration

A fully integrated contract can be established through an integration clause "that states that the writing is meant to represent the parties' entire agreement," which constitutes "a clear sign that the writing is meant to be just that, and thereby expresses all the parties' negotiations, conversations, and agreements made prior to its execution." Toy, 593 Pa. at 49. However, a written contract need not contain an express integration clause in order to be fully integrated. A written contract without an express integration clause can be considered fully integrated if it appears to reflect the parties' complete agreement.

For example, in <u>Gianni v. Russell & Co.</u>, 281 Pa. 320 (1924), the Court stated:

> The writing must be the entire contract between the parties if parol evidence is to be excluded, and to determine whether it is or not the writing will be looked at, and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced to writing.

<u>Id.</u> at 323 (internal citation omitted).

This standard has been affirmed and developed in subsequent cases, <u>see</u> <u>Yocca</u>, 578 Pa. 479; <u>Dunn v. Orloff</u>, 420 Pa. 492 (1966); <u>In re Boyd's Estate</u>, 394 Pa. 225 (1958), and cited with approval by the Third Circuit. <u>See, e.g.</u>, <u>Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Investments</u>, 951 F.2d 1399, 1405 (3d Cir. 1991).

For example, in <u>Dunn</u>, the Pennsylvania Supreme Court stated that "if a written agreement was <u>intended by the parties to encompass the entire understanding between the parties</u>, then evidence of a contrary nature, based upon an oral agreement at the time of the execution of the written agreement, was barred in the absence of fraud,[3] accident or mistake." 420 Pa. at 495 (emphasis added). In other words, while a merger or integration clause will serve as a strong indication that the contract is fully integrated, the intention of the parties is also a key consideration in a court's analysis.

The Court finds that the Management Agreement at issue in the present case is fully integrated. Importantly, it contains a merger clause, stating, in no uncertain terms:

> This Agreement contains all agreements of the parties with respect to matters covered herein, superseding any prior agreements, and

---

[3] As stated *supra*, the exception for parol evidence with respect to "fraud" applies to "fraud in the execution," rather than "fraud in the inducement." <u>See, e.g.</u>, <u>Toy</u>, 593 Pa. at 49-50.

> may not be challenged other than by an agreement in writing
> signed by the parties hereto.

(Sodexo SOF, Ex. 1 § 10.11)

Sodexo contends that the above language is not a merger clause because nothing in the

clause refers to prior representations, only to prior agreements. Therefore, Sodexo asserts, it is

unlike the language previously found sufficient to constitute a merger clause. Further supporting

its argument, Sodexo maintains, is another contract provision that explicitly references

"representations" made by "each party":

> 9.1     Changes in Policies and Practices.   The financial terms
> set forth in this Agreement and other obligations assumed by
> SodexoMAGIC hereunder are based on conditions in existence on
> the date SodexoMAGIC commences operations, including by way
> of example, [Drexel's] student population; labor, food, and supply
> costs; and federal, state and local sales, use and excise tax.   In
> addition, each party has relied on representations regarding
> existing and future conditions and projections made by the other in
> connection with the negotiation and execution of this Agreement.
> In the event of a change in the conditions or the inaccuracy or
> breach of, or the failure to fulfill, any such representation by a
> party, the financial terms and other obligations assumed by the
> other party shall be renegotiated on a mutually agreeable basis to
> reflect such change, inaccuracy or breach. SodexoMAGIC shall
> submit any requested changes and the cause for such changes to
> [Drexel], in writing, prior to any negotiations.

(Id. § 9.1).

Section 9.1 does not alter the Court's analysis with respect to the question of full

integration. The Supreme Court of Pennsylvania has clearly indicated that "an integration clause

which states that a writing is meant to represent the parties' entire agreement is a clear sign that

the writing is meant to be just that." Yocca, 578 Pa. at 498. Having agreed in the Management

Agreement itself that "[t]his Agreement contains all agreements of the parties with respect to

matters covered herein," Sodexo may not now seek to introduce evidence of prior oral representations made by Drexel.

However, this is not the end of the Court's inquiry, as there are other indications that the Management Agreement was intended by the parties to be a "complete agreement." The Management Agreement is, including exhibits, nearly one hundred pages single-spaced (excluding exhibits it is forty pages single-spaced). (See generally Sodexo SOF Ex. 1). It is so detailed that it even covers the subject matter of Drexel's alleged misrepresentations, stating that the "[p]arties agree that the University's growth is a critical factor in calculating the Investments afforded under the Agreement and it has been projected by SodexoMAGIC that this growth will realize an increase of 2% per year in the freshman class year over year." (Id. § 9.2). See Deutsch v. Wells Fargo Bank, N.A., No. 13-cv-3914, 2015 WL 3833226, at *4 (E.D. Pa. June 19, 2015) (courts consider the "length and detail of the contract" when determining whether a contract is integrated).

In fact, section 9.1, cited by Sodexo, is consistent with the Court's conclusion that the Management Agreement is integrated. The parties' obligations under section 9.1 are clear, requiring the parties to "renegotiate on a mutually agreeable basis" should there be a "change in the conditions or the inaccuracy or breach of, or the failure to fulfill, any [] representation by a party." Just as determining compliance with section 9.1 requires reference to outside "facts" (i.e., was a representation inaccurate?), so too does determining compliance with any other contractual provision. For example, determining whether a party breaches a confidentiality clause requires proof of an improper communication imparting sensitive information; paying only partial invoice sums requires reference to bank receipts; and breach of a contractual

provision requiring passing grades for Health Department inspections requires reference to failed inspections. Although external evidence would be required in each of the above examples to prove the case, that fact does not preclude a contract containing such provisions from being legally integrated, nor does it mean the contract is ambiguous. See *supra*. A party can still substantiate its case with evidence where the above situations are presented (in the above examples, for breach of contract). However, where the parties intend for a contract to be fully integrated and to reflect their complete agreement, as occurred with the Management Agreement, "previous oral or written negotiations or agreements involving the same subject matter as the contract" are inadmissible. Yocca, 578 Pa. at 498. The fact that § 9.1 refers to "representations" while § 10.11 refers to "agreements" does not change the Court's conclusion.

### e) Ambiguity

Sodexo argues that it may introduce parol evidence because the term "representations" is ambiguous. Parol evidence is admissible based on the ambiguity of a contractual term where the parol evidence is presented "to explain or clarify or resolve the ambiguity." Yocca, 578 Pa. at 498; see also Estate of Herr, 400 Pa. 90 (1960); Waldman v. Shoemaker, 367 Pa. 587 (1951). Here, however, Sodexo's does not seek to introduce parol evidence to resolve any ambiguity in the term "representations." Instead, Sodexo seeks to introduce alleged oral representations by Drexel regarding student enrollment to prove its claim for fraudulent inducement. The purpose for which Sodexo seeks to introduce the parol evidence, therefore, is unrelated to any purported ambiguity, "latent" or "patent," contained in the term "representations."

34

### f) Sodexo's Post-Argument Submission Regarding the Parol Evidence Rule

In its submission arguing against the application of the parol evidence rule, Sodexo fails to recognize the strength of Pennsylvania precedents holding that fraudulent inducement claims do not provide an escape from the parol evidence rule. Although citing <u>Yocca</u> and <u>Toy</u> in passing references, Sodexo ignores their holdings, which this Court is bound to follow. Instead, Sodexo relies heavily on a recent, clearly distinguishable, non-precedential decision in this District, <u>Boardakan Rest. LLC v. Gordon Grp. Holdings LLC</u>, No. 11-cv-5676, 2015 WL 4597970 (E.D. Pa. July 31, 2015). In <u>Boardakan</u>, the plaintiffs allegedly entered into lease agreements with defendant companies for space near a pier in Atlantic City, New Jersey. <u>Id.</u> at *1. The parties entered into the lease agreements during ongoing pier construction, and they specified that the agreements became automatically null and void if the pier did not open on time. <u>Id.</u> The plaintiffs alleged that, after it became apparent that the pier would open later than scheduled, they sought assurances from defendants that the other businesses opening at the pier intended to maintain their leases. <u>Id.</u> According to the complaint in that case, the defendants specifically represented that the other businesses would "definitely be opening" at the pier, when in fact they had both already terminated their leases. <u>Id.</u> As a result, the plaintiffs allegedly entered into amended lease agreements with defendants and invested substantial sums of money on improvements. <u>Id.</u>

Sodexo acknowledges Judge Slomsky's decision in <u>Boardakan</u> finding the parol evidence rule inapplicable was premised on the fact that the plaintiffs in that case were not asserting that "they were promised something different than what was reflected in the contract." <u>Id.</u> at *7.

35

Sodexo contends that its claims should similarly be considered separate-and-apart from the contents of the contract into which they allege they were fraudulently induced. However, Sodexo has persistently pointed this Court to the language of the Management Agreement stating that the "[p]arties agree that the University's growth is a critical factor in calculating the Investments afforded under this Agreement and it has been projected by SodexoMAGIC that this growth will realize an increase of 2% per year in the freshman class year over year." (Sodexo SOF Ex. 1, § 9.2). Given that Sodexo's fraudulent inducement claim is exclusively premised on allegations that it was misled as to freshman student class sizes, it is clear that Sodexo's claim is based on promises that were partially, and could have been more completely, incorporated into the integrated contract. Boardakan has no relevance to this case.

Also in its submission, Sodexo seeks to distinguish the Pennsylvania Supreme Court's 2004 decision in Yocca, discussed in detail *supra*, which unambiguously reaffirmed the well-settled rule that, unless parol evidence is being offered to explain an ambiguous term, "[o]nce a writing is determined to be the parties' entire contract . . . evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract" is inadmissible. 578 Pa. at 498. Sodexo dedicates a mere six lines in a footnote to an attempt to distinguish Yocca on the basis that, unlike in Yocca, "SodexoMAGIC is not attempting to undo or vary any obligations set out in the Agreement." (ECF 245, at 7 n. 5). Given that the Management Agreement is, according to Sodexo, the source of a contractual duty to renegotiate in the event that freshman student enrollment does not grow by 2% annually, (see Sodexo SOF Ex. 1, § 9.2), this Court is unable to reconcile Sodexo's post-argument submission with its prior briefing. Stated bluntly, Sodexo fails to meaningfully distinguish Yocca's holding, which

specifically controls the present case.

Then, in footnote #4 of its submission, Sodexo suggests that there is a "second prong" of the parol evidence rule which "concerns whether the [parol] evidence contradicts the agreement's terms or creates a new contractual obligation." (ECF 245, at 5 n. 4). While Sodexo may be correct that parol evidence is barred where it constitutes the same subject matter as the integrated contract, see HCB Contractors, 539 Pa. at 397, Sodexo itself acknowledges that the "same subject matter" inquiry has, in the past, involved scenarios in which the representations forming the basis for fraud were related to, and not necessarily specifically dealt with, in the parties' integrated contract. See, e.g., Gianni, 281 Pa. at 323 (same subject matter where representation was that shop owner would have exclusive right to sell soda in the building, but the lease did not include that obligation even though the contract designated what the shop owner could sell in the building).[4]

Sodexo's final argument in favor of allowing its fraudulent inducement claim to succeed is that "Pennsylvania has a strong interest in holding fraudsters accountable for their conduct and resulting injury." (ECF 245, at 9). Sodexo cites to Toy for this contention, although it is of course self-evident that Pennsylvania has an interest in curtailing fraud. Nonetheless, the parol evidence rule bars fraudulent inducement claims, because,

> it subsumes an objective to promote certainty and stability of
> contract, and to place some reasonable limitations on the litigation

---

[4] In the same footnote, Sodexo presents another irreconcilable internal inconsistency, claiming, with the emphasis its own, that it "is not claiming Drexel had any contractual obligation to increase enrollment," (ECF 245, at 6 n. 4), yet Sodexo has staunchly maintained throughout this litigation that Drexel's failure to increase enrollment triggered a contractual duty on the part of Drexel to renegotiate the Management Agreement in good faith. (See, e.g., ECF 227, at 2 ("[T]he Agreement noted that SodexoMAGIC's investment was based on an assumption that freshman enrollment would grow, and that if that assumption 'changed,' Drexel would renegotiate the Agreement in good faith.)).

exposure of the business community and others, by investing contracting parties with an obligation to read their written agreements and abide by clear terms, short of an allegation of fraud of a sort that would not be obvious from the face of the integrated agreement, and/or in the absence of circumstances in which reading the written agreement would not be reasonable. Cf. Thorne v. Warfflein, 100 Pa. 519 (1882) ('We cannot agree that it is proper to throw the whole case into the jury box on the ground of fraud, simply because one of two parties to a written contract testifies that there were parol stipulations contradictory to the terms of the writing, agreed to at the same time. There must be evidence of fraud other than that which may be derived from the mere difference in the parol and written terms. We can find no such evidence in the present case, and we are, therefore, of opinion that the learned court below was in error in leaving the question of fraud to the jury.').

Toy 593 Pa. at 63–64 (Saylor, J.)

In summary, Sodexo is unable to successfully distinguish Yocca, or any of the other well-established and binding Pennsylvania Supreme Court precedents. The present case fits doctrinally into the clearly applicable case law barring claims for fraudulent inducement into integrated contracts.

### (2) Gist of the Action Doctrine

To determine whether the fraud claim is barred by the gist of the action doctrine, the Court must first assess the alleged breach of the "social duty imposed by the law of torts" (i.e., the fraud), and then compare that breach to Drexel's contractual obligations under the Management Agreement. See Bruno v. Erie Ins. Co., 106 A.3d 48, 70 (Pa. 2014). If the claim against Drexel for its alleged actions is not "based on" Drexel's "violation of any [] contractual commitments," then it is not barred by the gist of the action doctrine. Id. On the other hand, courts have barred fraud claims: (1) which arise solely from a contract between the parties; (2)

where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim. Downs v. Andrews, No. 13-cv-5788, 2014 WL 7235841, at *9 (E.D. Pa. Dec. 19, 2014), aff'd, 639 F. App'x 816 (3d Cir. 2016) (citing eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002 (collecting cases)).

The Complaint alleges that Drexel fraudulently induced Sodexo into the Management Agreement by falsely representing "Drexel's plans for future student enrollment." Ultimately, Sodexo's growth projections materialized within the final Management Agreement, in a section entitled "Financial Assumptions":

> [Drexel] recognizes that SodexoMAGIC made certain assumptions in preparing the financial package offered in this Agreement and understands that changes to the financial assumptions below may have an adverse economic impact on SodexoMAGIC; in such cases [Drexel] shall work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact.
> . . .
> - Parties agree that the University's growth is a critical factor in calculating the Investments afforded under this Agreement and it has been projected by SodexoMAGIC that this growth will realize an increase of 2% per year in the freshman class year over year.
>   . . .
> - Minimum Catering Net Sales of Three Million Four Hundred Thousand Dollars ($3,400,000) in full Contract Year 1 (July 1, 2015 through June 30, 2016) with projected growth of three percent (3%) annually thereafter.

(Management Agreement, § 9.2).

This bargained-for contractual term specifically referenced Sodexo's projection that growth in the freshman class would be 2% per year, and required Drexel to "work with Sodexo[] in good faith to mutually agree upon solutions" where this projection ultimately proved incorrect

and caused "an adverse economic impact on Sodexo[]." In other words, Sodexo addressed its student growth concerns via the Management Agreement.

Applying the relevant legal tests for the gist of the action doctrine, it cannot be said that Sodexo's fraud claim "arise[s] solely from [the] contract between the parties." eToll, 811 A.2d at 19. Sodexo's fraud claim instead arises out of Drexel's purported representations, which in turn led Sodexo to enter into the contract.

Nevertheless, because Sodexo's fraud claim revolves around representations which were manifested in the express terms of the Management Agreement, Sodexo's fraud claim does "essentially duplicate[] a breach of contract claim." Id. In this case, that claim is expressed as Count II, in which Sodexo alleges Drexel failed to re-negotiate the contract in good faith after projections for student enrollment materially differed from later enrollment numbers.

Moreover, the liability that Sodexo claims in its fraud count "stems from a contract." eToll, 811 A.2d at 19. The liability alleged is derived from the parties' inability to renegotiate the contract, in light of the deviation in student enrollment from that which Sodexo assumed as part of the Management Agreement. Thus, this case also fits within the realm of cases where the "gist of the action" doctrine barred a fraud claim because the liability alleged as part of the fraud claim arose from a contractual obligation and/or breach. See id. (collecting cases).

Regarding the "gist of the action doctrine," Sodexo cites only two cases in its response to Drexel's Motion for Summary Judgment: Bruno v. Erie Ins. Co., 106 A.3d 48 (Pa. 2014) and Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc., 885 F.Supp.2d 767 (E.D. Pa. 2012) (Baylson, J.).

In Bruno, the Pennsylvania Supreme Court held that the trial court erred by dismissing

via demurrer the plaintiff's negligence claim because it was not barred by the gist of the action doctrine. Importantly, the <u>Bruno</u> Court stated a "general governing principle which can be derived from our prior cases":

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

<u>Bruno v. Erie Ins. Co.</u>, 630 Pa. at 112 (internal citations omitted).

The Court's analysis above is consistent with this principle. Sodexo alleges that its damages arose from Drexel's intentional decision to mislead Sodexo about student enrollment projections. In other words, Drexel made no "specific promise to do something." Therefore, "but for the existence of the contract," Drexel owed no underlying "social duty" to disclose its anticipated student enrollment to Sodexo.

In <u>Mendelsohn</u>, this Court denied the defendant's motion to dismiss plaintiff's fraudulent inducement claim, finding that it was not barred by the gist of the action doctrine because the alleged fraud constituted "a breach of duties of honesty imposed by society, not contractual duties." <u>Mendelsohn</u>, 885 F. Supp. 2d at 790 (Baylson, J.). This Court relied on, and cited, <u>Mill Run Assocs. v. Locke Property Co., Inc.</u>, 282 F.Supp.2d 278 (E.D. Pa. 2003), in reaching its decision. <u>Mill Run</u>, which, like <u>Mendelsohn</u>, arose in the context of a motion to dismiss, made clear that its central rationale for allowing both contract and tort claims to proceed was that "alternative pleading is permissible under" the Federal Rules, and "it is unclear at this stage of

litigation whether the 'gist' of the action sounds in contract or tort." <u>Mill Run</u>, 282 F. Supp. 2d at 291.

The procedural posture of <u>Mill Run</u> and <u>Mendelsohn</u> is crucially important. Both cases permitted potentially duplicative claims to go forward because, in the absence of a sufficient factual record to determine whether the tort or contract claim predominated the complaint, they could proceed "in the alternative." Here, after substantial discovery and motion practice, it has become abundantly clear that the thrust of this case revolves around claims grounded in the parties' Management Agreement.

Thus, the Court will also, or alternatively, grant Drexel's Motion for Summary Judgment and dismiss Count I of Sodexo's Complaint.

### (3) Clear and Convincing Evidence of Misrepresentations or Omissions

Drexel asserts that a third ground precludes Sodexo from pursuing its fraudulent inducement claim, namely, that Sodexo has failed to present clear and convincing evidence of any misrepresentations made by Drexel during the time period preceding the execution of the Management Agreement. On this narrow point, the Court disagrees. When viewed in a light most favorable to Sodexo, the evidence it has presented could reasonably be seen as clear and convincing indications that Drexel misrepresented its freshman student enrollment. Specifically, the Court looks to three declarations attached to Sodexo's Statement of Undisputed Facts in Opposition to Drexel's Motion for Summary Judgment (ECF 213, Ex. 70, 71, and 93).

All three declarations, submitted by Sodexo employees Nancy Arnett, Rush Sherman, and Leonard Riccio, stated that,

> during the RFP process and throughout contract negotiations, Rita LaRue

repeatedly represented to me and other representatives of SodexoMAGIC that freshman enrollment would continue to grow over the ten-year life of the contract, or at the very least, enrollment would stay flat for the first three years.

(Ex. 93 ¶ 9; Ex. 70 ¶ 23; Ex. 71 ¶ 23).

Nonetheless, the Court recognizes that its conclusion regarding the issue of "misrepresentations or omissions" is inconsequential to its overall finding as to Count I, which, based on the gist of the action doctrine and the parol evidence rule, must be dismissed.[5]

### (B) Drexel's Motion for Summary Judgment as to Sodexo Count II (Breach of Contract)

Count II of Sodexo's complaint alleges that Drexel breached § 9.2 of the Management Agreement by failing to renegotiate the Management Agreement in good faith. The Agreement provided that, in the event that any of the information on which Sodexo relied in forming a contract with Drexel was inaccurate, then Drexel would renegotiate in good faith to correct the inaccuracy and come to a mutually agreed-upon solution. Sodexo claims, however, that Drexel insisted on commercially unreasonable terms that wouldn't allow Sodexo to make any profit, demonstrating Drexel's lack of good faith. As a result of this alleged breach, Sodexo again alleges that it suffered millions of dollars of damages, including liabilities incurred and lost profits.

### (1) Drexel's Motion and Reply

Drexel argues that Sodexo cannot use the good-faith provision to impose liability on Drexel for provisions that it adamantly rejected. Drexel also asserts that the good-faith provision did not specify any basis by which to measure bad faith, and Sodexo cannot use this provision to force Drexel to terms that are not mutually agreeable. Additionally, Drexel asserts that there is

---

[5] For the same reasons, as discussed *infra*, Drexel's fraudulent inducement claim also fails.

no evidence of bad faith because Drexel made an offer that included various concessions.

### (2) Sodexo's Response

Sodexo asserts that the good-faith provision is enforceable because the term fulfills the meeting of the minds, definitive terms, and consideration requirements. Sodexo argues that Drexel breached the good faith provision during renegotiations by obscuring enrollment numbers, reneging on agreed-upon terms, and pursuing a contract with Sodexo's competitor Aramark during renegotiations. Sodexo argues that bad faith is a question of fact inappropriate for resolution at this stage.

### (3) Analysis

> [Drexel] recognizes that SodexoMAGIC made certain assumptions in preparing the financial package offered in this Agreement and understands that changes to the financial assumptions below may have an adverse economic impact on SodexoMAGIC; in such cases [Drexel] shall work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact.
> . . .
> - [University] growth will realize an increase of 2% per year in the freshman class year over year.
>   . . .
> - Minimum Catering Net Sales of [$3,400,000] in full Contract Year 1 . . . with projected growth of three percent (3%) annually thereafter.

Good faith provisions can be implicit (i.e., parties to a contract must act in good faith, without anything written into the contract) or explicit (e.g., parties to a contract can write that they will act in good faith to renegotiate a resolution if interest rates rise beyond a certain point). Here, Sodexo argues that Section 9.2 operates as an explicit good faith provision, which was triggered when Sodexo's projection—that freshman student enrollment would grow by 2% each year—turned out to be incorrect. However, Sodexo urges the Court to borrow the standard for

44

good faith claims from an implied good faith case, <u>Somers v. Somers</u>, 418 Pa. Super. 131 (1992), in which "there [was] no express term in the contract requiring defendants to act in good faith." <u>Id.</u> at 138. In fact, <u>Somers</u> approvingly cited a prior case, <u>Frickert v. Deiter Bros. Fuel Co., Inc.</u>, 464 Pa. 596 (1975), which made clear that only "[i]n the absence of an express provision [will] the law imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do . . . ." <u>Id.</u> at 603; <u>accord</u> <u>Slater v. Pearle Vision Center, Inc.</u>, 376 Pa. Super. 580, 586 (1988).

Here, the more appropriate cases to look to for guidance involve <u>explicit</u> good faith agreements. As Sodexo's Complaint makes clear, the source of the alleged good faith obligation that it claims it was owed is contained within the Management Agreement itself. (<u>See, e.g.</u>, Compl. ¶ 88 (In the Agreement, Drexel promised that if the information it provided to SodexoMAGIC was inaccurate, Drexel would renegotiate in good faith . . . .")).

A preliminary step in analyzing whether there has been a breach of an explicit good faith agreement is to determine whether the good faith provision at issue is enforceable. Under Pennsylvania law, "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." <u>Channel Home Centers, Div. of Grace Retail Corp. v. Grossman</u>, 795 F.2d 291, 298-299 (3d Cir. 1986). In <u>Channel Home</u>, the case on which Sodexo exclusively relies, the Third Circuit reversed and remanded the District Court, on the ground that the District Court erred in its determination that a letter of intent did not create an enforceable agreement to negotiate in good faith. <u>Id.</u> at 291. Instead, the Third Circuit held that "the letter of intent and the circumstances surrounding its adoption both support[ed] a finding that the parties intended to

be bound by an agreement to negotiate in good faith." <u>Id.</u> at 300.

Subsequent cases in this Circuit and others have addressed the enforceability of "good faith" clauses in more specific language, although various courts have noted the extensive "ambiguity regarding what an agreement to negotiate in good faith must include to be enforceable." <u>Clark Resources, Inc. v. Verizon Bus. Network Servs., Inc.</u>, No. 10-cv-1119, 2011 WL 1627074, at *4 (M.D. Pa. Apr. 29, 2011); <u>accord</u> <u>Venture Assocs. Corp. v. Zenith Data Sys. Corp.</u>, 96 F.3d 275, 278 (7th Cir. 1996) (Posner, J.) ("[T]he notion of a legally enforceable duty to negotiate in good faith toward the formation of a contract rests on somewhat shaky foundations . . . ."). In fact, even though the Third Circuit in <u>Channel Home</u> found that, under Pennsylvania law, there is an action for breach of an agreement to negotiate in good faith, "Pennsylvania courts have not explicitly recognized the cause of action." <u>See</u> <u>Clark Resources</u>, 2011 WL 1627074, at *4 n. 5 (citing <u>Jenkins v. Cnty. of Schuylkill</u>, 441 Pa. Super. 642, 658 (1995 (concluding that if the cause of action existed it would not apply); <u>GMH Assoc., Inc. v. Prudential Realty Grp.</u>, 752 A.2d 889, 903 (Pa. Super. Ct. 2000) (same).

This Court agrees with the determination made in <u>Clark Resources</u>, that "an agreement to negotiate in good faith must include some 'framework' or 'objective criteria' by which a court can measure whether the agreement to negotiate in good faith has been breached." 2011 WL 1627074, at *5; <u>accord</u> <u>Feldman v. Allegheny Int'l, Inc.</u>, 850 F.2d 1217 (7th Cir. 1988) ("'Good faith' is no guide. In a business transaction both sides presumably try to get the best of the deal."); <u>Candid Prods., Inc. v. Int'l Skating Union</u>, 530 F. Supp. 1330, 1337 (S.D.N.Y. 1982) ("On what basis does the Court decide that the [proposal] is so unreasonable so that it can determine that the proposal was contrary to good faith bargaining?").

Sodexo claims that the "good faith provision" at issue here is sufficiently definite because it is "for the purpose of countering negative effects to SodexoMAGIC." (ECF 228, at 11). However, simply because the provision is "triggered" by the negative effects or geared towards remedying them does not mean that mitigating negative effects is a sufficient metric for judging whether Drexel complied with such a provision.

Therefore, because there is no limiting principle against which a fact finder could measure Drexel's "good faith," this Court is unable to recognize the existence of an enforceable agreement to renegotiate in good faith. Count II will be dismissed.[6]

### (C) Motions for Summary Judgment as to Sodexo Count V (Breach of Contract)[7]

Count V of Sodexo's amended complaint alleges that Drexel owes damages arising from its breach of contract, specifically concerning its failure to pay:

(1) the increased board daily rates and failure to accept the reduced commission agreed upon in September 2016;

(2) student labor wages totaling $7,000, pursuant to the Management Agreement;

(3) inventory invoice expenses totaling $76,945.81, pursuant to the Management Agreement;

---

[6] Moreover, even if the good faith provision were enforceable, because Drexel made an offer containing various concessions that would partially mitigate the negative effects of lagging enrollment (see, e.g., Sodexo SOF Ex. 42), Drexel complied with its obligation to "work with SodexoMAGIC in good faith to mutually agree upon solutions in an effort to counter such impact." (Sodexo SOF Ex. 1 § 9.2).

[7] Note that because the Court's discussion of Counts III and IV, Sodexo's claims for unjust enrichment and punitive damages, respectively, is informed by its analysis of the parties' other claims, they will be addressed last.

(4) dining dollars totaling approximately $75,000, pursuant to the Management Agreement;

(5) outstanding contractual interest (i.e., late fees) totaling $407,625.16, pursuant to the Management Agreement, accruing as a result of Drexel failing to pay invoices for dining services, inventory, student labor wages, and dining dollars; and

(6) attorneys' fees and court costs, pursuant to the Management Agreement, the total of which is yet to be determined.

Both parties moved for summary judgment on this cause of action, seeking entry of judgment as a matter of law in their respective favors.

### (1) Briefing with Respect to Drexel's Motion

#### a) Drexel's Motion for Summary Judgment as to Sodexo Count V (Breach of Contract)

Drexel argues that this claim should fail because Sodexo made no demand for relief in relation to this claim. Considering the substance of the claim, Drexel argues that it should still fail because Sodexo cannot prove the requisite meeting of the minds to form the basis of a contract. The alleged contract regarding increased daily board rates and reduced commissions draws from correspondence in September 2016. Drexel asserts that Sodexo's response expressed its intention to terminate for cause effective immediately, without mention of Drexel's initial offer. Drexel argues that this does not constitute acceptance of an offer and cannot form the basis of a contract.

Additionally, Drexel contends that there was no consideration for the alleged contract formed in September 2016. Sodexo continued providing dining services on campus for the remainder of the semester, stating that it did so because the company does not abandon students in the middle of a term. Sodexo, however, was still obligated to provide dining services for 60 days after Drexel's notice of termination under the Management Agreement. Sodexo cannot

claim to have a new contract formed based on the September 2016 correspondence when it was already legally obligated to provide dining services by the terms of the Management Agreement.

### b) Sodexo's Response to Drexel's Motion

Sodexo disagrees with Drexel's characterization of the communication between the two companies in September 2016. Sodexo argues that Drexel's letter, dated September 19, constituted an offer which Sodexo accepted by both its conduct and by its reply letter dated September 26. Sodexo argues that it is irrelevant whether the reply letter stated that Sodexo does not abandon its students. Additionally, Sodexo asserts that it was only required to stay on campus for 60 days after Drexel's termination notice, i.e. only until November 19, 2016, but instead remained on campus until December 10, 2016 in consideration for adjusted daily rates and commissions. Therefore, Sodexo argues, it is entitled to the agree-upon compensation calculated at the increased daily rates and decreased commissions.[8]

### (2) Briefing with Respect to Sodexo's Motion

### a) Sodexo's Motion for Summary Judgment as to Sodexo Count V (Breach of Contract)

Sodexo also seeks summary judgment on Count V (breach of contract). Sodexo asserts that it accepted Drexel's offer of modified terms concerning the increased board rate and the decreased commission in a letter dated September 26, 2016. As to the remaining damages associated with the breach of contract claim, Sodexo asserts that the deposition testimony of Rita LaRue indicates Drexel's admission that it owes these costs.

### b) Drexel's Response

Concerning the daily board rates and reduced commission, Drexel reiterates that Sodexo

---

[8] Drexel's reply brief does not raise any additional points meriting discussion here.

never made a demand for relief on this claim; that no contract was formed because Sodexo rejected Drexel's September 19 offer by Sodexo's September 26 letter and subsequent suit; and that Sodexo provided no consideration for the alleged contract because Sodexo was already obligated to remain on campus for at least 60 days.

Concerning outstanding contractual interest, Drexel argues that Sodexo is not entitled to summary judgment because Sodexo has not produced evidence showing that the alleged late fees are connected to any invoice that Drexel received. Further, Drexel asserts that the invoices were inaccurately calculated using rates other than those agreed upon, and that Sodexo failed to provide the required itemizations and back-up. Drexel asserts that these are disputed issues of material fact that cannot be determined on summary judgment.

Concerning the student labor wages, the inventory invoices, and the dining dollars, Drexel asserts that Sodexo actually owes Drexel for rolled-over dining dollars, and that the amount Drexel allegedly owes is dwarfed by the amount that Sodexo owes Drexel due to Sodexo's own breaches. Thus, Drexel argues that summary judgment cannot be granted to Sodexo on these claims while the net amount owed is yet undetermined.

Concerning attorneys' fees, Drexel asserts that Sodexo is not entitled to attorneys' fees, and certainly not on summary judgment, because section 10.12 of the Management Agreement indicates that such costs may only be recovered in a collections action or when enforcing an indemnity obligation. As this suit falls into neither category, Drexel asserts that Sodexo is not entitled to these fees.[9]

---

[9] Sodexo's reply brief does not raise any additional points meriting discussion here.

### (3) Analysis of Cross-Motions for Summary Judgment as to Sodexo Count V (Breach of Contract)

This breach of contract claim involves alleged breaches of both the Management Agreement and a later alleged agreement formed in September 2016 (the "2016 Agreement").

The Court begins by analyzing the alleged 2016 Agreement.

### a) The Alleged 2016 Agreement

The only two documents that inform the alleged 2016 Agreement are: (1) a letter dated September 19, 2016 from Drexel's legal counsel to Sodexo's legal counsel (ECF 130-1, "Def. 9/19 Letter"); and (2) Sodexo's counsel's response letter on September 26, 2016. (ECF 130-9, "Pla. 9/26 Letter").

The September 19, 2016 letter, sent from Drexel to Sodexo, is excerpted below:

> Drexel's duty is to its student community. To meet this obligation, Drexel must have some reasonable degree of certainty about the future of its food service operations, which are a crucial component of the world-class student experience Drexel works to provide very day. Drexel certainly cannot meet its obligations to its students while laboring under an ongoing threat that its food service provider of over 20 years will cease operations on a mere 10 days' notice, in the middle of a term, based on a fabricated legal theory. Rather, Drexel must attempt to control its future and to create certainty. Accordingly, and regretfully, Drexel hereby exercises its right to termination for convenience under Section 3.1.C, effective December 10, 2016. While Drexel is required to provide only 60 days' notice, it is providing as much notice as possible as part of its continuing good faith towards [Sodexo].

> Given the primary obligation we collectively have to meet the needs of our students and other affected constituencies, especially now that the fall term has just begun, please be clear that Drexel fully expects [Sodexo] to comply with its obligations and reserves its rights to seek injunctive and monetary relief from the courts as it deems necessary. However, in a further extension of good faith, and provided [Sodexo] performs the services under the Agreement

through December 10, 2016, Drexel will pay [Sodexo] an increased daily rate of $22.44 (for the all-inclusive plans) and accept a reduced commission of 7.75% for the period between today's date and December 10, 2016, and will forego any additional capital investment otherwise due under the Agreement.

Sodexo's response letter, sent on September 26, 2016, is excerpted below:

I write regarding Sodexo's July 25, 2016 Notice of Default to Drexel for failure to pay amounts due under the Agreement. As I wrote in my letter dated September 1, 2016, as an act of good faith, Sodexo was willing to further extend the cure period to September 30, 2016. Having now received your letter dated September 19, 2016, in which Drexel purports to exercise its right to terminate the Agreement for convenience, Sodexo intends to end the cure period at the close of business, and hereby exercises its right to terminate the Agreement for Cause effective at the end of today. Because Sodexo does not leave students in mid-term, Sodexo agrees to remain on campus through December 10, 2016.

Under Pennsylvania Law, "[i]t is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 635 Pa. 427, 445 (2016). Drexel disputes that Sodexo has proven the first element above, asserting that no contract was ever formed between the parties in September, 2016.

It is "fundamental contract law" that one cannot be liable for a breach of contract unless one is a party to that contract. Electron Energy Corp. v. Short, 408 Pa. Super. 563, 567 (1991), aff'd, 618 A.2d 395 (1993). A contract is formed when the parties to it (1) reach a mutual understanding, (2) exchange consideration, and (3) create sufficiently definitive terms. Channel Home Centers, Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298–99 (3d Cir. 1986). Drexel disputes the existence of a binding contract, on the grounds that the parties never:

(1) reached a mutual understanding; nor (2) exchanged consideration.  (See Def. MSJ, at 24).

### i.  Meeting of the Minds

Mutual understanding, or a meeting of the minds, is demonstrated by an offer of certain terms and an acceptance of those terms.  Martin v. Pennsylvania Turnpike Comm'n, 381 Pa. 67, 71 (1955).  Certain conduct may constitute an offer and acceptance if "what the parties did pursuant to [the] offer shows conclusively that [the offer] was accepted."  Gum, Inc. v. Felton, 341 Pa. 96, 102 (1941).  Particularly relevant to determine the existence of a contract are any "words or conduct of the offeree" indicating that "the offeree intends not to accept the offer," constituting a rejection of the original offer.  Smaligo v. Fireman's Fund Ins. Co., 432 Pa. 133, 139 (1968).

In its letter dated September 19, Drexel stated that it was terminating the Management Agreement for convenience under section 3.1.C, effective December 10, 2016.  (See Def. 9/19 Letter, at 2).  Drexel noted that, though it was only required to give 60 days' notice, it was providing more as a part of its continuing good faith toward Sodexo.  (Id.).  Drexel clarified that it expects Sodexo to fully comply with its obligations, but went on to say that, "in a further extension of good faith, and provided [Sodexo] performs the services under the Agreement through December 10, 2016, Drexel will pay [Sodexo] an increased daily rate of $22.44 . . . and accept a reduced commission of 7.75% for the period between today's date and December 10, 2016."  (Id.).  Sodexo's response did not conclusively indicate an agreement of those terms, noting that while Drexel "purports" to terminate for convenience, Sodexo exercised its "right to terminate the Agreement for Cause effective at the end of today."  (Pla. 9/26 Letter).  Sodexo stated that it would "[agree] to remain on campus through December 10, 2016" because it "does

not leave students in mid-term." (Id.).  Sodexo's letter mentions nothing of the rate modifications that Drexel offered.  (Id.).  The words of Sodexo's response, particularly the assertion that Sodexo was terminating for cause effective at the end of the day, would indicate that Sodexo did not accept the terms of Drexel's initial offer.  Therefore, this alleged "agreement" lacked the requisite meeting of the minds.

As to whether Sodexo's September 26 letter terminated the existing contract "for cause" while simultaneously accepting Drexel's offer to stay on campus until December 10, the Court notes that Sodexo's letter was transmitted at a time that termination was not yet finalized.  In fact, Sodexo itself wrote that it "intend[s] to end the cure period at the close of business . . . effective at the end of today."  (Pla. 9/26 Letter).  Thus, even under Sodexo's understanding of events, Drexel still had the right to "cure" any alleged deficiencies that created the "Cause" for which Sodexo terminated the Management Agreement.  Had Drexel effectuated a "cure," such as, assuming Sodexo thought it sufficient, by waiving all capital investment requirements, the Management Agreement would have continued.

There was no meeting of the minds as to the terms which Drexel proposed in its September 19 letter for Sodexo's rates and commissions.  Sodexo may not accept some terms, reject others, and then assert that an agreement conclusively existed.

### ii.  Consideration

Further, even if the court were to find that the correspondence indicates a meeting of the minds, the letters exchanged between the parties in September, 2016 do not create a legally enforceable contract because there was no consideration given for the changed terms.  To form a contract, "it is axiomatic that the performance of an act which one party is legally bound to

54

render to the other party is not legal consideration," "for if a person gets nothing in return for his promise but that to which he is already legally entitled, the consideration is unreal." <u>Chatham Communications v. General Press Corp.</u>, 463 Pa. 292, 297 (1975); <u>In re Commonwealth Trust Co. of Pittsburgh</u>, 357 Pa. 349, 354 (1949).

As Drexel noted in its letter, it fully expected Sodexo to fulfill its obligations that were already in place under the Management Agreement. (<u>See</u> Def. 9/19 Letter, at 2; ECF 202-5, "Man. Ag."). The termination-for-convenience provision that Drexel invoked requires 60 days' notice under section 3.1.C of the Management Agreement (<u>See</u> Man. Ag., at 5); Drexel gave over 80 days' notice. (<u>See</u> Def. 9/19 Letter, at 2). Sodexo responded by invoking section 3.1.B, the termination-for-cause provision, based on Drexel's failure to make payments allegedly due under the Management Agreement. (<u>See</u> Pla. 9/26 Letter; Man. Ag., at 4). The termination-for-cause provision requires the non-breaching party to give notice of a failure to make payments and provide a 10-day cure period, which can be extended upon a showing of good faith efforts by the breaching party. (<u>See</u> Man. Ag., at 4). Sodexo alleged that the cure period had already extended beyond 10 days, and that the company was entitled to terminate the Agreement effective that day, September 26, 2016. (<u>See</u> Pla. 9/26 Letter).

If the court had found that the September letters reflected a meeting of the minds, Sodexo would have <u>unequivocally</u> agreed to the terms of Drexel's offer, including the requirements under 3.1.C that the non-terminating party fulfills its obligations under the Agreement until, at the very least, the end of sixty days. <u>See</u> <u>Delaware River Pres. Co. v. Miskin</u>, 923 A.2d 1177, 1181–82 (Pa. Super. 2007) ("If a reply does not unequivocally accept the terms of an offer, then no contract is formed."). Problematically, Sodexo already had a pre-existing legal obligation

under the Agreement to remain on campus for the duration of the Agreement; thus, the services that Sodexo provided from September 19, 2016 until the end of the term cannot constitute consideration to support a new contract.  See In re Commonwealth Trust Co. of Pittsburgh, 357 Pa. at 354.

Sodexo stayed on campus of its own accord, and cannot demand payment under terms beyond those legally agreed-upon in the Management Agreement.  By asserting that the "termination for cause" provision had been triggered, Sodexo failed to accept all terms of Drexel's offer.  Then, when it chose to stay at Drexel through December 10, 2016 (despite, according to its own letter, terminating for cause), Sodexo fulfilled its pre-existing legal obligation to provide dining services to Drexel students.

To the extent Sodexo's Count V relies on the existence of a contract alleged to have been formed through the September 2016 correspondence, it will be dismissed.

The Court now turns to the additional claims in Sodexo Count V that are premised on alleged breaches of the Management Agreement.

### b) Sodexo Count V Continued: Claims Based on the Management Agreement

Sodexo alleges that it is owed, due to Drexel's breaches of the Management Agreement:

    (1) student labor wages totaling $7,000;

    (2) inventory invoice expenses totaling $76,945.81;

    (3) dining dollars totaling approximately $75,000;

    (4) outstanding contractual interest (i.e., late fees) totaling $407,625.16; and

    (5) attorneys' fees and court costs, the total of which is yet to be determined.

With respect to items (1) and (2) above, Drexel has admitted that it owes Sodexo for student labor wages and inventory invoice expenses.  Sodexo will be granted summary judgment

on those portions of Count V. (Drexel Resp. to Sodexo SOF ¶¶ 95-96).

With respect to item (3) above, dining dollars rollover, Sodexo claims that Drexel admitted it owes Sodexo $75,000. Drexel denies this characterization, citing to the relevant deposition testimony. (Id. ¶ 97). Having reviewed the transcript, the Court will not grant summary judgment as to dining dollars, because the testimony was not conclusive on this item.

With respect to item (4) above, there are various disputed facts regarding contractual interest, such that this portion of Count V cannot be resolved at this juncture. (See id. ¶¶ 91-94).

Item (5) pertains to attorneys' fees, and more specifically, § 10.12 of the Management Agreement, which states:

> 10.12 Collection Costs and Costs to Enforce Indemnity Obligations. The parties shall pay each other the reasonable collection expenses, attorneys' fees and court costs incurred in collecting from each other any amount not paid when due, and/or in connection with the enforcement of an indemnity obligation of a party under this Agreement.

(Sodexo SOF Ex. 1)

Drexel contends that the language of § 10.12 only provides for fees in collections actions or when enforcing indemnity obligations. This is contrary to the plain language of the contract. Sodexo's claims, some of which have prevailed at summary judgment as described *supra*, involved expenses "incurred in collecting" amounts that Drexel has admitted it owed Sodexo. Thus, this argument fails.

Drexel also contends that the amount it owes Sodexo is offset by the amount that Sodexo owes Drexel, and therefore, that Drexel should not be liable for attorney's fees. Because this case remains ongoing, and the amounts justifiably owed to each party remain disputed, the Court

will not grant summary judgment as to the attorney's fees provision.

### (D) Drexel's Claims against Sodexo

### (1) Fraudulent Inducement (Drexel Count I)

Count I of Drexel's counterclaim alleges that Sodexo fraudulently induced Drexel into awarding it the dining services contract (which then materialized by way of the Management Agreement).  By presenting a Best and Final Offer indicating that Sodexo could outperform Aramark, Drexel contends that Sodexo misrepresented its ability and intention to actually perform the contract.  Drexel asserts that Sodexo knew of its inability to perform, and entered the contract in order to keep its large account with Drexel, with a hidden plan to renegotiate the terms at a later time by demanding substantial concessions.  Drexel claims damages exceeding $1 million arising from the transition costs from Sodexo to Aramark; the loss of contracted-for investment money due to the breach of the Sodexo contract and Drexel's weakened bargaining power with Aramark; and the costs of litigating this suit.

### a)  Sodexo's Motion

Procedurally, Sodexo asserts that Pennsylvania's two-year statute of limitations governing common law fraud bars Count I.  Even if the court allowed the amended counterclaim to relate back to the original filing date on January 27, 2017, Drexel asserts that the alleged fraud took place and should have been discovered before January 27, 2015.

Substantively, Sodexo first argues that Count I should be dismissed because the alleged

fraud dealt with <u>awarding</u> the dining services contract to Sodexo, which was not itself a contract. Rather, it was a preliminary agreement pending further negotiations, which Sodexo argues cannot support a claim of fraudulent inducement into a contract. Second, Sodexo asserts that Count I fails because Drexel cannot establish the essential elements of fraudulent inducement, including justified reliance and the actual falsity of alleged misrepresentations. Third, Sodexo argues that this claim is barred by the gist of the action doctrine and, fourth, that it is precluded due to Drexel's failure to provide its Statement of Damages in accordance with the requirements set by the court in October 2017.

### b) Drexel's Response

Drexel responds to Sodexo's procedural argument by asserting that both the discovery rule and the doctrine of fraudulent concealment tolled the statute of limitations until April 28, 2017. At that point, Drexel asserts that it learned through Sodexo's initial document production that Sodexo never intended to fulfill the promises in its Initial Proposal or its Best and Final Offer, and that Sodexo knew Drexel's growth plans would not increase the freshmen class until 2017. Additionally, Drexel notes that it had no reason to believe Sodexo was falsely representing its understanding of the student growth plan or that Sodexo had lied at any point in their twenty-year relationship. Drexel asserts that Sodexo's actions to actively conceal its fraudulent misrepresentations preclude Sodexo from invoking the statute of limitations as a defense. Drexel contends there is no basis to conclude as a matter of law that Drexel knew or should have known about Sodexo's fraudulent actions before April 28, 2017, and therefore, Drexel timely filed its amended counterclaim within the statute of limitations.

Drexel further argues that Sodexo has distorted Drexel's claim by focusing on whether

the award of the dining services contract is itself a contract. Drexel contends that it justifiably relied on Sodexo's misrepresentations in awarding Sodexo, as opposed to Aramark, the dining services contract and in negotiating with Sodexo until September, 2016. Drexel claims it was unable to negotiate with Aramark to receive the same terms put forth in Aramark's Initial Proposal and Best and Final Offer, and Drexel seeks to recover the difference between Aramark's Best and Final Offer and the contract that was ultimately executed.

Moreover, Drexel argues that its reliance on Sodexo's false statements was wholly justified. Drexel asserts that, while Sodexo knew of the decreasing freshmen enrollment, Drexel could not have known that Sodexo's representations of misunderstanding were false; thus, it cannot be determined as a matter of law that Drexel's reliance was unjustified.

Drexel also contends that the gist of the action doctrine does not bar its fraud claim because it is not seeking the benefit of commitments made in the Management Agreement. Rather, Drexel seeks to recover reliance damages caused by Sodexo's false claims during the bidding process which induced Drexel to award Sodexo, rather than Aramark, the dining services contract. Further, Drexel claims, the gist of the action doctrine does not bar fraud claims based on false promises to continue a relationship. Drexel asserts that the gist of the action doctrine bars Sodexo's fraud claim, but not Drexel's, because, while Sodexo's claim concerns student growth requirements—which were thoroughly negotiated and explicitly written into the contract—Drexel's claim concerns Sodexo's misrepresentation that it had misunderstood the student growth plan, and is thus based on Sodexo's Initial Proposal and Best and Final Offer.[10]

---

[10] Sodexo's reply brief does not add any new argument meriting discussion here.

### c) Analysis

As discussed *supra*, the parol evidence rule serves as a bar to fraudulent inducement claims in Pennsylvania. Drexel claims that it was harmed by awarding Sodexo the dining services contract, but no firm commitment to Sodexo was made until the Management Agreement materialized. Because the actual harm to Drexel occurred with the signing of the Management Agreement, which as discussed *supra* is fully integrated and unambiguous, any representations made in the Best and Final Offer, or otherwise occurring prior to the Management Agreement, are barred from this Court's consideration.

Moreover, the "gist of the action" doctrine serves as a further bar to Drexel's fraudulent inducement claim. Also discussed *supra* in great detail, the gist of the action doctrine bars fraud claims where the alleged liability "stems from a contract." eToll, 811 A.2d at 19. The liability Drexel alleges is clearly derived from the fact that the parties entered into the Management Agreement on terms that were "worse" for Drexel than the Best and Final Offers made by Sodexo and Aramark. Thus, this case also fits within the realm of cases where the "gist of the action" doctrine barred a fraud claim because the liability alleged as part of the fraud claim arose from a contractual obligation and/or breach. See id. (collecting cases).

Count I of Drexel's counterclaims must be dismissed.

**(E) Breach of Contract (Drexel Count II)**

Count II of Drexel's counterclaim alleges that Sodexo breached various provisions in the Management Agreement by:

(1) Failing to fill the Key Management Positions of Executive Chef and Retail General Manager within the 120-day limit as set by §4.8(D) of the Management Agreement;

(2) Failing to provide $230,000 in monetary support as laid out in §§ 8.8–8.14;

(3) Failing to secure any appearances by Mr. Johnson in Fiscal Year 2015 and only one appearance in Fiscal Year 2016, violating § 8.15; and

(4) Failing to provide Drexel with KPI compliance data, pursuant to §8.17, during the approximately 18 months of the Agreement, which Drexel additionally suspects Sodexo failed to meet entirely.

Each allegation is addressed below.

### (1) Breach of Key Management Positions Clause

The first part of Drexel's breach of contract claim is that Sodexo failed to fill key management positions within the 120-day limit, as required by § 4.8(D) of the Management Agreement, which states:

> For any key management position that remains vacant beyond one hundred and twenty (120) days . . . SodexoMAGIC will pay to [Drexel] an amount equal to the weekly salary of the employee who most-recently occupied such vacant position until the position is filled. For the purposes of this Section, "key management positions" shall refer to the District Manager in Residence, Catering Director, Campus Executive Chef, HR Manager, General Manager of Residential Dining, and General Manager of Retail Operations. In the event that Sodexo is prevented from filling a vacant position by circumstances beyond its control, Sodexo shall provide notice to [Drexel] of the reason and the parties shall meet to discuss the matter in an effect to develop a mutually-agreeable solution.

(Sodexo SOF Ex. 1).

Sodexo asserts that Drexel frustrated Sodexo's ability to fill the Key Management

Positions at issue, and in doing so materially breached the provision themselves.  Therefore, Sodexo argues that Drexel cannot prove damages from this alleged breach because other additional hires meant that the vacancies did not affect operations.

Drexel claims that Sodexo's arguments regarding the Key Management Positions fail for two reasons.  To start, Drexel argues that it did not frustrate Sodexo's ability to fill the positions; it provided feedback but did not have veto power over the positions left empty.  Further, Sodexo's claim regarding the lack of actual damages fails because the breached provision set liquidated damages in advance as a reasonable approximation of the expected loss, which could not be determined at the time the contract was signed.  The fact that Sodexo filled other positions, Drexel argues, should not be considered when determining Sodexo's breach of this particular liquidated-damages provision.

The Court concludes that there remain factual disputes regarding this provision.  While Sodexo is correct that a party to a contract may not frustrate its counterparty's ability to comply with any contractual provision, Benchmark Grp., Inc. v. Penn Tank Lines, Inc., 612 F. Supp. 2d 562, 580 (E.D. Pa. 2009), the extent to which Drexel frustrated Sodexo's ability to fill Key Management Positions remains disputed.[11]

As for Sodexo's argument that Drexel has not proven damages, this argument altogether ignores that the contract contains an explicit liquidated damages provision.  A party need not prove actual damages where the parties agree to a liquidated damages provision, and the sum agreed to is a reasonable approximation of the expected loss.  A.G. Cullen Constr., Inc. v. State

---

[11] Sodexo insists that "a strict reading of this provision would unjustly ignore the facts."  (ECF 229, at 9).  However, the Court notes that its "strict" reading of the contract is what excused Sodexo from its obligation to produce Mr. Johnson twice per year.  See supra.

System of Higher Educ., 898 A.2d 1145, 1162 (Pa. Commw. Ct. 2006).

This portion of Drexel's breach of contract claim must proceed to trial.

### (2) Breach of Monetary Support Provisions

Drexel also alleges that Sodexo failed to provide $230,000 in monetary support, as required by §§ 8.8-8.14, which required Sodexo to pay:

- $5,000 annually on June 30 to support student co-op opportunities (§8.8);
- $50,000 annually on June 30 to sponsor the U.S. Open Squash Championships (§8.9);
- $25,000 annually on June 30 to support the Liberty Scholars Program (§8.10);
- $12,500 annually on June 30 to sponsor the Lindy Institute for Urban Innovation (§8.11);
- $25,000 annually on June 30 to sponsor the Drexel Childcare Center (§8.12);
- $12,500 annually on June 30 to sponsor the Center for the Study of Third Space and Learning Environments (§8.13); and
- $25,000 annually on June 30 to be used as mutually agreed by the parties to establish a SodexoMAGIC Better Tomorrow Speaker Series (§8.14).

(Sodexo SOF Ex. 1).

Sodexo claims that a proposal was made on August 18, 2016 by LaRue to release Sodexo from $155,000 of liability during renegotiations, which Sodexo accepted on August 22, 2016. As a result, Sodexo asserts that Drexel is estopped from raising a breach of contract claim based on Sodexo's failure to pay monetary support.

Drexel argues that while Drexel did in fact offer to relieve Sodexo of liability regarding payments due under sections 8.8–8.14 of the Management Agreement, Sodexo did not accept the offer. Instead, Drexel asserts that Sodexo tried to cherry-pick the provisions it wanted to keep and then reject the rest, which is not allowed under contract law. Sodexo made a counter-offer on August 22, 2016, rejecting Drexel's August 18, 2016 offer. Drexel asserts that it did not

accept the counter-offer, and therefore, Sodexo is not excused from these payments.

Both parties agree that Drexel's August 18, 2016 email constituted an offer, but disagree as to whether Sodexo's email on August 22, 2016 constituted an acceptance. Sodexo's email on August 22, 2016 was written "into" the body of the August 18, 2016 email, such that Sodexo's responses appear immediately after each section of Drexel's email. Therefore, to distinguish between the text written by each party, reproduced in relevant part below, the text of Drexel's August 18, 2016 letter is in **bold font**, while the text of Sodexo's August 22, 2016 letter is in *italic font*.

> **In considering both the Drexel and SodexoMAGIC proformas and in recognition of the changing landscape of higher education, including a national focus on access and affordability for students, Drexel would like to engage in a collaborative process with SodexoMAGIC . . . . We propose reviewing all aspects of the relationship . . . . Our goal would be to have a new, mutually agreeable program in place for the start of Fall 2018.** *SodexoMAGIC is always willing to review all aspects of the dining program. . . .*
>
> 1. **For 2016/17, Drexel would pay a daily rate of $21,45 for the all-inclusive plans . . . .** *SodexoMAGIC proposes for 2016/17 Drexel would pay a daily rate of $24.64 for the all-inclusive plans. . . .*
> 2. **Effective July 1, 2016, the commission rate to Drexel would be reduced from 9.75% to 7.75%.** *SodexoMAGIC agrees*
> 3. **For 2016/17 and 2017/18, Drexel guarantee a minimum of 6,480 all-inclusive [] plans sold . . . .** *Based on the descriptive language, SodexoMAGIC assumes this includes voluntary meal plan purchases . . . is that assumption correct?*
> 4. **Effective Fall 2016-Spring 2017, the hours of operation would be . . . .** *SodexoMAGIC agrees*
> 5. **Drexel would agree to release SodexoMAGIC from the requirement to make the payments totaling $80,000 listed in Sections 8.7 [], 8.10 [], 8.11 [], 8.12 [], 8.13 [], as well as $75,000 in funds that were to have been made available listed in Section 8.8 [] and 8.12 [] for a grand total of $155,000 that were due to Drexel on June 30, 2016 per the Agreement. Drexel also would**

**agree that these payments will be discontinued going forward as of July 1, 2016, with the exception of the payment required per Section 8.9 [], which shall continue to be required in accordance with the terms of the Agreement.** *SodexoMAGIC agrees.*

6. **Drexel would agree to the SodexoMAGIC proposed future capital investment of $1,000,000 for the Handschumacher Dining Center and $250,000 for National Brands Refresh. . . .** *Due to the additional reduction in the number of students and in an effort to keep the rates as low as possible, SodexoMAGIC believes that no more capital is warranted at this time. . . .*

7. **Drexel would extend the length of the Agreement by five (5) years to 2030.** *SodexoMAGIC agrees*

8. **Drexel will not reimburse SodexoMAGIC for any proforma shortfalls in operating results.** *SodexoMAGIC does not agree that this is a proforma shortfall. . . . SodexoMAGIC does expect Drexel to address this issue. SodexoMAGIC also understands that Drexel may have a cash flow issue and is willing to accept any of the following three options: . . .*

(Sodexo SOF Ex. 53).

The question of whether Drexel and Sodexo reached an agreement to release Sodexo from monetary support liability requires a simple contract analysis. In order to form a contract, there must be an offer, acceptance, and consideration or mutual meeting of the minds. Jenkins v. County of Schuylkill, 441 Pa. Super. 642, 648, allocatur denied, 542 Pa. 647 (1995). An alleged acceptance of an offer is not unconditional and, therefore, is not an "acceptance" if it materially alters the terms of the offer. Thomas A. Armbruster, Inc. v. Barron, 341 Pa. Super. 409, 419 (1985) (citing 1 A. Corbin, Corbin on Contracts § 82 (1963)). As such, a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer. First Home Sav. Bank, FSB v. Nernberg, 436 Pa.Super. 377, 389 (1994), allocatur denied, 540 Pa. 620 (1995). Further, it is well established that the acceptance of any offer or counter-offer must be "unconditional and

absolute." O'Brien v. Nationwide Mut. Ins. Co., 455 Pa. Super. 568, 577 (1997).

Sodexo characterizes Drexel's letter as a series of offers, and thus asserts that Sodexo's letter "unconditionally and absolutely accepted many of the offers in Drexel's letter." (ECF 229, at 10). However, Drexel's letter was clearly not a series of distinct offers, but rather a comprehensive set of proposed contractual terms. In other words, although parties may "agree" with one another on specific contractual terms over the course of contract negotiations, there is no overarching "agreement" between the parties. Sodexo may not simply pick and choose specific terms and then claim the parties were bound by them. See Shaer v. Orthopaedic Surgeons of Cent. Pa., Ltd., 938 A.2d 457, 463 (Pa. Super. Ct. 2007).

This portion of Drexel's breach of contract claim must proceed to trial.

### (3) Breach of Provision for Visits from "Magic" Johnson

Drexel also alleges that Sodexo failed to secure appearances from "Magic Johnson," as required by § 8.15 of the Management Agreement, which states:

> 8.15    Campus Visits by Earvin "Magic" Johnson.    Mr. Johnson shall appear on Client's campus (or mutually agreed upon location) as mutually agreed by the parties for up to two (2) 90-minute speaking engagements annually during the term of this Agreement provided that the appearance dates can be mutually agreed upon by the parties.    At the time of the request, Client shall propose a minimum of three (3) dates for consideration and approval subject to Mr. Johnson's availability and provide a proposed agenda for Mr. Johnson's review and consideration.    Any such request shall be made a minimum of twelve (12) weeks in advance.

(Sodexo SOF, Ex. 1).

Sodexo contends that the clause does not require Mr. Johnson to participate in any fixed number of visits per year because the contract specifies that his visits are to be made "up to two"

times per year.  Additionally, Sodexo asserts that the visits were to be set according to mutually agreed upon dates, and Drexel did not claim that Sodexo failed to attempt to arrange appearances.

Drexel asserts that the appearances by Mr. Johnson were prominently featured in Sodexo's Best and Final Offer and were valued by Sodexo at $150,000 per year.  Drexel also contends that Sodexo failed to reciprocate Drexel's substantial efforts to coordinate a campus visit for Mr. Johnson.

The Court finds that, by its plain terms, the provision does not require Mr. Johnson to appear for any speaking engagements whatsoever.  The phrase, "up to two visits" is unambiguous, and it includes the number zero.  See In re Mochel, 470 F.2d 638, 640 (C.C.P.A. 1972) (the phrase "up to" includes zero as the lower limit).  Drexel is a sophisticated counterparty that could easily have changed this contractual term to state that Mr. Johnson was required to appear once or twice per year.  In the absence of such a contractual term, the Court declines to infer it.

This portion of Drexel's breach of contract claim will be dismissed.

### (4) Breach for Failure to Discuss Key Performance Indicators

The final component of Drexel's breach of contract claim is that Sodexo failed to provide Drexel with Key Performance Indicator ("KPI") data, in violation of § 8.17 of the Management Agreement, which states, in relevant part:

> 8.17    Measurable Outcomes.    SodexoMAGIC shall be evaluated using mutually agreed upon Key Performance Indicators (KPIs) set forth in Exhibit J which shall be used to monitor SodexoMAGIC performance and [Drexel] patron satisfaction.  The KPIs shall be reviewed annually by the parties during the Annual Business

68

> Review and the parties may mutually agree on changes in the KPIs.
>
> If during any Contract Year, SodexoMAGIC does not meet an agreed upon KPI, SodexoMAGIC agrees to pay to [Drexel], upon [Drexel's] request, the designated portion of the One Hundred Thousand Dollars ($100,000) for such KPI within thirty (30) days after the parties, acting reasonably and in good faith, mutually determine that the KPI has not been met.

(Sodexo SOF, Ex. 1).

Sodexo asserts that Drexel cannot claim damages for breach of Key Performance Indicators, because Drexel did not actually determine that Sodexo failed to meet these provisions.

Drexel counters that Sodexo's motion for summary judgment should fail because Sodexo withheld the data that Drexel seeks. Drexel argues that Sodexo cannot now benefit from its actions frustrating Drexel's ability to determine whether Sodexo met the KPIs as outlined in the Management Agreement.

The provision in question, quoted above, requires two conditions precedent before Sodexo must pay Drexel for any failure to meet a designated KPI. First, the parties must, while "acting reasonably and in good faith, mutually determine that the KPI has not been met." (Id.). Second, Drexel must make a request for the payment to which it is entitled. Neither of those conditions precedent was fulfilled.

Drexel claims that Sodexo has "unilaterally prevent[ed] the performance of a condition upon which [its] own liability depends," and now attempts to "capitalize on that failure." Benchmark Grp., 612 F. Supp. 2d at 580. However, Drexel overlooks the actual language of the contract, which requires the parties to <u>mutually determine</u> that a KPI has not been met. Thus,

Sodexo did not unilaterally prevent the parties from finding that a KPI had not been met.

It is not sufficient for Drexel to state that Sodexo "never provided this information to Drexel for use at an annual business review and never scheduled such a review so the parties could evaluate" the KPIs. (Drexel SOF Ex. 74). However, the contract does not require that Sodexo provide KPI information or schedule a review. Instead, the contract imposes a requirement that both parties meet to discuss the KPI data. Because this was a mutual obligation, shared equally by Drexel, Drexel cannot assert a breach of contract claim without affirmative evidence that Sodexo actually "prevent[ed] the performance of [the] condition upon which [its] own liability depends." Benchmark Grp., 612 F. Supp. 2d at 580.

This portion of Drexel's breach of contract claim will be dismissed.


### (F) Drexel's Motion for Summary Judgment as to Sodexo Count III (Unjust Enrichment)

The Court now turns to Sodexo's Counts III and IV, having postponed its discussion of both counts in order to inform its discussion using conclusions drawn with respect to the other claims presented in this case.

Count III of Sodexo's complaint alleges that Drexel benefitted from Sodexo's actions— specifically Sodexo's providing dining services below the intended rate and assuming the pension liability of workers—and that Drexel appreciated and retained those benefits. Sodexo argues that it would be inequitable to allow Drexel to retain those benefits without paying their value to Sodexo.

### (1) Parties' Contentions

Drexel asserts that the unjust enrichment claim is foreclosed by the fact that the parties' relationship was established in, and wholly defined by, the contract.

Sodexo admits that it is not permitted to receive double recovery under both the breach of contract and unjust enrichment claims, but asserts that it is permitted to plead in the alternative a claim for unjust enrichment. Sodexo argues that Drexel has benefited from its fraudulent actions and that Sodexo could receive damages under the equitable doctrine of unjust enrichment, through which the law would imply a contract where no express contract exists.

### (2) Analysis

Unjust enrichment claims under Pennsylvania law fall into one of two categories: (1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim. See, e.g., Zafarana v. Pfizer, Inc., 724 F.Supp.2d 545, 561 (E.D.Pa.2010) (dismissing the plaintiff's unjust enrichment claim because (1) the plaintiff did not allege that the defendant refused to provide a service or good after securing a benefit, and (2) the plaintiff did not "plead a separate tort, the damages from which could be supported by a theory of unjust enrichment"); Torchia v. Torchia, 346 Pa.Super. 229, 233 (1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." (citation omitted)). Under either theory, the requisite circumstances exist to establish that the defendant has been "unjustly enriched."

As to the first theory, an unjust enrichment claim based on a theory of quasi-contract may be pled as an alternative to a breach of contract claim. Lugo v. Farmers Pride, Inc., 967 A.2d 963, 970 (Pa. Super. Ct. 2009). A quasi-contract theory is "typically invoked . . . when [the] plaintiff seeks to recover from [the] defendant for a benefit conferred under an unconsummated or void contract." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999). As such, the doctrine does not apply where a written or express contract exists. Lackner v. Glosser, 892 A.2d 21, 34 (Pa. Super. Ct. 2006).

With respect to the second theory, an unjust enrichment claim may be pled as a companion, not an alternative, to a claim of unlawful or improper conduct as defined by law— e.g., a tort claim. "In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." Steamfitters, 171 F.3d at 936. Where the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim. See, e.g. id. at 937 (dismissing the plaintiff's unjust enrichment claim because it was based on the same improper conduct as the plaintiff's traditional tort claims, which were dismissed for lack of proximate cause). In other words, unlike the quasi-contract theory of unjust enrichment, which acts as an equitable stand-in for a failed breach of contract claim, an unjust enrichment claim based on wrongful conduct cannot stand alone as a substitute for the failed tort claim. Zafarana, 724 F.Supp.2d at 561; see also In re Avandia Mktg., Sales, Practices & Prods. Liab. Litig., No. 07-md-01871, 2013 WL 3486907, at *3 (E.D. Pa. July 10, 2013); Tatum v. Takeda Pharm. N. Am., Inc., No. 12-cv-1114, 2012 WL 5182895, at *4 (E.D. Pa. Oct. 19, 2012).

During oral argument, Sodexo claimed that its unjust enrichment claim was based on an agreement allegedly formed through correspondence with Drexel in September 2016 (the aforementioned "2016 Agreement"):

> The Court: Well, are you limiting Count 3 then to that exchange in September of 2016?
>
> Counsel for Sodexo: Yes, Your Honor, because we have an enforceable contract, so --
> . . .
>
> The Court: Well, wait a minute. . . . I thought you were – your Count 3 was in part alleging that if the Court were to find that there was no breach, that is that the gist of the action doctrine barred your tort claim and there was no breach under Count 2, that you were relying on an unjust enrichment theory for the same damages that you would have been able to – that you allege were due under Counts 1 or 2. Am I not right?
>
> Counsel for Sodexo: I don't believe so, Your Honor, --

(ECF 243, at 39-40).

Despite Sodexo's representations at oral argument, Sodexo unmistakably bases Count III of its complaint, as pled, on Drexel's allegedly fraudulent statements (i.e., not on any contract formed in September, 2016). (See Compl. ¶ 97 ("Relying on Drexel's statements about its student population, SodexoMAGIC agreed to assume certain pension liabilities of workers on Drexel's campus, and agreed to provide campus dining services far below the intended rate.") (emphasis added)). Nowhere in Sodexo's complaint is there any allegation that a quasi-contract was formed, nor is there any allegation that Drexel was unjustly enriched by receiving campus dining services with commissions and rates that had been promised in any correspondence in September, 2016. Instead, all of Sodexo's alleged payments were in reliance "on Drexel's

statements about its student population." (Id.).[12]  There is no doubt that Sodexo's claim, as pled, is grounded in tort.

In this case, because Sodexo's Count I, clearly a tort claim, will be dismissed for the reasons stated *supra*, Sodexo's claim for unjust enrichment cannot proceed as pendant to a tort theory.  And because Sodexo did not plead any unjust enrichment claim based on the formation of an implied contract (i.e., a quasi-contract), Sodexo may not pivot to such a theory at this stage in the litigation.  See, e.g., Soo Line R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997) (noting "the well-settled rule that a party is bound by what it states in its pleadings).

Nonetheless, assuming Sodexo had properly raised an implied contract theory of unjust enrichment, Sodexo has not shown any genuine issue of material fact as to whether Drexel has retained benefits under circumstances that are inequitable.  See Styer v. Hugo, 422 Pa. Super. 262, 268 ("[T]he most significant element of the doctrine is whether the enrichment of the defendant is unjust."); see also Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999).

As detailed *supra* during the Court's discussion of Count V, and undisputed by the parties, Sodexo and Drexel formed a contract through the Management Agreement.  Later, after the decline in student enrollment at Drexel was fully recognized by both parties, Drexel made a letter offer to Sodexo to provide a reduced commission and greater fees than provided for in the Management Agreement.  (Sodexo Resp. to Drexel SOF ¶ 124)  Sodexo's response reflected no meeting of the minds (and no consideration), and thus no contract was formed.  (See *supra*, Count V).  Although it is undisputed that Sodexo subsequently provided dining services to

---

[12] By Sodexo's own admission, Sodexo was aware long before September, 2016, of the decline in Drexel's student enrollment for the 2016-2017 academic year.  (See, e.g., Drexel SOF Ex. 3-20).

Drexel and its students through December 10, 2016 (Drexel Resp. to Sodexo SOF ¶ 90), thereby providing Drexel a benefit, even in the absence of any legally effective novation or quasi-contract, the undisputed facts have shown that Drexel paid for Sodexo's services at the commission and rate amounts set forth in the Management Agreement. See Wilson Area Sch. Dist. v. Skepton, 586 Pa. 513, 520 (2006) "([I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract. . . .").

There is no inequity associated with this set of facts, especially in light of Sodexo's full opportunity to accept, but decision to reject, Drexel's proposal for the reduced commissions and increased rates that Sodexo now seeks through this litigation.

Count III will be dismissed.

### (G) Drexel's Motion for Summary Judgment as to Sodexo Count IV (Punitive Damages)

Sodexo alleges in Count IV of its Complaint that Drexel should be assessed punitive damages in order to deter others from replicating Drexel's "outrageous conduct" in the future.

Under Pennsylvania law, punitive damages cannot be claimed independently, but are a "mere incident to [another] cause of action." See Feingold v. Southeastern Pennsylvania Transp. Authority, 512 Pa. 567, 579 (1986). Pennsylvania law also dictates that "punitive damages are not recoverable in an action solely based upon breach of contract." Nicholas v. Pennsylvania

State Univ., 227 F.3d 133, 147 (3d Cir. 2000). Instead, "[p]unitive damages are collateral or ancillary to a tort claim." Baker v. Pennsylvania Nat. Mut. Cas. Ins. Co., 522 Pa. 80, 84 (1989). Sodexo's only tort claim against Drexel is Count I, for fraudulent inducement, which this Court dismisses for the reasons set forth *supra*. Therefore, Count IV must also be dismissed. See id.

## V. Conclusion

Pursuant to the Court's discussion above, Drexel's Motion to Strike (ECF 208) will be GRANTED IN PART AND DENIED IN PART, Sodexo's Motion to Strike (ECF 221) will be DENIED, Drexel's Motion for Summary Judgment (ECF 220) will be GRANTED IN PART AND DENIED IN PART, and Sodexo's Motion for Summary Judgment (ECF 200, 204) will be GRANTED IN PART AND DENIED IN PART.

As a result, and as detailed above, Counts I, II, III, and IV of Sodexo's Complaint will be DISMISSED, Count V of Sodexo's Supplemental Complaint will be PARTIALLY DISMISSED, Count I of Drexel's Counterclaims will be DISMISSED, and Count II of Drexel's Counterclaims will be PARTIALLY DISMISSED.

An appropriate Order follows.